14 CV 9075

JUDGE OETKEN

Joshua E. Abraham, Esq.  (JA1818)
230 Park Avenue, Suite 850
New York, New York 10167
T: (646) 245-6710
F: (646) 201-4454
josh@joshabrahamlaw.com

*Attorney for Plaintiff*
*LifeTree Trading PTE., LTD.*



RECEIVED
NOV 1 4 2014
U.S.D.C. S.D. N.Y.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

LIFETREE TRADING PTE., LTD.,

                   Plaintiff,

     -against-

WASHAKIE RENEWABLE ENERGY, LLC,
ISAIAH KINGSTON, JACOB KINGSTON,
RACHEL KINGSTON, and WASHAKIE
ENTITY # 1, WASHAKIE ENTITY # 2,
WASHAKIE ENTITY # 3, WASHAKIE ENTITY
# 4, and WASHAKIE ENTITY # 5, the last five
names being entities currently unknown to plaintiff
but believed to have entered into a contract with,
and/or perpetrated a fraud against, plaintiff,

                   Defendants.

-----------------------------------------------------------------x

Case No.: _____

**JURY TRIAL DEMANDED**

## <u>COMPLAINT</u>

    Plaintiff LifeTree Trading PTE., LTD. ("LifeTree"), by and through its undersigned

counsel, as and for its complaint against defendants Washakie Renewable Energy, LLC

("Washakie"), Isaiah Kingston, Jacob Kingston, Rachel Kingston, and five Washakie-affiliated

entities currently unknown to LifeTree, alleges and states as follows:

## NATURE OF THE ACTION

1.      The defendants in this action are either insolvent or operate their business without any regard for contractual obligations and the rule of law.

2.      This diversity action arises from the defendants' breach and anticipated breach of, and fraud related to, a sales contract, dated May 6, 2014 (the "<u>Contract</u>"), pursuant to which Washakie agreed to purchase from LifeTree 90,000 metric tons of biodiesel fuel (in three equal shipments of 30,000 metric tons) at an aggregate purchase price of over $90 Million.

3.      Prior to entering into the Contract, Jacob Kingston, Isaiah Kingston, and Rachel Kingston – executives of Washakie – each expressly stated to LifeTree's representatives that Washakie was solvent and had the financial means to quickly arrange for a letter of credit to secure Washakie's purchase obligations under the Contract.  This representation was critical to LifeTree because without it, LifeTree could not risk purchasing tens of millions of dollars of biodiesel fuel for its own account for subsequent delivery to Washakie under the Contract.

4.      Relying on this representation, the parties entered into the Contract.  LifeTree then immediately took steps to honor its obligations under the Contract: it purchased 30,000 metric tons of biofuel – over $30 million worth of product – due to be delivered to Washakie in June 2014 (the "<u>June Shipment</u>"), the first shipment called for in the Contract.

5.      Washakie, in turn, was required under the Contract to "promptly" open a letter of credit ("<u>LC</u>") to secure the payment of the purchase price for the June Shipment.  But Washakie never opened the LC.  Nor did it take delivery of, or pay for, the June Shipment.  Instead, the defendants caused and induced LifeTree to hold the June Shipment and to incur massive costs with retaining the biodiesel meant for delivery to Washakie.  As the market price for biofuels

turned sharply lower, and the weeks turned into months, the defendants continued to falsely assure LifeTree that Washakie would abide by its contractual commitments and obligations.

6.      As set forth below, the defendants (1) fraudulently induced LifeTree to enter into the Contract by misrepresenting its creditworthiness and financial wherewithal – prompting LifeTree to acquire $30 Million worth of goods for immediate delivery – and then blatantly strung LifeTree along for months, causing LifeTree to incur additional "swapping," "carrying" and other significant costs; and (2) willfully breached the Contract, causing LifeTree to incur significant damages and devastating LifeTree's business operations.  Accordingly, by this action, LifeTree seeks from the defendants compensatory damages exceeding $61 million, and punitive damages exceeding $180 million for their tortious and unlawful conduct, on the grounds stated below.

## PARTIES

7.      Plaintiff LifeTree is a trader and supplier of biofuels and biofuel feedstocks. LifeTree is a private company limited by shares (Pte. Ltd.), incorporated in Singapore, with its primary place of business in Singapore.  LifeTree also maintains a branch office at 144 Route 59, Suite #1, Suffern, New York.

8.      Upon information and belief, defendant Washakie is a producer of biodiesel fuel. Washakie is a Utah limited liability company with its principal place of business at 3950 South 700 East, Suite #100, Salt Lake City, Utah.

9.      Upon information and belief, defendant Isaiah Kingston ("Isaiah") is the Chief Financial Officer of Washakie and is a resident of Utah.

10.     Upon information and belief, defendant Jacob Kingston ("Jacob") is the Chief Executive Officer of Washakie and is a resident of Utah.

3

11.    Upon information and belief, defendant Rachel Kingston ("Rachel") is an officer at Washakie with the title of "Project Manager" and is a resident of Utah.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), based on complete diversity of citizenship and the amount in controversy, which exceeds the sum or value of $75,000, exclusive of interest and costs.

13.    The parties have agreed in the Contract to submit to the Court's jurisdiction for purposes of resolving this dispute and that New York law shall apply in this action.

## STATEMENT OF FACTS

### Prior Relationship

14.    Washakie and LifeTree have previously entered into and performed under contracts for the purchase and sale of biodiesel fuel.

15.    All biodiesel products previously delivered by LifeTree to Washakie have met Washakie's material specifications, and Washakie has paid for past biodiesel shipments per the terms of the parties' previous agreements.  Washakie has previously opened LCs to guaranty payment for shipments of biofuel by LifeTree.

### The Contract

16.    In early 2014, Washakie sought out an agreement with LifeTree for the purchase of a large shipment of Argentine Soy Methyl Ester ("SME"), a form of biodiesel fuel.  As Rachel wrote to William Rooz ("William"), LifeTree's Chief Executive Officer, on February 15, 2014: "We are very interested in purchasing *the full production* of biodiesel of the plants in Argentina. When... can [we] discuss the details?"  (Emphasis added.)

4

17.     The parties subsequently entered into negotiations.  During these discussions, Jacob, Isaiah, and Rachel each expressly stated to William that Washakie was solvent and creditworthy, and had the ability to quickly arrange for a LC to secure its multi-million dollar purchase obligations under a prospective contract.  In light of past dealings among the parties in which Washakie did, in fact, arrange for LCs in connection with biofuel transactions, LifeTree relied on these representations and did not suspect that they would turn out to be patently false.

18.     A deal was concluded in May when LifeTree and Washakie signed and exchanged copies of the Contract.  The Contract is dated May 6, 2014, but was executed and delivered on or about May 14, 2014.

19.     The Contract consists of an underlying agreement that incorporates by reference a form contract – Form 51 of the Federation of Oils, Seeds and Fats Associations Limited (referred to herein as "FOSFA 51") – to the extent the provisions of FOSFA 51 do not conflict with those stated in the underlying Contract. (FOSFA is the leading trade organization in the biofuel industry, and its form contracts are routinely used or incorporated into agreements between parties engaging in the purchase and sale of biofuel products.)  A true and correct copy of the Contract, including FOSFA 51, is appended hereto as **Exhibit A**.

20.     The Contract was signed by Isaiah on behalf of "Washakie Renewable Energy Inc."  Upon information and belief, there is no such corporation.  Instead, it was the intent of the parties that Washakie (*i.e.*, "Washakie Renewable Energy, LLC") would be obligated under the Contract.  Should Washakie not be found to be bound by the agreement, LifeTree hereby seeks recoveries from Isaiah personally (who actually signed the Contract), or from other Washakie-related entities currently unknown to plaintiff but believed to have entered into the Contract with LifeTree.

21.     The Contract requires Washakie to purchase from LifeTree, and LifeTree to sell to Washakie, 90,000 tons of SME biofuel in three equal shipments of "30,000 metric tons per shipment. Shipments to be 1 each in June 2014, August/September 2014 and last quarter 2014" at a purchase price of $1,015 per ton.

