# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIFETREE TRADING PTE., LTD.<br><br>Plaintiff,<br><br>vs.<br><br>WASHAKIE RENEWABLE ENERGY, LLC, et. al.,<br><br>Defendants. | CIVIL ACTION<br>No. 14-CV-9075-JPO |

## EXPERT DECLARATION OF J. STEPHEN LUCAS

1. My name is J. Stephen Lucas. I have been actively engaged in the domestic and international trading and transportation of grain and grain products for more than thirty - five years. I have earned a Bachelor of Arts degree in microbiology and a Master of Business Administration degree from the University of Kansas.

2. From 1973 until 2004, I was employed by Louis Dreyfus Corporation of Wilton. Connecticut. Beginning in 1973 I held a variety of trading positions with the company, including responsibilities for trading truck, railcar, barge and ocean vessel shipments of feedgrains and oilseeds. In 1980 I was appointed as Director of Logistics and Operations for the corporation. As such, I had direct responsibility for the logistics coordination and operations at all Louis Dreyfus domestic and export facilities as well as responsibility for all grain contract execution.

3. I was elected Vice-President – Export Operations of Louis Dreyfus Corporation in 1994. In this position I had responsibility for a number of functions, including all elevator operations in North America, trading and marketing of Great Lakes freight, marketing of all feedgrains and oilseeds to Central and South America, and management and resolution of all commercial disputes.

1

4. Beginning in 2005, I became President of Jayhawker Consulting Co., LLC, a company which provides consulting services in all areas of bulk commodity trading, transportation and operations. A copy of my current *curriculum vitae* is attached to this report as Appendix 1.

5. In the above matter before the United States District Court, I have been asked by counsel, the Law Office of Joshua E. Abraham on behalf of Plaintiff, LifeTree Trading Pte., Ltd. ("LifeTree"), to provide my expert opinion on various aspects of the transaction between LifeTree and Defendant, Washakie Renewable Energy, LLC ("WRE") as well as my opinion on the amount of damages which have been incurred by LifeTree.

6. I have been qualified as an expert on several previous occasions, both in state and federal courts and in actions before the Federal Maritime Commission as shown in my CV. I am being compensated for my study and testimony at the rate of $275 per hour.

7. Although the first part of my career was primarily involved with domestic and international grain trading, I have subsequently been involved with all aspects of renewable fuels, both ethanol and biodiesel, including the building of an 80 million gallon per year biodiesel plant in Indiana. For the same client I have been the primary drafter of both domestic and international biodiesel purchase and sale contracts and continue to monitor and review biodiesel contracts from numerous firms in the domestic and international biodiesel trade. I am the voting member for a multinational trading company at ASTM International – the organization which sets U.S. standards for biodiesel quality – and have been a member of the Biofuels Committee of the National Grand and Feed Association for the past eight years.

8. I have reviewed numerous documents and materials pertinent to this litigation. A listing of these and copies of such are attached as Appendix 2. This report was prepared on the basis of information available at the time of writing. I understand that the parties are engaged in ongoing exchanges of information and testimony and I reserve the right to supplement this report as further information is made available.

## FATTY ACID METHYL ESTER ("FAME")

9. Commonly referred to as biodiesel, FAME is the generic name for a combustion engine fuel composed of "mono-alkyl esters of long-chain fatty acids" derived from plant oils or animal fats[1]. The most common feedstocks used to produce biodiesel are soybean oil, canola oil, palm oil and used cooking grease. The feedstock is often designated in the description of the resulting product because different feedstocks produce biodiesel with different operating characteristics. Thus, FAME derived from soybean oil may be described as SME – soy methyl ester – to denote that only soybean oil was used in the production of the biodiesel.

---

[1] http://biodiesel.org/what-is-biodiesel/

2

## COMMODITIES TRADING AND CONTRACTING

10. The trading of cash[2] commodities, both domestically and internationally, is a fast paced business involving transactions worth millions of dollars between two people who may not speak the same native language or be in the same time zone. Contracts may be done through a broker or directly with the trading counterpart and are most commonly done today via email or instant message.