22.     The purchase price of SME under the Contract was locked-in because Jacob determined that the price should be fixed, rather than having it based on the market price of SME (which is linked to the index price of heating oil).  Thus, the aggregate purchase price under the Contract is $91,350,000, and the purchase price for each of the three shipments is $30,450,000 per shipment.

23.     Following its execution, prompt action was required by both parties to ensure compliance with the terms of the Contract.  In order for the June Shipment of 30,000 tons of SME to be delivered to Washakie in a timely manner, LifeTree was itself required to purchase, secure and package the SME in Argentina, and then ship the SME to Washakie in the United States for delivery in June, all within weeks of the May 14, 2014 signing of the Contract.  The defendants were well aware, even before the Contract was signed, of the need for LifeTree to "line up the vessel and the rest of the logistics as soon as possible in order to get the shipment out in time."

24.     Rapid action by Washakie was also necessary.  The Contract requires that Washakie's "payments shall be guaranteed by an irrevocable standby letter of credit to be opened *promptly* and valid through February 28, 2015, covering [the] full amount of a 30,000 [metric ton] shipment plus 5% and to be replenished immediately, if it is drawn upon or if contract is extended." (Emphasis added.)

25.     Indeed, the day after the Contract was signed, the defendants led LifeTree to believe that the letter of credit was, in fact, in the process of being opened.  As Rachel wrote to William on May 15, 2014: "Can you give us your banking details so [our] bank in Turkey can open the LC?  We will also get you the Turkish banking details."

26.     Upon information and belief, Washakie does not have – nor did it ever have – a working relationship with a Turkish bank able to issue LCs for international transactions.

27.     In reliance on the Contract, and the defendants' inducements and assurances, LifeTree did its part to honor the terms of the Contract, including purchasing, securing and preparing the June Shipment of 30,000 tons of SME for timely delivery to Washakie.  As William, LifeTree's CEO, wrote to the defendants on June 18, 2014: "Please understand that when I signed the contract, I took it very seriously and made 100% certain that I had the material locked in and that I would be able to perform."

28.     In contrast, Washakie has willfully breached the Contract, without any valid excuse or legal justification, by (i) failing to promptly arrange for a letter of credit to guarantee its payment obligations pursuant to the Contract, (ii) failing to take delivery of the SME it purchased pursuant to the Contract, and (iii) failing to pay for the SME it purchased pursuant to the Contract.

**The Defendants Deceive LifeTree and Devastate its Operations**

29.     Extensive correspondence among the parties confirms the defendants were well aware of Washakie's contractual obligations to open the LC, take delivery of the SME, and pay for the products.  For example, several weeks after signing the Contract, on June 9, 2014, Jacob (Washakie's CEO) wrote to William that he was seeking to "resolve" the matter of obtaining a LC as required by the Contract.  In that email, Jacob promised William that he would "keep

[William] updated." This, however, was Jacob's last communication to LifeTree despite repeated and urgent pleas, and extensive travel by LifeTree representatives who attempted without success to meet personally with Jacob in an effort to resolve Washakie's noncompliance with the Contract.

30.    Although Jacob went silent, his surrogates at Washakie continued to mislead LifeTree, inducing LifeTree to incur substantial costs under the illusion that Washakie would ultimately honor the Contract. For example, Rachel, in a June 17, 2014 email, informed William that Washakie would eventually – but not quite "yet" – honor the Contract. On June 19, 2014, Rachel advised William that "[Washakie] will take [the June Shipment] at a later date." And one month later, Rachel continued to delay, emailing William in mid-June 2014 that "we will have to postpone" complying with the terms of the Contract until later in the year. Thus, the defendants were well aware of their obligations under the Contract – they simply failed to perform, without any excuse or justification whatsoever.

31.    As the defendants were stringing LifeTree along, they directly caused and induced LifeTree to incur increasing and significant expenses, with no regard whatsoever for the damages that LifeTree was suffering. Throughout the breach – since early June 2014 – the defendants were continuously apprised of the damage they were causing, including LifeTree's "mounting" costs and "accumulating losses."

32.    The defendants were also informed, at an early stage, of the devastation that they were inflicting upon LifeTree's business reputation, including the effect on LifeTree's business relationships: As William wrote to the defendants, "[the] bank, the supplier, the shipowner… they are all over me."

8

33.     As the defendants were continuing to lead LifeTree on, the price of SME plunged. LifeTree was thus forced to engage, at the defendants' behest, in costly "swaps" of the cargo -- i.e., the original cargo was exchanged at the market price on the date of the swap for new cargo held for Washakie's benefit (a process which has since occurred on multiple occasions). These swaps had the effect of buying time to allow Washakie to honor the Contract. But with each swap, LifeTree incurred, and continues to incur, substantial costs and losses on the SME it is holding for Washakie's benefit.

34.     Significantly, the defendants were informed that with each swap LifeTree would have "to pay a serious penalty in regards to shipping/storing and redirecting." Nevertheless, on June 19, 2014, Rachel instructed William to "[s]wap out the July [i.e., June] shipment, and we will take it at a later date." The defendants were informed that the first swap cost "a few hundred thousand dollars," and they were continuously apprised of the ongoing increasing swapping costs. By July 10, 2014, the SME cargo secured by LifeTree for Washakie's benefit had been swapped three times, but Washakie continued to induce LifeTree into believing that it would abide by its contractual commitments.

35.     During this period (June 2014 through October 2014), LifeTree conveyed repeatedly to Washakie the "urgency" and desperation of the situation. LifeTree also reiteratively "implored" the defendants by email to "clarify" their position and to help "mitigate" LifeTree's mounting damages. All such requests were ignored. At one point, on August 7, 2014, when LifeTree was stuck holding 7,000 tons of the SME on a swap that was done at Washakie's behest, William pleaded with Jacob and Rachel by email to help "plug the bleeding" and to stem LifeTree's ongoing swapping costs by taking in just 7,000 of the 30,000 tons of SME that LifeTree had been holding for Washakie. (In context, 7,000 tons would have

constituted less than 25% of the June Shipment and less than 10% of the goods that Washakie was required to purchase from LifeTree under the Contract.)  This request was ignored as well.

36.    Finally, in desperation, William wrote to the defendants in early October, "I will pretty much do anything" in order "to accommodate you."  William offered the defendants the following options: (1) "reduce the amount of material you take in to about 20,000 MT [metric tons] as opposed to 30,000 MT;" (2) "reduce the price;" (3) LifeTree would "finance up to nearly 90% of the cargo and [Washakie] can draw the material based on a schedule that you would design;" (4) LifeTree would "sell the material at a loss" and then would be "compensate[d] for damages;" and (5) "anything, within reason, to make this happen."  The defendants refused to accept – much less, discuss seriously – any of these options.  In fact, since October 7, 2014, Washakie had refused to communicate with LifeTree altogether.

37.    In a letter dated October 20, 2014, as well as in a follow-up email on October 31, 2014, LifeTree's corporate counsel informed the defendants that LifeTree would finally have no choice but to bring this action.

38.    In sum, Washakie has refused to honor any aspect of the Contract.  It has (i) failed to open an LC, (ii) refused to take delivery of the June Shipment, as well as the other two shipments contemplated in the Contract, and (iii) refused to pay for the products purchased pursuant to the Contract.  Given Washakie's almost instant breach of the Contract and its failure to engage in any serious effort to perform or mitigate LifeTree's damages, it is apparent that the defendants *ab initio* never intended to honor the Contract.   Nevertheless, the defendants continued to induce LifeTree to hold onto and swap a significant quantity of SME which Washakie never intended to purchase, causing LifeTree to incur substantial "carrying" and "swapping" costs.

39.     Indeed, throughout the entire period since the execution of the Contract to date – during which the defendants have delayed performance, obfuscated, provided excuses, prevaricated and ultimately engaged in the tactic of complete silence – they have not denied their obligations under the Contract or made any claims whatsoever that would provide a basis for them not to fulfill the terms of the Contract.