11. Because of the risks involved in trading cash commodities, both the buyer and the seller wish to protect themselves from some of the risks associated with trading a commodity whose price is volatile with a person who is unknown to them. The initial risk is that both parties understand in detail what they have traded, no matter what mechanism they used to arrive at a trade.

12. In order to prevent errors or misunderstandings, the custom in international commodities trading is for at least one party to send a contract confirmation to the other party soon after the trade is concluded. This confirmation will contain the full description of the terms of the trade. The party receiving the confirmation checks it against its understanding of the trade and either signs it to confirm its correctness or informs the other party of any errors which are found in it. Because this becomes the basis for all further action by both parties, it is imperative that the confirmation or writing contain the full and accurate description of all of the terms of the trade.

13. If the parties subsequently agree to change or modify some parts of the original agreement, an additional confirmation showing the amended language is sent in the same manner as the original confirmation. This amendment is also reviewed and ultimately signed by both parties. Such a system of agreement and review prior to any action by either party ensures that both parties understand all of the contract terms prior to making any decisions regarding the fulfillment of their obligations under the contract.

14. Although there are no unimportant terms in a commodity contract, some terms are of primary importance to both parties. These include:

   A. Quantity
   B. Quality
   C. Price
   D. Shipment period
   E. Delivery terms
   F. Payment terms
   G. Governing form contracts or rules.

15. The quantity and quality of the goods are of primary importance to both the buyer and seller. The buyer must be assured that the goods are suitable for whatever purposes he chooses to use them and of sufficient quantity for that purpose. The seller

---

[2] As opposed to futures contracts which are tightly structured and regulated by governmental agencies.

3

must be absolutely certain of the quality and quantity which he is required to deliver in order not to deliver goods of poor quality or the wrong quantity.

16. The shipment period and delivery terms define the seller's responsibilities for shipping the goods at a time and place of the buyer's choosing. These terms also allow the seller to plan for shipments by obtaining both the goods and the transportation at the appropriate time required by the contract.

17. Payment terms are one of the most sensitive parts of a contract for both buyer and seller. The buyer needs to be assured as to how he will verify the shipment and quality of the goods before parting with his money. This is usually done by presentation of documents showing the shipment of the goods (the bill of lading) and certificates issued by a disinterested third party evidencing the quantity and quality of the goods shipped.

18. Similarly, the seller needs assurances that when he ships the goods – often to destinations on another continent – he will be assured of payment if he has fulfilled all of his obligations. Thus, the shipping documents may be presented through a bank in the buyer's place of business in trust until the buyer pays for the goods. If the buyer does not pay, the shipping documents are then returned to the seller. Also, the seller may require a standby letter of credit ("LC") which only operates if the buyer fails to pay in accordance with the contracted payment terms. With this mechanism, the seller is protected by a 'back-up' plan in case the original payment terms are not complied with.

19. All of the terms of a commodity contract have some bearing on the ultimate price agreed on for the goods. Different qualities and quantities of goods may be priced differently while different shipment periods and delivery terms may have vastly different values depending on market conditions. Additionally, the payment terms directly affect the price of the goods because any term other than payment for the goods at the time of the contract amounts to an extension of credit to the buyer with a financial cost to the seller.

20. In order not to have to negotiate each pertinent point in a commodity contract, many trades are made using a form contract or rules devised by an industry organization to serve as the base of the transaction. Such contracts may be modified by the parties to reflect the particular terms of their trade but retain the other terms of the form contract. Primary among these types of forms are those published by The Grain and Feed Trade Association ("GAFTA"), The Federation of Oils, Seeds and Fats Associations ("FOSFA"), North American Grain Export Association ("NAEGA"), and the National Grain and Feed Association ("NGFA").