40.     Furthermore, upon information and belief, Washakie locked in the purchase price on the Contract solely to speculate on the SME market, setting LifeTree up to take the fall if the price of SME declined below the Contract price.   This is apparent from the fact that, as discussed, the defendants' breach of the Contract was *immediate*.   Thus, LifeTree was induced to take an immediate position on the SME materials, and then was left to hold onto the products as the defendants speculated on the market.   The defendants made the wrongful and deplorable decision to treat the Contract as an "option," rather than a legally binding obligation.   As the price of SME falls, the defendants apparently continue to believe that they can walk away from the Contract, and immunize themselves from losses.   Accordingly, Washakie must be held to account for its willful breach of the Contract and the significant resulting damages to LifeTree.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach and Anticipated Breach of Contract against
**Washakie, Isaiah, and/or other Washakie-related entities currently unknown to LifeTree)**

41.     LifeTree incorporates by reference paragraphs 1-40, above.

42.     LifeTree and Washakie are parties to the Contract.

43.     In the alternative, LifeTree on the one hand, and Isaiah and/or other Washakie-affiliated entities currently unknown to LifeTree on the other hand, are parties to the Contract.

11

44.     The Contract requires Washakie to purchase from LifeTree 90,000 tons of SME in three equal shipments of "30,000 metric tons per shipment.  Shipments to be 1 each in June 2014, August/September 2014 and last quarter 2014."

45.     The Contract sets a purchase price of $1,015.00 per metric ton for each of the three shipments identified in the Contract.

46.     The Contract also requires that Washakie's "payments shall be guaranteed by an irrevocable stand by letter of credit to be opened promptly and valid through February 28, 2015, covering the full amount of a 30,000 [metric ton] shipment plus 5% and to be replenished immediately, if it is drawn upon or if contract is extended."

47.     LifeTree has performed all of its obligations under the Contract.

48.     LifeTree purchased 30,000 metric tons of SME in connection with the June Shipment.

49.     Washakie, however, has breached the Contract without any valid excuse or legal justification.  To date, Washakie has (i) failed to arrange for a LC to guarantee its payment obligations in connection with the June 2014 Shipment, (ii) failed to take delivery of the June 2014 Shipment, (iii) failed to make payment for the June 2014 Shipment, and (iv) has repudiated its obligations to take delivery of, and pay for, two additional SME shipments called for under the Contract.

50.     LifeTree has done everything in its power to persuade Washakie to perform under the Contract.  LifeTree also offered to engage in discussions with Washakie in an attempt to mitigate its own damages.  Washakie, however, ignored LifeTree's good faith overtures and declined to engage in any meaningful discussions.

51.     LifeTree is entitled to significant damages for Washakie's willful and blatant breach and anticipated breach of the Contract. The Contract – which incorporates FOSFA 51 – delineates the damages Washakie must pay for its breach and non-performance.

52.     *Lost Profits*: the Contract provides that damages, in the event of default, shall be measured by "the difference between the contract price and the actual market or estimated market price" of the SME products that were sold.  (Exhibit A, FOFSA 51 § 29.)  The foregoing is consistent with the measure of damages mandated under New York law for non-acceptance of goods by a contractually-obligated purchaser. (*See* N.Y. Uniform Commercial Code § 2-708.)

53.     *Incidental Costs*: the Contract also requires broadly that the non-performing party pay "all costs of *whatever nature*" incurred by the seller as a result of the non-performing party's breach of the Contract. (*See* Exhibit A, FOFSA 51 § 14; emphasis added.)  LifeTree acquired 30,000 tons of SME pursuant to the Contract, and then was induced to hold onto it and to incur significant costs at the direction of Washakie.  The resulting incidental damages incurred by LifeTree include, without limitation, the following costs: (i) carrying and storage costs LifeTree is obligated to pay to its suppliers; (ii) hedging costs incurred in reliance on Washakie's anticipated performance under the Contract; and (iii) costs incurred through the "swapping" of the June Shipment, which was done at the defendants' explicit request.  Recovery of such damages from Washakie is also mandated by New York's Uniform Commercial Code. (*See* N.Y. U.C.C. § 2-710.)  In addition, LifeTree has suffered severe reputational harm in connection with its bank, shipper and, most importantly, suppliers in Argentina and elsewhere as a result of the defendants' deceptions regarding the June Shipment.  LifeTree's cost of doing business in Argentina and elsewhere has risen significantly as a direct result of Washakie's breach.

54.   *Carrying Charges*: the Contract also provides, "[s]hould Buyer not have taken delivery within the delivery period specified in the contract," then it must pay to the seller "Carrying Charges," calculated as follows: (a) "$0.50 per metric ton per day for the first fifteen days" following the last day of the delivery period; and (b) "$0.75 per metric ton per day" thereafter. (Exhibit A, FOFSA 51 § 15.) These Carrying Charges are due for the entire period that performance on the Contract is delayed or extended. (Exhibit A, FOFSA 51 § 14). The defendants failed to take delivery of the SME biofuel within the delivery periods specified in the Contract – 30,000 metric tons in June 2014, and 30,000 metric tons in September 2014 (and it is anticipated that Washakie will also fail to take delivery of 30,000 metric tons in the last quarter of 2014). Thus, Washakie is required to pay to LifeTree the specified "Carrying Charges" on the shipments called for in the contract.

55.   *Interest Payments*: the Contract provides that "[i]n case of late payment of documents or monies otherwise due," the buyer must also pay to LifeTree "interest" at the rate of 2.5% over the "New York prime rate," computed from the day after "payment was due up to the day payment is received." (Exhibit A, FOFSA 51 § 19.)

56.   Based on the foregoing, LifeTree has been damaged in an amount to be determined at trial, but expected to exceed $61 million.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Fraudulent Inducement against Washakie, Jacob, Isaiah and Rachel)

57.   LifeTree incorporates by reference paragraphs 1-50, above.

58.   Prior to entering into the Contract, Jacob, Isaiah, Rachel, and Washakie misrepresented to William and other LifeTree representatives that Washakie was financially

stable and otherwise had the financial ability to promptly arrange for a LC to secure its payment obligations under the prospective contract.

59.     This representation was false.  Washakie did not have the resources to guaranty payment through a LC for the amount of SME it purportedly intended to purchase from LifeTree.

60.     This representation was made to induce LifeTree into entering the Contract.

61.     The defendants continued to mislead LifeTree after the Contract was signed, claiming falsely that they were arranging a LC through a bank in Turkey, speculating on the market at LifeTree's expense, duping LifeTree on multiple and various occasions into believing the defendants would actually perform under the Contract, and directly inducing LifeTree to incur significant costs while never intending to perform on the Contract.

62.     Had the defendants disclosed that Washakie was severely lacking in financial resources and would not be able to arrange for a LC, LifeTree would never have entered into the Contract with Washakie and would not have incurred ongoing costs and expenses in the belief that Washakie would eventually honor the Contract.

63.     These fraudulent misrepresentations have thus resulted in damages to LifeTree in an amount to be determined at trial, but expected to exceed $61 million.

64.     In addition, Jacob, Isaiah, Rachel and Washakie's conduct, described above, is morally reprehensible and of such wanton dishonesty as to imply a criminal indifference to civil obligations.  Accordingly, LifeTree is entitled to punitive damages for this tortious conduct in an amount to be determined at trial, but exceeding $180 million.

## JURY DEMAND

65.     LifeTree demands a jury for the trial of this action.

**WHEREFORE**, Plaintiff requests judgment against Defendants as follows:

a)   For its First Cause of Action, compensatory damages in an amount to be determined at trial, but exceeding $61 million, or in the alternative, specific performance;

b)   For its Second Cause of Action, compensatory damages in an amount to be determined at trial, but exceeding $61 million; and punitive damages in an amount to be determined at trial, but exceeding $180 million;

c)   Statutory and contractual interest;

d)   Attorney's fees, litigation expenses, costs and disbursements of this action; and

e)   Such other and further relief as this Court deems just and proper.

Dated: New York, New York
      November 14, 2014

Respectfully submitted,

JOSHUA E. ABRAHAM, ESQ.