21. Such form contracts and rules are available for review by any interested party in advance of a trade. They may have clauses relating to the shipment period and any extensions of the shipment period which may be available to the seller or the buyer. For delivered contracts, these are often described as extension penalties and for FOB[3] contracts they are often described as carrying charges. Also, many of these contracts

---

[3] Free on board – goods are delivered onto the buyer's vessel without cost to the seller.

contain clauses regarding default by either party and method of calculating damages in case of such a default. These are typically a mark-to-market calculation done at the time of default or shortly thereafter.

## LIFETREE AND WRE CONTRACTS

22. Prior to the negotiation of the contract which is the subject of this litigation, LifeTree and WRE had negotiated and executed at least two previous shipments of SME from Argentina to the U.S., one signed 21 May 2013 for shipment in June or July 2013 and a second signed 3 October 2013 for shipment in October 2013.

23. The first contract called for payment by a confirmed irrevocable letter of credit payable upon presentation of the shipping documents.

24. The second contract required 90 per cent of the invoice value to be paid by a direct pay LC upon presentation of the shipping documents to WRE.

25. In both of these cases, LifeTree sent a contract confirmation to WRE which was duly signed and returned without any changes. It is also interesting to note that some of the terms of the second contract were amended after the original confirmation and an amendment confirmation was sent and signed by WRE without change.

26. The contract which is the subject of this litigation was concluded on 6 May 2014 and the confirmation sent by LifeTree was signed by WRE on 14 May 2014[4]. Among other things the contract called for three shipments of SME of 30,000 metric tonnes[5] each to be delivered CIFFO[6] from Argentina to either Houston or Brownsville, Texas. The contract called for one shipment to be made during 1 – 30 June 2014, one shipment during 1 Aug to 30 Sep 2014, and on shipment during 1 Oct to 31 Dec 2014.

27. The price of the contract was to be $1,000.00 per metric tonne with an additional payment of $15.00 per metric tonne to be made if WRE was successful in receiving the tax credit incentive in the United States. Since this credit was approved in December 2014, the effective price of all three shipments was $1,015.00 per metric tonne. At the time of making this sale, LifeTree anticipated the following gross margin on the trade:

---

[4] Rooz Declaration, Exhibit 1.
[5] One (1) metric tonne = 1,000 kilograms = 2,204.6 pounds
[6] Cost, insurance and freight, free out. The Seller is responsible for the goods, insurance and freight to the destination and the buyer is responsible for all costs associated with discharging the goods.

5

| | |
|---|---|
| Sale price | $1,015.00 per metric tonne |
| Less: | |
| Goods FOB Argentina | $ 860.00 per metric tonne |
| Freight from Argentina to U.S. | $   45.00 per metric tonne |
| Duty paid in U.S. | $   45.25 per metric tonne |
| Surveyor cost at discharge | $     5.00 per metric tonne |
| Gross trading margin | $   59.75 per metric tonne[7] |

28. Payment for the goods was to be by wire transfer of funds from WRE to LifeTree upon the first presentation of shipping documents issued at loading. The balance of the payment section reads:

> "Payments shall be guaranteed by an irrevocable stand by letter of credit **to be opened promptly** and valid through February 28, 2015, covering full amount of a 30,000 MT shipment plus 5% and to be replenished immediately, if it is drawn upon or if contract is extended." (Emphasis added.)

29. This contract also referenced FOSFA 51 as the governing form contract for the transaction where its terms were not in contradiction with the terms found in the contract confirmation signed by WRE. A copy of this form contract is attached to this report as Appendix 3.