230 Park Avenue, Suite 850
New York, New York 10169
Tel: (646) 245-6710
Fax: (646) 201-4454
josh@joshabrahamlaw.com

*Attorney for Plaintiff LifeTree Trading PTE., LTD.*

16

# Exhibit A

# LIFETREE TRADING PTE LTD
# 111 North Bridge Road
# SINGAPORE

## Tel-67200950   Fax-67200951

**MAY 6, 2014**

SELLER'S BIODIESEL SALES CONTRACT #1095-S
BUYER'S CONTRACT #

SELLERS:  LIFE TREE TRADING PTE LTD

BUYERS:   WASHAKIE RENEWABLE ENERGY INC,

P.O. BOX 192, PLYMOUTH, UTAH  84330

GOODS:  ARGENTINE SOY METHYL ESTER (SME)

IN BULK

QUALITY:  AS PER NORM EN 14214 SPECS WITH

THE FOLLOWING EXCEPTIONS:

IODINE VALUE MAX 135

CETANE MIN 47

OR, IN BUYER'S OPTION, AS PER

ASTM 6751/SA WITH THE

FOLLOWING EXCEPTIONS:

-IODINE VALUE MAX 135

-CETANE MIN 47

IN EITHER CASE C E R Fl MAX 10 /D/ CENTIGRADES

QUANTITY:   APPROXIMATELY 90,000 METRIC TONS.

SHIPMENTS:   APPROXIMATLEY 30,000 METRIC TONS PER SHIPMENT.
SHIPMENTS TO BE 1 EACH IN JUNE 2014, AUGUST/SEPTEMBER
2014 AND LAST QUARTER 2014.

PRICE:     USD 1015.00 PER METRIC TON, DUTY PAID.
DIVIDED AS FOLLOWS, USD 1000.00 PER METRIC TON PAYABLE UPON
PRESENTATION OF SHIPPING DOCUMENTS. BALANCE OF USD 15.00 PER
METRIC TON PAYABLE UPON RECEIPT BY WRE OF THE UNITED STATES
TAX CREDIT INCENTIVE.

DELIVERY: CIFFO HOUSTON, TEXAS OR BROWNSVILLE, TEXAS,
USA.

WEIGHT/SAMPLING/ASSAYING (W/S/A):

PROVISIONAL WEIGHING, SAMPLING AND ASSAYING WILL TAKE
PLACE IN ARGENTINA UPON LOADING OF MATERIAL, THE
RESULTS OF WHICH SHALL BE USED FOR THE PROVISIONAL
PAYMENT. FINAL WEIGHING, SAMPLING AND ASSAYING SHALL
BE DONE UPON ARRIVAL OF THE SHIP AT DESTINATION, THE
RESULTS OF WHICH SHALL BE USED FOR THE FINAL PAYMENT.

THE WEIGHING, SAMPLING AND ASSAYING SHALL BE DONE BOTH
AT LOADPORT AND DISCHARGE PORT BY THE SAME
RECOGNIZED, INDEPENDENT SURVEY COMPANY AS MUTUALLY
AGREED BETWEEN BUYER AND SELLER, THE COSTS OF WHICH
SHALL BE EQUALLY SHARED. UNLESS OTHERWISE AMENDED BY MUTUAL
AGREEMENT, BUYER AND SELLER AGREE UPON INTERTEK FOR THE
DURATION OF THIS CONTRACT.

SHIPPING TERMS:   ALL SHIPPING TERMS AND CONDITIONS SHALL BE
AS PER RELEVANT CHARTER PARTY.

DUTY:   SELLER SHALL BE RESPONSIBLE FOR THE IMPORT DUTY, IF
ANY, PAYABLE IN THE U.S. IN CONJUNCTION WITH THESE
SHIPMENTS AND SHALL BE ENTITLED TO ANY REBATE, REFUND OR
RETURN IN ANY FORM OF THESE DUTIES, IF PAID. AT SUCH TIME
AS ANY DUTY IS PAYABLE, SELLER SHALL PROMPTLY PAY ON BEHALF
OF BUYER, OR RE-IMBURSE BUYER IF IT PAYS, THE AMOUNTS OF
THIS DUTY. THESE AMOUNTS MAY
ALSO BE PAID BY BUYER AND DEDUCTED FROM THE PAYMENTS DUE TO
SELLER PER THIS CONTRACT.



IF A REBATE, REFUND OR RETURN OF THESE DUTIES IS DUE, BUYER
WILL FILE FOR SAME AND OTHERWISE ASSIST SELLER IN ANY WAY
NECESSARY IN OBTAINING THIS REBATE, REFUND OR RETURN AND
SHALL PROMPTLY TURN OVER ANY FUNDS SO OBTAINED BY BUYER TO
SELLER.

PAYMENT: NET CASH PAYABLE BY WIRE TRANSFER WITHIN 24
HOURS OF PRESENTATION OF DOCUMENTS TO BUYER AND COVERING
ONE HUNDRED PERCENT (100%) OF SHIPMENT, BASED UPON
PROVISIONAL W/S/A. FINAL ADJUSTMENTS, BASED UPON
FINAL W/S/A, ANY DUTY OR PENALTY DEDUCTIONS,
DEMMURRAGE, ETC. SHALL BE DUE AND PAYABLE PROMPTLY
UPON PRESENTATION OF FINAL INVOICE.

PAYMENTS SHALL BE GUARANTEED BY AN IRREVOCABLE STAND BY
LETTER OF CREDIT TO BE OPENED PROMPTLY AND VALID THROUGH
FEBRUARY 28, 2015, COVERING FULL AMOUNT OF A 30,000 MT
SHIPMENT PLUS 5% AND TO BE REPLENISHED IMMEDIATELY, IF IT
IS DRAWN UPON OR IF CONTRACT IS EXTENDED.

TARIFF:        CLAUSE 10 OF FOSFA
51 TO READ: SURVEYOR, EXCESS
OVER USD 0,70 PER MT FOR BUYER '
S ACCOUNT.

OTHER CONDITIONS: BUYERS DECLARE TO BE AWARE OF ALL
ECONOMIC SANCTIONS LAWS, ANTI-BOYCOTT LAWS AND TRADE
RESTRICTIONS IMPOSED BY THE US, UN AND EU, AND WARRANT
TO COMPLY WITH THEM IN ALL RESPECTS RELATED TO THE
PERFORMANCE OF THIS CONTRACT. THIS WARRANTY REFERS
PARTICULARLY BUT NOT EXCLUSIVELY TO THE NOMINATED VESSEL,
TO WHOEVER MAY OWN, CONTROL, OPERATE OR HAVE CHARTERED
HER, TO BUYERS' DOCUMENTARY INSTRUCTIONS, TO ANY
INTERVENING BANKS AND, IN GENERAL, TO ANY OTHER PERSON,
COMPANY OR ENTITY INVOLVED IN THE PERFORMANCE OF THIS
CONTRACT. BUYERS SHALL INDEMNIFY SELLERS AND HOLD THEM
FULLY HARMLESS IN THE EVENT OF LOSS OR DAMAGE SUFFERED BY
SELLERS, THEIR PRINCIPALS OR AFFILIATES, AS A RESULT OF
ANY CONTRAVENTION, INTENTIONAL OR NOT, OF THE ABOVE
MENTIONED ECONOMIC AND ANTI-BOYCOTING
SANCTIONS LAWS AND/OR TRADE RESTRICTIONS BY BUYERS OR
ANY OF THE PERSONS, COMPANIES AND ENTITIES COMPRISED
IN THE BUYERS' WARRANTY UNDER THE TERMS OF THIS CLAUSE.

NOTHING IN THIS CONTRACT IS MEANT TO REQUIRE EITHER
PARTY TO TAKE ANY ACTION WHICH IS LIKELY TO PLACE IT OR
ITS AFFILIATES IN A POSITION OF NON-COMPLIANCE WITH, OR
IN CONTRAVENTION OF, THE ABOVE MENTIONED LAWS AND



RESTRICTIONS IN PARTICULAR, BUT WITHOUT LIMITATION, SELLERS SHALL AT ANY TIME BE ENTITLED TO REJECT OR WITHDRAW ACCEPTANCE OF ANY VESSEL NOMINATION WHERE THE ACCEPTANCE OF SUCH VESSEL NOMINATION WOULD PLACE THEM OR THEIR AFFILIATES OF NON-COMPLIANCE WITH, OR IN CONTRAVENTION OF, THE SAID LAWS AND RESTRICTIONS. BUYERS SHALL IN SUCH CASES NOMINATE A SUITABLE FULLY CONTRACTUAL SUBSTITUTE VESSEL.