30. Of primary interest in this dispute, FOSFA 51 contains the following clauses:

> "15. **Carrying Charges**: Should Buyers have not taken delivery within the delivery period specified in the contract, Buyers are to pay Sellers Carrying Charges calculated from the first day following the last day of the delivery period so specified until Bill/s of Lading date/s, as follows:
> (a) US$ 0.50 per metric ton per day for the first fifteen days.
> (b) US$ 0.75 per metric ton per day from the sixteenth day inclusive until the thirtieth day inclusive or the Bill of Lading date, if later. Carrying Charges shall be paid by Buyers to Sellers upon payment of shipping documents."

and, in part,

> "29. **Default**: In default of fulfilment of this contract by either party, the other party at his discretion shall, after giving notice, have the right to either cancel the contract, or the right to sell or purchase, as the case may be, against the defaulter who shall, on demand make good the loss, if any, on such sale or purchase. If the party liable to pay shall be dissatisfied with the price of such sale or purchase, or if neither of the

---

[7] See Rooz Declaration and Appendix 2.

above rights is exercised, the damages, if any, shall, failing amicable settlement, be determined by arbitration. The damages awarded against the defaulter shall be limited to the difference between the contract price and the actual or estimated market price on the day of default. Damages to be computed on the mean contract quantity. . . . "

## PERFORMANCE OF THE CONTRACT

31. Any commodity sale contract places obligations on both the seller and the buyer to perform certain actions in order to fulfill the terms of the contract. The present contract required LifeTree to find SME in Argentina of the proper quantity and quality which could be loaded aboard an ocean-going vessel whose next destination would be ether Houston or Brownsville, Texas. Similarly, LifeTree would have to find such a vessel and negotiate the terms and price for using the vessel, as well as arranging for insurance and other miscellaneous items relating to the loading of the vessel. All of these things needed to be done in such time that the vessel would load the entire quantity of 30,000 metric tonnes prior to 30 Jun 2014.

32. The contract required WRE to "promptly" open a LC in favor of LifeTree after signing the confirmation on 14 May 2014. In order to do this WRE would have to negotiate with a bank to issue such an amount of credit in WRE's name if WRE failed to pay some or all of the invoice for the goods. This LC would then be transmitted to LifeTree for review and acceptance. Then, WRE would also be required to pay for the goods as they were shipped if the shipping documents were in order and presented to them by LifeTree.

33. Because of the short time frame between the signing of the confirmation and the time specified for the first shipment, it was important that all of the payment terms be complied with. Oxford English Dictionaries defines promptly as "with little or no delay; immediately"[8], while the NGFA defines prompt in its rules as within "ten (10) days"[9]. Thus, WRE's obligation to open the LC may be said to be somewhere between the next day and ten days after the signing of the contract confirmation.

34. However, WRE did not open the LC within ten days after the signing of the contract confirmation. LifeTree and WRE engaged in an ongoing dialogue regarding the LC and the need to have it opened so that LifeTree could proceed with the arrangements to make the first shipment. Without the LC, LifeTree would have no assurance of payment from WRE if the shipment was made within the contract terms.

35. The dialogue concerning the opening of the LC continued throughout the last half of 2014 but the LC was never opened by WRE and, thus, no shipments were ever made by LifeTree. Finally, on 15 Dec 2014, WRE send a letter of cancellation of the contract to LifeTree states that "government intervention and strife in Turkey have made it impossible to obtain the necessary financing and/or letter of credit."[10]

---

[8] Oxford Dictionaries, found at www.en.oxforddictionaries.com
[9] National Grain and Feed Association Grain Trade Rules, found at www.ngfa.org
[10] Rooz Decl. Ex. 3

7

## LIFETREE ACTIONS AND DAMAGES

36. In order to accommodate its customer and to try to maintain the first shipment of SME to WRE, LifeTree made efforts to "roll" the purchases it had made to fulfill the WRE contract to later shipment periods. "Rolling" a shipment forward involves selling the goods in the earlier shipment period and repurchasing goods in a later period. At a time when SME market prices were declining rapidly, this effort led to large losses for LifeTree.

37. Figure 1 details the various contracts made by LifeTree while attempting to salvage the first shipment to WRE and the substantial losses associated with this action. The underlying documentation for these calculations may be found in Appendix 4 to this report.