FORCE MAJEURE: IF SHIPMENT UNDER THIS CONTRACT IS PREVENTED, HINDERED, OR DELAYED BY REASONS OF FORCE MAJEURE, SELLER SHALL BE EXCUSED FROM NONPERFORMANCE AND THIS CONTRACT SHALL BE DEEMED SUSPENDED DURING THE CONTINUANCE OF THE FORCE MAJEURE. FORCE MAJEURE SHALL INCLUDE BUT NOT BE LIMITED TO, AN ACT OF GOD, STRIKE, FIRE OR RIOT; ACCIDENT; NON-AVAILABILITY OF MATERIAL; NONAVAILABILITY OF POWER OR TRANSPORTATION FACILITIES AT SOURCE; DELAYS OF CARRIERS; EMBARGOES; RESTRICTIONS IMPOSED BY ANY GOVERNMENT OR GOVERNMENTAL AUTHORITY. IN CASE OF FORCE MAJEURE, SELLER SHALL GIVE NOTICE TO BUYER IN WRITING WITHIN A REASONABLE TIME AFTER THE HAPPENING THERE OF AND SHALL MAKE ITS BEST EFFORT TO PROCURE OTHER SUBSTITUTE MATERIAL. IF DELIVERY HEREUNDER IS SO PREVENTED FOR MORE THAN SIX MONTHS, BUYER SHALL HAVE THE RIGHT TO CANCEL THE AGREEMENT WITH RESPECT TO SUCH DELIVERY BY WRITTEN NOTICE TO SELLER.

JURISDICTION AND GOVERNING LAW: ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ALLEGED BREACH THEREOF, SHALL BE DETERMINED IN NEW YORK IN ACCORDANCE WITH NEW YORK LAW.

ALL OTHER TERMS, CONDITIONS AND RULES NOT IN CONTRADICTION WITH THE ABOVE, CONTAINED IN FOSFA CONTRACT NBR.51 SHALL BE IN FORCE THIS DAY, OF WHICH THE PARTIES ADMIT TO HAVE KNOWLEDGE AND NOTICE, APPLY TO THIS CONTRACT AND THE DETAILS GIVEN ABOVE SHALL BE TAKEN AS HAVING BEEN WRITTEN INTO SUCH CONTRACT FORM IN THE APPROPIATE PLACE.

BUYER: WASHAKIE RENEWABLE ENERGY INC.

BY:

SELLER: LIFE TREE TRADING PTE LTD

# FEDERATION OF OILS, SEEDS AND FATS ASSOCIATIONS LIMITED
## FOSFA INTERNATIONAL

ISSUED IN CONJUNCTION WITH CAMARA DE LA INDUSTRIA ACEITERA
DE LA REPUBLICA ARGENTINA (CIARA)

Revised and Effective
from 1st January 2013

**CONTRACT FOR ARGENTINE VEGETABLE OILS IN BULK
FOB TERMS**

**51**

Reference Nos

SELLERS: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

BUYERS: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

BROKERS: . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Date: . . . . . . . . . . . . . . . . . . . . . . . . . . .

Sellers have agreed to sell and Buyers have agreed to buy . . . . . . . . . . . . . . . . . . . . . . . . say . . . . . . . . . . . . . . . . . . . . . . . . . . . . . metric tons   1

. . . . . . . . . . . . . . . . . . . . . . . OIL, in bulk   2

at . . . . . . . . . . . . . . . . . . . . . . . . . . . say . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . per metric ton   3

or fixed basis CBOT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

to be loaded into ship or ships during . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

**1. QUALITY:** The oil shall be of good merchantable quality of the agreed description and contractual specification at time and place of delivery or at the end   6
of the extension period if not shipped. If the oil is delivered to more than one tank of the same ship the analysis details of the oil delivered to each separate tank   7
at loading shall conform to the contractual specifications.   8

**2. SPECIFICATIONS:** Minimum flash point of 250°F (121°C).   9

**For Crude Degummed Soybean Oil:**   10
FFA (As oleic with a molecular weight of 282): Basis: 1.00%, Maximum: 1.25%   11
Allowances: The following deviations are permitted with the following scales of allowances to Buyers:   12
    1.01% to 1.05% — discount to be 0.6% of contract price   13
    1.06% to 1.15% — discount to be 0.9% of contract price   14
    1.16% to 1.25% — discount to be 1.2% of contract price   15
Moisture and Volatile Matter: Maximum: 0.20%   16
Impurities (insoluble in petrol ether): Maximum: 0.10%   17
Sediment: Maximum: 0.10%   18
Lecithin (expressed as Phosphorous): Basis: 0.020%, Maximum: 0.025%   19
Allowances: The following deviations are permitted with the following scales of allowances to Buyers:   20
    Up to 0.021% - discount to be 0.2% of contract price   21
    0.022% — discount to be 0.4% of contract price   22
    0.023% — discount to be 0.6% of contract price   23
    0.024% — discount to be 0.9% of contract price   24
    0.025% — discount to be 1.2% of contract price   25
Colour (Lovibond cell 1 inch): Basis: not darker than 50 yellow plus 5 red   26
Unsaponifiable Matter: Maximum: 1.50%   27

**For Crude Sunflowerseed Oil:**   28
FFA (As oleic with a molecular weight of 282): Basis: 2.00%, Maximum: 3.00%   29
Allowances: The following deviations are permitted with the following allowances to Buyers:   30
    2.01% to 3.00% — discount 2% of contract price for each 1%, fractions in proportion   31
Moisture and Impurities: Maximum: 0.50%   32

**For Other Vegetable Oils:** As specified in contract.   33

**3. FIXATION CLAUSE** (if price to be fixed basis CBOT): Futures in exchange, Sellers' give-up. Price to be fixed and futures to be given up latest 5 days prior   34
to shipment or 2 days prior to the first notice day of option in question, whichever earlier. The US$ cents per pound value multiplied by 22.0462 is the US$ price   35
per metric ton of 1,000 kilograms each.   36

**4. DELIVERY:** At Buyers' call during . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Bill of Lading or mate's receipt shall be considered proof of delivery of   37
the goods in the absence of evidence to the contrary.   38

**5. NOMINATION OF SHIP:** Buyers to give notice of nomination of ship to Sellers together with expected date of readiness to load, demurrage rate if   39
applicable, flag, quantity, agents at loading port and final country of destination for Sellers, including the first Seller in the event of a string, to receive it not later   40
than 10 consecutive days before the date of the ship's expected readiness to load. Nomination of vessel/s once given or passed on shall not be withdrawn, unless   41
the vessel is unable to proceed to load port due to an event outside Buyers' control. For nominations of less than 250 metric tons, or loading/s (for reasons not   42
attributable to Sellers) of less than 250 metric tons, Sellers will charge Buyers with extra US$2,000 to be added in the invoice.   43

**6. SUBSTITUTION OF SHIP:** Buyers are allowed to substitute the nominated ship provided the substitute ship is expected to arrive no earlier than the   44
original ship and not more than 5 working days later unless otherwise agreed by Sellers. Sellers shall not be obliged to accept more than two substitutions. Buyers   45
shall notify their Sellers and first Sellers (if known) of such substitution as soon as possible, but not later than 2 business days before the expected arrival of the   46
original ship. The original delivery period and any extension thereto shall not be affected by this clause.   47

**7. DOCUMENTS:** Sellers shall receive relevant documentary instructions including splits not less than 5 working days prior to the estimated arrival of ship at   48
loading port. For the purpose of this contract shipping documents will consist of:   49
  (a)  Full set of original clean on board Bills of Lading issued to the order and blank endorsed, or clean on board blank endorsed Mate's Receipts at Buyer's   50
       option, either party having the right to request Mate's Receipts to be issued for partial or daily loaded quantities;   51
  (b)  Certificate of origin issued by Argentine Chamber of Commerce or Argentine Chamber of Exporters;   52
  (c)  Certificates of Weight and Quality, but Buyers provisionally to accept Seller's letter of guarantee for such certificates if missing;   53
  (d)  Commercial invoice.   54
No clerical error in the documents shall entitle the Buyers to reject them or delay payment, but Sellers shall be responsible for all loss or expense caused to Buyers   55
by reason of such error.   56