### LifeTree Contract Changes

| Date | Transaction | Quantity | Price ($/metric ton) | | Shipment | Gross Margin | |
|---|---|---|---|---|---|---|---|
| 7-Apr-14 | Purchase | 8,500 | $ | 850.00 | June | | |
| 21-May-14 | Sale | 8,500 | $ | 832.00 | June | | |
| | | | $ | (18.00) | | $ | (153,000.00) |
| | Commission | | $ | 1.00 | | $ | (8,500.00) |
| | | | Net | | | $ | (161,500.00) |
| 19-May-14 | Purchase | 21,500 | $ | 822.98 | 15 Jun / 15 Jul | | |
| 11-Jun-14 | Sale | 21,500 | $ | 840.00 | 20 Jun / 20 Jul | | |
| | | | $ | 17.02 | | $ | 365,930 |
| | Commission | | $ | 2.00 | | $ | (43,000.00) |
| | | | Net | | | | 322,930.00 |
| 21-May-14 | Purchase | 8,500 | $ | 833.00 | June | | |
| 11-Jun-14 | Sale | 8,500 | $ | 840.00 | 20 Jun / 20 Jul | | |
| | | | $ | 7.00 | | $ | 59,500.00 |
| | Commission | | $ | 2.00 | | $ | (17,000.00) |
| | | | Net | | | $ | 42,500.00 |
| 11-Jun-14 | Purchase | 22,000 | $ | 833.00 | Jul | | |
| 7-Jul-14 | Sale | 22,000 | $ | 833.00 | Jul | | |
| | | | $ | - | | $ | - |
| | Commission | | $ | 1.00 | | $ | (22,000.00) |
| | | | Net | | | $ | (22,000.00) |

| Date | Type | Quantity | Price | Period | Amount |
|---|---|---|---|---|---|
| 7-Jul-14 | Purchase | 15,000 | $ 833.00 | 20 Jul / 30 Aug | |
| 29-Jul-14 | Sale | 15,000 | $ 843.00 | Aug | $ 150,000.00 |
| | | | $ 10.00 | | |
| | Commission | | $ 1.00 | | $ (15,000.00) |
| | | | Net | | $ 135,000.00 |
| 7-Jul-14 | Purchase | 7,000 | $ 833.00 | 20 Jul / 30 Aug | |
| 19-Sep-14 | Sale | 7,000 | $ 780.00 | Sep | $ (371,000.00) |
| | | | $ (53.00) | | |
| | Commission | | $ 2.00 | | $ (14,000.00) |
| | | | Net | | $ (385,000.00) |
| 29-Jul-14 | Purchase | 15,000 | $ 843.00 | Sep | |
| 19-Sep-14 | Sale | 15,000 | $ 780.00 | Sep | $ (945,000.00) |
| | | | $ (63.00) | | |
| | Commission | | $ 2.00 | | $ (30,000.00) |
| | | | Net | | $ (975,000.00) |
| 19-Sep-14 | Purchase | 15,000 | $ 783.00 | 10 Oct / 10 Nov | |
| 10-Dec-14 | Washout | 15,000 | $ 515.00 | 10 Oct / 10 Nov | |
| | | | $ (268.00) | | $(4,020,000.00) |
| | Carrying charges | | | | $ (281,250.00) |
| | | | Net | | $(4,301,250.00) |
| 19-Sep-14 | Purchase | 7,000 | $ 786.50 | Nov | |
| 30-Dec-14 | Washout | 7,000 | $ 475.00 | Nov | |
| | | | $ (311.50) | | $(2,180,500.00) |
| | Carrying charges | | | | $ (131,250.00) |
| | | | Net | | $(2,311,750.00) |
| | | | Total | | $(7,656,070.00) |

Figure 1.

38. The second shipment intended for WRE was to have been shipped during 1 September to 30 October 2104. As the first shipment was delayed by WRE, so the second shipment was also delayed until 15 Dec 2014 when WRE sent its letter of repudiation to LifeTree.