**8. NOTICE OF READINESS:** Once vessel is in berth and ready in all respects to receive the oil, Notice of Readiness to be given during local office hours by   57
vessel and/or Agents to Shippers and laytime to start counting 6 hours after such notice has been tendered, even if loading starts earlier. Should superintendents after   58
inspection find ship's tanks require further cleaning, time required to clean not to count as laytime. Laytime not to commence prior to expiry of minimum number of   59
days pre-advice for nomination of ship unless Sellers agree to load earlier in which case laytime to commence when ship actually commences to load. All notices   60
shall have been passed on with due despatch.   61

**9. LOADING:** Freight space to be provided by Buyers who shall be solely responsible for the cleanliness and fitness of the ship's tank/s receiving the oil. Should commencement of loading be delayed due to ship's tank/s not being passed by the appointed superintendent or for any other reason for which Sellers are not contractually responsible, any extra costs incurred by Sellers shall be for Buyer's account. All expenses relating to the ship like wharfage, dockage, pilotage, port dues, tugs, any freight or transportation levy that may be imposed by government or local authority at port/s of loading shall be for Buyer's account or risk. Sellers to deliver the oil at not less than an average rate of 200 metric tons per running hour, Sundays and holidays included, provided the ship can receive at that rate. If any Seller fails to comply and demurrage is thereby incurred he shall be liable to pay demurrage at the rate stipulated in the Charter Party or US$25,000 per day/pro rata, whichever is the lower, but Sellers shall not be responsible for any time lost due to Act of God, strike, lockouts, riots, civil commotion, labour stoppages, breakdown of machinery and/or winches, failure of power, fire or any other cause of Force Majeure. Should commencement of loading be delayed by more than 72 hours after acceptance of the Notice of Readiness due to ship's tanks not being passed by the appointed superintendent or for any other reason for which Sellers are not contractually responsible, any extra costs incurred by Sellers shall be for Buyers' account. Each delivery to be considered a separate contract. For the purpose of this contract the word "ship" or "ships" means any full powered primarily engine-driven ship classified not lower than 100 A1 in Lloyds Register or of equivalent classification of a similar institute.
Sellers to be responsible for obtaining export licence, if required.

**10. SUPERINTENDENTS:** Reference in the contract to superintendents, surveyors or representatives shall mean Argentine member superintendents of FOSFA International. The superintendent, whose certificates at time and place of loading shall be final as to weight, quality and condition, is at Buyer's choice and at Seller's expense but should the total fee of such certificates and analysis exceed ............ per metric ton, the excess to be for Buyer's account. The use of member superintendents shall be mandatory except where the contract or national laws or regulations require the use of Governmental or other agencies not recognised by FOSFA International.

**11. ANALYSTS:** Reference in the contract to analysts shall mean Argentine member analysts who are members of FOSFA International and represented in the Oils and Fats Section. The analyst is at Buyers choice. The use of member analysts shall be mandatory except where the contract or national laws or regulations require the use of Governmental or other analysts.

**12. WEIGHTS:** Shipped weight, as certified by the surveyor, ascertained by gauging either in officially calibrated land tank/s or tank barge/s from which the oil is delivered or by delivery via certified weight scales, or from tank cars which, if not calibrated, shall be weighed before and after loading by single weighing only (front and back axle weighing not allowed). In the event of disagreement on the question of litre weight in air, sealed samples shall be submitted to an analyst in membership of the Federation and represented in the Oils and Fats Section whose decision shall be final. Weight ascertained by vessel's tank(s) ullage or draft survey shall be contractually irrelevant.

**13. SAMPLING AND ANALYSIS: General:** Sampling shall be done in accordance with the method ISO 5555. The samples drawn by the superintendent shall be the valid samples for the purpose of analysis and/or arbitration and contamination. The analysis shall be carried out in accordance with the methods laid down in the FOSFA International Standard Contractual Methods List. Details of seals and labels shall be given on loading weight report(s) and analysis certificate(s). The analysis certificate(s) shall bear the FOSFA International seal.
**Sampling:** Representative samples of the oil delivered to each vessel's tank shall be drawn by superintendents at vessel's rail or the nearest practicable point thereto prior to loading and sealed for analysis and/or arbitration and contamination purposes. If the oil to be shipped is not to be commingled in the vessel's tank(s) with oil loaded by any other Seller(s), Sellers under this contract have the option that the sample(s) shall be drawn from the vessel's tank(s). However, if this option is exercised and to ensure that samples are available in the event of a contamination claim, superintendents shall draw and seal no less than five representative pre-shipment samples of the oil delivered to each vessel's tank at the vessel's rail or the nearest practicable point thereto prior to loading. These samples are to remain sealed with superintendents at origin but to be available on demand to any receiver in the event of a contamination claim. Samples shall be kept for three months from the date of the Bill of Lading. If the oil is not loaded within 30 consecutive days of the contract period, then representative samples to be drawn by superintendents at the storage installation or the producing factory at or near the port of delivery at the end of the extension period allowed under the Extension Clause. Any extra expenses necessarily incurred by Sellers to facilitate drawing of samples for establishment of quality at end of extension shall be for Buyers' account.
**Analysis:** Sellers or superintendents shall send sealed samples for analysis on the contractual specification to an analyst. Parties shall pass on certificates of analysis with due despatch. Analysis of samples taken at time of loading or, in the event of the oil not being loaded within 30 consecutive days of the contract period, at the end of the extension period allowed under the Extension Clause, to be final.

**14. EXTENSION:** Buyers shall be entitled to an extension of the original contract delivery period not exceeding 30 days in which to provide suitable freight. Notice of such extension shall be given to Sellers as soon as possible but not later than the last business day of the original contract delivery period. Sellers undertake to carry the oil for Buyers' account for such an extension period at the rates stipulated in the Carrying Charges Clause. If loading is commenced within 30 days after the original contract delivery period, payment shall be made in accordance with the Payment Clause. In the event that loading is not commenced within 30 days of the original contract delivery period the provisions of the Default Clause shall apply and Buyers shall additionally pay to Sellers an amount equal to carrying charges for the total extension period. However, Buyers have the option, provided they give Sellers minimum 4 business days pre-advice, to effect payment against warrant, delivery order or similar document, in place of the Bill of Lading or Mate's Receipt, giving unencumbered title to the quantity called for, issued by an installation or the producing factory or at or near the port of delivery. Sellers also to provide Certificate of Analysis and Certificate of Origin. The warrant, delivery order or similar document to be guaranteed by a Bank if requested by Buyers in the pre-advice. The expenses of such Bank guarantee to be for Buyers' account. Thereafter, all costs of whatsoever nature arising (including the cost of removing the oil to separate other storage but excluding those of putting the oil FOB ruling on the 30th day of the extension) shall be paid by Buyers. If Buyers exercise their option to take delivery in store, Sellers shall nevertheless deliver to the ship if it presents in time for loading to commence before the expiry of the extension period.

**15. CARRYING CHARGES:** Should Buyers not have taken delivery within the delivery period specified in the contract, Buyers are to pay Sellers Carrying Charges calculated from the first day following the last day of the delivery period so specified until Bill/s of Lading date/s, as follows:
   (a) US$0.50 per metric ton per day for the first fifteen days.
   (b) US$0.75 per metric ton per day from the sixteenth day inclusive until the thirtieth day inclusive or the Bill of Lading date, if later. Carrying charges shall be paid by Buyers to Sellers upon payment of shipping documents.

**16. BILLS OF LADING:** Sellers shall follow any instructions/requirements of Buyers and/or vessel Agents and/or Master regarding Bill of Lading forms to be used and conditions to be inserted therein, but Sellers assume no responsibility for the correctness of same.
If the Bill of Lading refers to a Charter Party and/or any other document relating to the freight booking, the Buyers warrant and guarantee to indemnify Sellers and hold them harmless against any detrimental consequences from clauses of such documents.
If freight paid or freight pre-paid Bill(s) of Lading are requested, Buyers shall pay freight plus any taxes and expenses in sufficient time so that the Bill(s) of Lading are released at the end of the first business day following the day when the Bill(s) of Lading are presented to the vessel's agents in Buenos Aires.
In any of the above situations Sellers shall at their discretion have the right to demand that Buyers expressly hold them harmless of any possible consequences, charge Buyers interest in case of delay in release of Bills of Lading according to the Interest Clause, or demand payment against Mate's Receipt instead of Bill of Lading, as the case may be.
Buyers shall accept as clean any Mate's Receipt or Bill of Lading showing a weight ascertained by the superintendents, irrespective of any remarks concerning a different weight determined by vessel's tank(s) ullage or draft survey. The necessary steps to overcome any difficulties arising from such remarks shall be taken by Buyers but shall not entitle Buyers to withhold or delay payment as per contract.
If Mate's Receipts are presented for payment, Sellers shall be entitled to instruct vessel's agents that the Bill(s) of Lading may only be issued in exchange for the original Mate's Receipt.