39. Using the method described in the governing FOSFA 51 contract, LifeTree suffered market losses and carrying charge costs on that day in the amount of $6,429,900.00. These damages are calculated as follows:

9

| | |
|---|---|
| Original contract FOB price | $860.00 per metric tonne |
| Market price on 15 Dec 2014[11] | $664.47 per metric tonne |
| Difference | $195.53 per metric tonne |
| Mean contract quantity | x  30,000 metric tonnes |
| Market difference | $5,865,900.00 |
| Carrying charges: | |
| 15 days @ $0.50 / day x 30,000 metric tonnes | $  225,000.00 |
| 15 days @ $0.75 / day x 30,000 metric tonnes | $  339,000.00 |
| Total losses | $6,429,900.00 |

40. The third shipment of the WRE contract was to be made during 1 October to 31 December 2014.  Since the two previously contracted shipments had not been made, this shipment was also not made by the time of the repudiation letter on 15 December 2014.

41. Again using the method described in the governing FOSFA 51 contract, LifeTree suffered losses of $5,865,900.00 on 15 December 2014.  The calculation of the damages is as follows:

| | |
|---|---|
| Original contract price | $860.00 per metric tonne |
| Market price[12] on 15 December 2014 | $664.47 per metric tonne |
| Difference | $195.53 per metric tonne |
| Mean contract quantity | x 30,000 metric tonnes |
| Market difference | $5,865,900.00 |

42. Additionally, when WRE repudiated the contract on 15 December 2014, LifeTree was deprived of the following anticipated gross trading margins on each shipment:

---

[11] JJH Execution email of 15 Dec 2014 at 11:56 PM
[12] *ibid.*

10

|             |                          |
|-------------|--------------------------|
| Gross margin | $59.75 per metric tonne |
| X           | 30,000 metric tonnes     |
| Total       | $1,792,500.00            |
| X           | 3 shipments              |
| Grand total | $5,377,500.00            |

**CONCLUSIONS**

43. Based on my review of the documents and pleadings in this case, combined with my present active involvement in biodiesel trading and contracting and my 40+ years' experience in the international trading of commodities, I have reached several opinions regarding this transaction.

44. It is usual and customary for trading partners to issue written contract confirmations for signature which include all of the pertinent terms of the trade. It is also usual and customary for trading partners to issue amendments in writing whenever the original terms of the trade are changed by mutual agreement. LifeTree and WRE both signed the contract of 9 May 2014 without amendment and, thus, it is my opinion that this represents the entirety of the agreement between them.

45. It is also usual and customary in a trade of this type for the seller to require the buyer to open an LC in case the buyer cannot make payment for the goods when the goods are shipped. This is one of the few ways in which a seller can be guaranteed of payment for goods which have left his control and are located in a foreign port. Thus, the issuance of an LC is crucial to the bargain between buyer and seller and a failure to open such an LC in a timely manner is a material breach of the agreement.

46. The present contract called for WRE to open an LC promptly after the signing of the contract. In my opinion, the requirement for prompt action is interpreted in the commodities trading industry as no more than ten (10) days. Thus, WRE had until 19 May 2014 to open the LC to guarantee payment. However, WRE never opened a LC and, therefore, LifeTree could not be expected to make any shipments without a guarantee of payment.

47. Although LifeTree had bought goods for the fulfillment of the WRE contract, it subsequently managed to move these purchases forward in time in order to accommodate WRE's material delay in establishing a LC. Unfortunately, these commercially reasonable actions ultimately resulted in substantial losses to LifeTree as they rolled purchases forward in a declining market.

11

48. As a consequence of WRE's failure to perform under the contract, LifeTree suffered damages of at least $25,329,370.00. These damages are calculated in accordance with the governing FOSFA 51 contract and the customary calculations of damages made in the industry.

Respectfully submitted,

J. Stephen Lucas

28 October 2016