**17. INSURANCE:** Marine and war risk insurance basis WA with 3% franchise or better terms, including strikes, riots, civil commotion and mine risk, to be effected by Buyers with first class underwriters and/or approved companies for at least the contract value plus 2%, protecting the interest of the Buyers and/or Sellers, as interests may appear. Once the goods are delivered on board, all risks including all average to be for account of the Buyers. Sellers shall receive confirmation, together with documentary instructions that insurance according to these terms and at Buyers' expense has been covered. If Buyers fail to provide such confirmation, Sellers shall have the right to place their own insurance according to the terms of this clause at the Buyers' risk and expense. If requested by Sellers, Buyers shall submit to Sellers a copy of the certificate and/or policy. Buyers agree to accept shipping documents containing the Chamber of Shipping and War Deviation Clause and/or other recognised War Risk Clauses.

**18. PAYMENT:** Buyer's payment in ............................................. for 100% of the invoice amount (plus carrying charges, if incurred) by telegraphic transfer will be due two working days after presentation of documents, if presented not later than at noon; past noon, presentation will be deemed to have been made on the following day. Presentation in trust or by collection is at Sellers' option.
If documents are presented to Buyers through the intermediary of a bank then the bank charges incurred shall be for Sellers' account. If Buyers demand presentation through a bank of their choice, those bank charges shall be for Buyers' account.
Payment shall not be deemed to have been effected and title to the goods shall not pass from Sellers to Buyers before receipt of cleared funds by the payee or his bank. If payment is agreed to be by bank transfer, the party shall effect payment to the payee's bank on or before the due date for payment and payment instructions shall specify a value date not later than the second bank working day after the day of payment.
Any monies due by either party to the contract to the other to represent final invoices and/or accounts for items on deliveries fulfilling this contract shall be settled by either party without delay (except as otherwise provided under awards of arbitration and appeal as governed by the other provisions in the contract) and if not settled a dispute shall be deemed to have arisen which may be referred to arbitration.

**19. INTEREST:** Interest at 2.50% over the New York prime rate in force shall be paid by Buyers to Sellers:
In case of late payment of documents or monies otherwise due, computed from the first business day following the day when payment was due up to the day payment is received, both days inclusive.

In case the Bill/s of Lading should not be at Sellers'/Shippers' disposal at the end of the first business day following the day when the Bill/s of Lading are presented 157
to vessel's agents in Buenos Aires, for any reasons whatsoever beyond Sellers' control, computed from the first working day after Bill/s of Lading presented to agency 158
up to the day the Bill/s of Lading is/are released to Sellers or their representatives, both days inclusive. 159
In case Buyers' complete documentary instructions have not been timely received and presentation of documents is delayed for reasons not attributable to Sellers 160
beyond the date of the Bill/s of Lading, computed from the first working day after Bill/s of Lading date up to the day documents are presented, both days inclusive. 161
In case of default of fulfilment by either party, the other party shall be entitled to recover interest on principal sum of damages at the rate of 2.50% over the current 162
New York prime rate, computed from the date of default up to the date of payment of the principal sum of damages. 163
Nothing in this clause shall affect a party's right to invoke the provisions of the Default Clause in a case where a failure to effect timely payment could give rise to 164
a claim under that clause. 165

**20. UNASCERTAINED GOODS:** In every instance where a parcel of goods sold by this contract forms an unidentified part of a larger identified quantity of goods 166
of the same description, no separation or distinction shall be necessary and, until separation and identification of the parcel sold hereby from the larger quantity has 167
taken place, the unpaid Seller and/or the Buyer who has made payment is/are the pro rata owner/s of the whole of the larger quantity in common with Seller/s and 168
Buyer/s of the other part of the larger quantity. 169

**21. DUTIES, TAXES ETC:** All export duties, taxes, levies, etc., to be for Sellers' account but any increase after the original contract delivery period to be for 170
Buyers' account. Where the goods are entitled to free entry into or preferential duty in the port of destination, Sellers shall furnish together with the shipping 171
documents a Certificate of Origin and/or necessary document/s in the form valid at the time of shipment, otherwise Sellers shall be responsible for any extra duty 172
incurred by Buyers through the non-production of such Certificate and/or document/s. 173

**22. NOTICES:** Notices to be despatched by any means of rapid written communication. All notices shall be under reserve for errors in transmission. Notices shall 174
be passed on until one despatch by intermediate Buyers and Sellers. Any notice received after 16.00 hours on a business day shall be deemed to have been received 175
on the following business day. Notice from a broker shall be a valid notice under this contract. Proof of string to be provided, if required, by either party. 176

**23. NON-BUSINESS DAYS AND ODD DAYS:** Should the time limit for doing any act or giving any notice expire on a Saturday, Sunday or any public holiday 177
in the country where the party required to do the act or give the notice resides or carries on business or in the country where the act has to be done or the notice has 178
to be received or on any day which the Federation shall declare to be a non-business day, the time so limited shall be extended until the first business day thereafter. 179
All business days shall be deemed to end at 16.00 hours Mondays to Fridays inclusive. The contract delivery period not to be affected by this clause. In any month 180
containing an odd number of days the middle day shall be reckoned as belonging to both halves of the month. 181

**24. FORCE MAJEURE:** Should Sellers be prevented from loading the goods on board Buyers' ship or should Buyers be prevented from taking delivery by 182
reason of fire, strikes, lockouts, riots, civil commotion or any cause comprehended in the term Force Majeure at port/s of loading, or elsewhere preventing transport 183
of the goods to such port/s, the contract delivery period shall be extended by 21 days beyond the termination of the Force Majeure event. Should such cause exist 184
for a period of 60 days beyond the contract delivery period, the contract or any unfulfilled part thereof so affected shall be cancelled. The party invoking this clause 185
shall advise the other with due despatch. The party claiming Force Majeure must produce proof to justify their claim if required. 186

**25. PROHIBITION:** In the event, during the contract delivery period, of prohibition of export or any other executive or legislative act by or on behalf of the 187
Government of the country of origin of the territory where the port/s of delivery named herein is/are situate, or of blockade or hostilities, restricting export, whether 188
partially or otherwise, any such restriction shall be deemed by both parties to apply to this contract and to the extent of such total or partial restriction to 189
prevent fulfilment whether by delivery or by any other means whatsoever and to that extent this contract or any unfulfilled portion thereof shall be extended by 21 190
days beyond the termination of the prohibition event. But should prohibition continue for 30 days, the contract or any unfulfilled part thereof shall be cancelled. 191
Sellers invoking this clause shall advise Buyers with due despatch. If required, Sellers must produce proof to justify their claim for extension or cancellation under 192
this clause. 193

**26. BANKRUPTCY/INSOLVENCY:** If before the fulfilment of this contract, either party shall suspend payment, notify any of his creditors that he is unable to 194
meet his debts or that he has suspended payment or that he is about to suspend payment of his debts, convene, call or hold a meeting of his creditors, propose 195
a voluntary arrangement, apply for an official moratorium, have an administration order made, have a winding up order made, have a receiver or manager 196
appointed, convene, call or hold a meeting to go into liquidation (other than for reconstruction or amalgamation), become subject to an Interim Order under Section 197
252 of the Insolvency Act 1986 or have a Bankruptcy Petition presented against him the contract shall forthwith be closed, either at the actual or estimated market 198
price then current for similar goods, or, at the option of the other party, at a price to be ascertained by re-purchase or re-sale and the difference between the contract 199
price and such closing-out price shall be the amount which the other party shall be entitled to claim or shall be liable to account for under this contract. Should either 200
party be dissatisfied with the price ascertained by re-purchase or re-sale, then the matter shall be referred to arbitration. If no re-purchase or re-sale takes place and 201
if the parties cannot agree to a closing-out price, then on application of either party, the closing-out price shall be fixed by a sole arbitrator appointed by the Federation 202
subject to the right of appeal under the Federation's Rules of Arbitration and Appeal. 203

**27. CIRCLE:** Where a Seller re-purchases from his Buyer, or from any subsequent Buyer, the same goods or part thereof, a circle shall be considered to exist as 204
regards the particular goods so re-purchased, and the provisions of the Default Clause shall not apply. (For the purpose of this clause the same goods shall mean 205
goods of the same description, of the same country of origin, of the same quality and, where applicable, of the same analysis warranty, for delivery from the same 206
port/s of loading during the same period of delivery.) Different currencies shall not invalidate the circle. 207
If the goods are not delivered or, having been delivered, documents are not presented as a result of a circle having been established, invoices based on the mean 208
contract quantity shall be settled between each Buyer and his Seller in the circle by payment by each Buyer to his Seller of the excess of the Seller's invoice amount 209
over the lowest invoice amount in the circle. 210
Where the circle includes contract/s expressed in different currencies, the lowest invoice amount shall be replaced by the market price on the first business day for 211
contractual delivery and invoices shall be settled between each Buyer and his Seller in the circle by payment of the difference between the market price and the 212
relevant current price in the currency of the contract. Failing amicable agreement the market price shall be that declared by a Price Settlement Committee of the 213
Federation appointed for that purpose on application of either party. 214
Such settlement shall be due for payment not later than 15 consecutive days after the last day of the delivery period or, should the circle not be established before 215
the expiry of this time, then settlement shall be due for payment not later than 7 days after the circle is established. No circle shall be considered to exist if its 216
existence is not established within 45 days after the last day of the delivery period. 217
All Sellers and Buyers shall give every assistance to the establishment of the circle and when a circle shall have been established same shall be binding on all 218
parties to the circle. Should any party in the circle commit prior to the due date for payment any comprehended in the Bankruptcy/Insolvency Clause, the invoice 219
amount for the goods calculated at the closing-out price as provided for in the Bankruptcy/Insolvency Clause, shall be taken as the basis for settlement instead of the 220
lowest invoice amount or market price in the circle, and in this event each Buyer shall make payment to his Seller or each Seller shall make payment to his Buyer 221
of the difference between the closing-out price and the contract price, as the case may be. 222
In the event of a claim under the Prohibition Clause or the Force Majeure Clause the date for settlement shall be deferred until the expiry of the extended delivery 223
period. Thereafter, if the contract is cancelled under the terms of the Prohibition Clause or the Force Majeure Clause, this clause is not applicable. 224

**28. DOCUMENTS BYPASS (STRING):** In case of re-sales in string any party involved may propose a documents bypass whereby the first or a subsequent Seller 225
is to present documents at his own price directly to the last or a previous Buyer. 226
Such proposal is to be made in good time prior to commencement of loading of the nominated vessel and to contain names of Sellers and Buyers in the string, their 227
individual prices and the suggested settlement of price differentials. 228
All parties in the string may in their own absolute discretion refuse or agree without prejudice to their rights and obligations under their own contract, and the 229
proposal will be declared in force only if all parties in the string have confirmed their agreement, otherwise it will be declared failed, either declaration to be 230
notified without delay to all parties involved by the party having made the original proposal. 231
If no such declaration is received by the time vessel has started to load, the first Seller may withdraw his agreement and present documents to his own Buyer, or at 232
his option charge interest at the rate stipulated in the Interest Clause for any time lost in presentation of documents. 233
If a string proposal is declared in force it shall be deemed to have transferred automatically from the first to the last Buyer the obligation to pay for the goods, to 234
cover insurance in accordance with the Insurance Clause above, and to defray any excess in the cost of Superintendence and Analysis above the rate agreed to be for 235
Seller's account. Likewise, the acceptance of a string proposal by the parties other than the first Seller and the last Buyer shall be deemed to constitute their firm 236
commitment to pay any price differentials and other monies due. 237
To permit settlement of price differentials the end Buyer in the string shall without delay confirm receipt of shipping documents and the exact quantity shipped to 238
all parties involved, and price differentials as agreed shall then be paid within 48 hours from receipt of the relevant debit note. 239
Despite agreeing without prejudice to a documents bypass proposal, all the parties' rights and obligations under their individual contracts, save as amended by 240
operation of the agreed bypass, shall remain fully in force. Prior to the presentation of documents to the end Buyer any party in the string may in the event of 241
unforeseen and serious circumstances, including the insolvency or threatened insolvency of any party in the string, withdraw agreement giving immediate notice of 242
such withdrawal to all other parties. The documents shall then be presented through the string between individual counter-parties. 243
Should the nominated vessel for a string already in force be substituted, totally or in part, the first Seller is under no obligation to commence loading the substitute 244
vessel prior to receipt of his own counter-party's agreement. 245
In the event of a dispute arising all parties to the agreement of the established documents bypass accept to be bound by the Arbitration and Bankruptcy/Insolvency 246
Clauses of the FOSFA Contract No 51, with Arbitration as specified in the FOSFA Rules of Arbitration and Appeal. English Law and Domicile to apply 247
notwithstanding any other law or domain to the contrary in respect of any or all disputes arising from the sale or movement of these goods. 248

**29. DEFAULT:** In default of fulfilment of this contract by either party, the other party at his discretion shall, after giving notice, have the right either to cancel the 249
contract, or the right to sell or purchase, as the case may be, against the defaulter who shall on demand make good the loss, if any, on such sale or purchase. If the 250
party liable to pay shall be dissatisfied with the price of such sale or purchase, or if neither of the above rights is exercised, the damages, if any, shall, failing 251

amicable settlement, be determined by arbitration. The damages awarded against the defaulter shall be limited to the difference between the contract price and the actual or estimated market price on the day of default. Damages to be computed on the mean contract quantity. If the arbitrators consider the circumstances of the default justify it they may, at their absolute discretion, award damages on a different quantity and/or award additional damages.
Prior to the last day of the contract delivery period either party may notify the other party of its inability to deliver or take delivery but the date of such notice shall not become the default date without the agreement of the other party. If, for any other reason, either party fails to fulfil the contract and is declared to be in default by the other party and default is agreed between the parties or subsequently found by the arbitrators to have occurred, then the day of default shall, failing amicable settlement, be decided by arbitration.

**30. DOMICILE**  This contract shall be deemed to have been made in England and the construction, validity and performance thereof shall be governed in all respects by English Law. Any dispute arising out of or in connection therewith shall be submitted to arbitration in accordance with the Rules of the Federation.  The serving of proceedings upon any party by sending same to their last known address together with leaving a copy of such proceedings at the offices of the Federation shall be deemed good service, rule of the law or equity to the contrary notwithstanding.

**31. INTERNATIONAL CONVENTIONS:**  The following shall not apply to this contract::—
    (a) The Uniform Law on Sales and the Uniform Law on Formation to which effect is given by the Uniform Laws on International Sales Act 1967;
    (b) The United Nations Convention on Contracts for the International Sale of Goods of 1980;
    (c) The United Nations Convention on the Limitation Period in the International Sale of Goods of 1974 and the amending Protocol of 1980.

**32. ARBITRATIONS:**  Any dispute arising out of this contract, including any question of law arising in connection therewith, shall be referred to arbitration in London (or elsewhere if so agreed) in accordance with the Rules of Arbitration and Appeal of the Federation of Oils, Seeds and Fats Associations Limited, in force at the date of this contract and of which both parties hereto shall be deemed to be cognizant.
Neither party hereto, nor any persons claiming under either of them, shall bring any action or other legal proceedings against the other of them in respect of any such dispute until such dispute shall first have been heard and determined by the arbitrators, umpire or Board of Appeal (as the case may be), in accordance with the Rules of Arbitration and Appeal of the Federation, and it is hereby expressly agreed and declared that the obtaining of an Award from the arbitrators, umpire or Board of Appeal (as the case may be), shall be a condition precedent to the right of either party hereto or any person claiming under either of them to bring any action or other legal proceedings against the other of them in respect of any such dispute.

© FOSFA Copyright 2013