Hbtdlif1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   LIFETREE TRADING Pte. Ltd.,

4                 Plaintiff,

5            v.                        14 Civ. 9075 (JPO)

6   WASHAKIE RENEWABLE ENERGY, LLC,

7                 Defendant.

8   ------------------------------x

9                                     November 29, 2017
                                      9:30 a.m.
10
    Before:
11
                      HON. J. PAUL OETKEN,
12
                                      District Judge
13                                      and a jury

14

15                      APPEARANCES

16
    LAW OFFICE OF JOSHUA E. ABRAHA
17       Attorneys for plaintiff
    BY:  JOSHUA ELI ABRAHAM, Esq.
18                 Of counsel

19  ZHONG LUN NEW YORK
         Attorneys for defendant
20  BY:  LEODIS CLYDE MATTHEWS, Esq.
         KERRY JAMES KALTENBACH, Esq.
21                 Of counsel

22  Also Present:

23       DEREK COLE, IT Specialist

24

25

Hbtdlif1

1             (Trial resumed; jury not present)

2             THE COURT:  Good morning, everyone.

3             MR. MATTHEWS:  Good morning, your Honor.

4             MR. ABRAHAM:  Good morning, your Honor.

5             THE COURT:  We're here I guess to continue the

6    charging conference relating to jury instructions in the case.

7    It is November 29th, Wednesday.  We completed testimony.  Both

8    sides rested with respect to their cases.  I don't know if you

9    rested last night because we didn't have much time in the rush,

10   but yesterday afternoon we started discussing the legal issues

11   implicated in the jury charge.  I asked the parties to provide

12   what I called their best and final offers of proposed jury

13   instructions by 9 o'clock last night, and I did receive emails

14   to our chambers' email.  I just want to make sure that's clear

15   for the record.  And this was based on what we had handed out

16   yesterday afternoon as my current draft of the jury charge.

17            So we received -- we'll try to get these emails on the

18   docket just so the record is clear as to any timing of

19   everything and for purposes of any appeal.

20            So 8:17 p.m. on November 28th, we received an email

21   from plaintiff's counsel, Mr. Abraham:  "Dear Judge Oetken, I

22   represent plaintiff LifeTree trading in the above-referenced

23   action.  I write to inform the Court that LifeTree has no

24   objection and seeks no modification to the form of the jury

25   instructions provided to counsel this afternoon."

Hbtdlif1

1          And then we also received an email from Mr. Matthews,

2     counsel for defendant, at just after 9 o'clock p.m., 9:10 p.m.:

3     "Dear Judge Oetken, our office has represented the defendant

4     Washakie in the above-referenced action and write to register

5     our objection to (1) the proposed jury instructions at page 6.

6     They are in the paragraph beginning with "under New York law"

7     and ending with "Damages Provision;" and (2) the last sentence

8     of the last paragraph on page 6 and ending on page 7 with the

9     words ending that paragraph "refusing to go on."

10         "Our objection to the first sentence is that New York

11    statutory and case law provides for a calculation of damages

12    and should be the standard for both the timing of damages and

13    the method of calculating the damages.  Secondly, with respect

14    to the latter objections, WRE contends that the language does

15    not clearly reflect that if the plaintiff elects to continue

16    performance, it cannot later assert the previous basis for any

17    default.  Additionally, the plaintiff has not conceded and does

18    not contend that any evidence demonstrates that the contract

19    was materially breached, as required under New York law,

20    entitling it to make the election, nor does plaintiff concede

21    that New York law is applicable to the determination of

22    damages.

23         "For the above reasons, the parties are not in

24    agreement with the proposed instruction.

25         "Defendant also attached hereto three additional

Hbtdlif1

1   requested jury instructions and will request an instruction on

2   prior inconsistent statements from the New York Pattern

3   instructions.

4           "Respectfully submitted, Mr. Matthews."

5           So I wanted to make sure the record is clear that you

6   all had a copy yesterday of my draft charge and you registered

7   these objections.  My law clerk, Ms. Weiner, has just handed

8   out a draft verdict form that I propose to use and also revised

9   jury instructions just based on an edit we did adding the

10  arbitration language I discussed and a few other edits we

11  caught, and those are all shown in track changes.

12          So now this morning we're here to discuss any

13  additional issues, including the issues raised last night.  I

14  see that we also just got from defense counsel at 9:18 this

15  morning copies of two cases.  So, I assume you will want to

16  talk about that.

17          Before we get to that, let's do the easy stuff first,

18  I think, which is the three proposed instructions that are

19  attached to defense counsel's email.  The first reference,

20  there is a reference to prior inconsistent statements.  I

21  actually believe that's already in there under "Impeachment of

22  Witnesses."  I think that should cover it.

23          MR. MATTHEWS:  OK.  We accept that, your Honor.

24          THE COURT:  OK.  And then in terms of use of

25  depositions, I believe the only -- there were no depositions

Hbtdlif1

1    offered, sort of designated depositions, as testimony.  The

2    only -- as I understand it, the only depositions were prior

3    inconsistent statement use of depositions, and, therefore, I

4    don't think we need the sentence about "Depositions' testimony

5    is entitled to the same consideration," etc., etc.  So what

6    I've done is I've added under 'Impeachment," I've added the

7    word "sworn," because I think the point we need to make about

8    depositions when they're used for impeachment purposes is that

9    a deposition is sworn testimony.  That's the only missing

10   piece.

11            So under "Impeachment," we added -- sorry, we added

12   the word "such as a deposition" after the reference to "sworn

13   testimony," because that makes clear that a deposition is a

14   sworn thing.  And then the discussion about use of sworn

15   testimony in "Prior Inconsistent Statements" makes it clear

16   that the deposition is an example of sworn testimony.

17            MR. MATTHEWS:  Thank you, your Honor.

18            THE COURT:  And then on numbers of witnesses, I

19   believe that's sufficiently in there under "Burden of Proof" on

20   page 4.  If you look, the fourth line down at the end, it

21   refers to the quality and persuasiveness of the evidence, not

22   the number of witnesses or exhibits.  I believe that's in

23   there.  And then there is also discussion of general --

24   considering the quality and nature of the credibility of

25   witnesses.  And having the ability to present better evidence,

Hbtdlif1

1    I've never used that instruction.  I'm not inclined to use it.

2             So, I'm all ears.  What else do you want to talk

3    about?

4             MR. MATTHEWS:  We have no objection to the Court's

5    modifications placed on the record.

6             THE COURT:  OK.

7             MR. MATTHEWS:  And LifeTree has no objection to the

8    Court's modifications this morning or to the verdict form that

9    was presented today.

10            THE COURT:  OK.  And are you OK with the verdict form

11   as well, Mr. Matthews?

12            MR. MATTHEWS:  Yes, your Honor.  We have the verdict

13   form.

14            THE COURT:  All right.  And did you want to talk about

15   the two cases?

16            MR. MATTHEWS:  Yes, your Honor.

17            THE COURT:  OK.

18            MR. MATTHEWS:  I don't believe -- just for the record,

19   I don't believe we have any objections to the verdict form, but

20   I would like to conclude that after we speak about the next

21   matter.

22            THE COURT:  OK.

23            MR. MATTHEWS:  Yes.  Thank you, your Honor.

24            THE COURT:  Yes.

25            MR. MATTHEWS:  May it please the Court, your Honor,

Hbtdlif1

and certainly I offer my apologies to the Court for the timing
of getting these two cases to the Court that I have been
thinking about the Court's discussion with us last night, and I
certainly realize that we may not have made our position as
clearly as we could have.  So we've retrieved these two cases,
your Honor, in order to sort of clarify the defendants'
position.

          First of all, the testimony of the damages is
undisputed by Mr. Lucas that with respect to the damage clause,
there are penalty provisions -- pure penalty provisions -- for
the only purpose of spurring performance.  Not an actual
damage, not a damage that would be imposed because of the fact
that this was a CFFO contract, and as we stated, they attached
this FOSFA 51, which is a FOB contract, but the language on the
damages -- and there is only one damage clause, one damage
provision, that describes all the damages.  It provides for
what you'd expect as penalties in the nature of liquidated
damages.

          And we provide to the Court, on Breath LLC v. White
Fox ventures, one case which discusses two issues that we
believe that were mentioned yesterday before the Court.  The
first one, your Honor, is that with respect to penalties, it's
a matter of public policy that they are not enforceable in a
private contract between the parties.  And what's referenced is
a settlement agreement which appears to have that language in

 1   it, and the court, in addressing this, has stated -- excuse me,

 2   I lost my spot there -- that the penalty -- as a damage clause,

 3   the penalty in a party's damage clause is unenforceable.  So

 4   from -- it's been the defendants' point of view that the

 5   contract provides that, look, if there is any conflict with

 6   respect to both the first part of the four pages and then the

 7   attached form, it's under California -- not California, under

 8   New York law.  And New York law does not permit as a matter of

 9   policy the type of damages that are described, according to the

10   testimony we've had from the expert in this case.

11           The other case that we have provided to the Court is a

12   case which deals with -- and we provided it to the Court for

13   the purposes of its analysis.  And basically that case, your

14   Honor, deals with the issue of a agreement and what is sort of

15   either mortgage or another type of contract which deprived the

16   party of a redemption right.  And the Court discusses that and

17   references a Supreme Court case, which basically says that if

18   there is a clause that deprives a party of a right, then that's

19   unenforceable.  And here, it is our position that the clause

20   and FOSFA 51 deprives the defense of the purposes of the law,

21   which is that that penalty is unenforceable.

22           So it's on that basis, your Honor, that we've objected

23   to the instruction of the Court, which as I read it seems to

24   specifically direct the jury that they must consider the

25   damages as stated in FOSFA 51 in computing the damages in this

Hbtdlif1

1    case, and we would submit, your Honor, that that would be

2    contrary to the parties' agreement and that would also be

3    contrary to New York law.

4             THE COURT:  So you're talking about the carrying

5    charges provision when you talk about the penalty?

6             MR. MATTHEWS:  I'm talking about -- specifically, yes,

7    your Honor, but we're referencing the damages provision, and I

8    would submit the other case that we talked about here is in a

9    bankruptcy court but it cites New York law and Southern

10   District cases, indicate that the logic is -- there is only one

11   damage provision here, and it's our position that we look at

12   the damage provision as it is being interpreted and it includes

13   a penalty.

14            THE COURT:  I'm sorry?

15            MR. MATTHEWS:  And it includes a penalty that is not

16   enforceable under New York law.

17            And that's the plaintiff's position, as I've

18   indicated, your Honor.

19            We have no objection to the verdict form as it's

20   stated.

21            THE COURT:  But what's the particular language in the

22   jury instruction that you object to?  I mean, my understanding

23   was that you agree -- the one part of the agreement, FOSFA

24   agreement, that refers to arbitration and talks about the

25   measure of damages, you're OK with that, right?

Hbtdlif1

1              MR. MATTHEWS:  Absolutely not, your Honor.  This

2      isn't -- just to be clear, the issue in the damage provision

3      provides -- well, the issue is whether the damages are covered

4      under New York law or covered by the contract.  And it's our

5      position that if the damages that the plaintiff is seeking is

6      prohibited by New York law, then it's clear that the parties

7      meant and intended that those damages or that damage provision

8      of the FOSFA would not be applicable, and I don't think this is

9      a circumstance where we can pick and choose.

10             THE COURT:  But I thought -- the carrying charges,

11     you're right, Mr. -- remind me of the expert's name.

12             MR. ABRAHAM:  Lucas.

13             THE COURT:  Mr. Lucas testified that it was a penalty,

14     but he also testified that it was a fair estimation of the

15     amount of carrying costs, carrying charges, and it just set the

16     contract.  New York law, as I understand it, provides that

17     fixing liquidated damages is fine and legal as long as it is a

18     reasonable estimate, and that if it goes to some punitively

19     level not based on anything in reality, then it's void as a

20     penalty.  The fact that he used the word "penalty" I don't

21     think is dispositive.

22             Now, the language in the other clause that talks about

23     the difference between the market price and the contract price,

24     that's standard UCC damages.  I don't see that as a punitive or

25     a penalty.  I mean, I think that's just a standard measure of

304

Hbtdlif1

1    damages.

2              MR. MATTHEWS:  Your Honor, if I may?  With respect to

3    the first matter the Court raised, it's undisputed that this

4    contract is a CIFFO contract.  None of the parties dispute

5    that.  Mr. Lucas has testified that his damages include

6    carrying costs that under a CFFI contract would not be

7    recoverable.  If the contract was performed, there are no such

8    damages that exist to be paid on either side.  This is between

9    the parties to this case.  We're not talking about past

10   expenses, we're talking about future.  And what he calculates

11   on his chart and particularly with respect to the future

12   damages or carriage under the second part is that there is only

13   one purpose for that, and that is to spur performance and it is

14   a penalty.  There is no estimated cost based upon that.

15             THE COURT:  So you're arguing that the carrying cost

16   is void as a penalty?

17             MR. MATTHEWS:  I am arguing that the damage -- yes,

18   your Honor.  And I understand -- it is our position that we

19   can't pick and choose.  If New York law says, hey, the damages

20   that they're seeking are unrecoverable, I don't think we can

21   look at the damages and say, well, 10 percent of it is and the

22   rest of it isn't.

23             THE COURT:  OK.  What are you asking from me?  What is

24   the request?

25             MR. MATTHEWS:  Yes, your Honor.  I'm asking the Court,

Hbtdlif1

        as a matter of law, and based upon the undisputed evidence

        here, that New York law applies with respect to the issue of

        damages, and that's what the parties wrote.  And I believe that

        no reasonable jury can find that, contrary to that, if the

        penalty is imparted as damages is not there.

                THE COURT:  OK.  Mr. Abraham, would you like to

        respond?

                MR. ABRAHAM:  Yes, your Honor.

                From the cases that I saw this morning from Mr.

        Matthews, it seems to be the defendants' position that the

        damages provisions in our contract are unenforceable liquidated

        penalty damages -- penalties provisions.  Putting aside

        Mr. Lucas' testimony, which we think was to the contrary, that

        goes to the issue of contract formation and validity, which

        provisions of the contract are valid.  I think that ship has

        sailed.  I think at this point the defendant has conceded that

        there was a valid binding contract between the parties.  The

        defendant has also conceded that there has been a breach.  Now

        the only question is measuring damages.

                To the extent the defendants had an issue with this

        provision or, frankly, any other provision of the contract,

        including the arbitration clause, including any other provision

        that's perhaps not valid, that's something that has long been

        open, conceded, should have been brought up in briefing as to

        the contract formation.  So, I think that issue has absolutely

Hbtdlif1

1   been resolved and even waived.

2           Also, it mischaracterizes the testimony of Mr. Lucas.

3   He calls it a penalty in the sense that, you know, you have

4   these storage costs, and the scheme set up by FOSFA is that in

5   the event of a default, rather than having the parties go and

6   in a cumbersome manner proving the exact amount of their

7   storage costs, the contract simply includes a standard daily

8   penalty rate just for the convenience of the parties.  In that

9   sense he called it a penalty.  He didn't call it, you know, an

10  outrageous punitive clause that gets, you know, applied in a

11  manner that is supposed to, you know, devastate the defaulting

12  party.  It's just sort of a standard -- and it is actually

13  capped based on a certain number of days.  So even if the

14  nonbreaching party incurred more carrying charges, they are

15  actually capped.  So in that sense I don't think he called it a

16  penalty clause.

17          And I will just add that, you know, the cases that

18  were cited talk about certain clauses being against public

19  policy.  That goes to, you know, the formation and

20  enforceability of a contract.  That's already been decided by

21  the Court.  And they've conceded that the parties had a valid

22  binding contract and that they breached it.  Now it is just a

23  question of calculating the damages.

24          THE COURT:  Right.  Yes.  My judgment on this -- I

25  mean, insofar as this is a motion for judgment pre-verdict, I'm

Hbtdlif1

going to deny it for a couple of reasons.

First of all, the UCC provision of New York law that governs says damages for breach by either party may be liquidated in the agreement but only in an amount which is reasonable in light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy.

And I think New York law generally applies a reasonableness test.  The testimony that I heard I think certainly permits a reasonable jury to determine, or me to determine, that the carrying costs, which are very clearly set forth in the agreement, were a reasonable rather than punitive estimate of carrying charges as a result of a breach of contract and as opposed to punitive.

I'll also note that they are not a large part of the damages.  They are in the hundreds of thousands of dollars, I think, maybe a million when you put them together, out of 25 million being sought.  So I don't think that that suggests they are punitive either.

And in any event, I think that if it were true that some part of the damages sought were an invalid penalty, I don't think that would invalidate the entire damages award.  It would invalidate that portion of the damages' award.

So, I will deny that motion for judgment insofar as

Hbtdlif1

1        that's what it is.

2                    What else?  Any other issues?

3                    MR. ABRAHAM:  Nothing else from LifeTree.

4                    MR. MATTHEWS:  I think, your Honor, we resolved the

5        issue concerning the modification or amendment.  I don't recall

6        seeing anything in the instructions concerning that so --

7                    THE COURT:  Right.  Since the parties didn't want to

8        push for that, I'm not putting it in.

9                    MR. MATTHEWS:  OK.

10                   THE COURT:  So I'll plan to read the version that you

11       have of the instructions with the changes, if that's all right.

12       I know you've registered objections to some of those.

13                   MR. MATTHEWS:  Yes, your Honor.  We obviously also

14       register objection with respect particularly -- well, on the

15       issue that we raised before the Court, that New York law would

16       be applicable and gauge the timing of damages, so I think the

17       Court has covered that.

18                   THE COURT:  OK.  And you are ready for your closing?

19                   MR. ABRAHAM:  We are ready.

20                   THE COURT:  Defendant first, then plaintiff.

21                   And how long do you think you'll take?

22                   MR. MATTHEWS:  20/30 minutes, your Honor, if that.

23                   THE COURT:  OK.

24                   MR. ABRAHAM:  Yes, about 20 minutes.

25                   THE COURT:  OK.  And any other preliminary matters?

Hbtdlif1

1              MR. ABRAHAM:  None from LifeTree.

2              MR. MATTHEWS:  Just so that we're clear on the

3    exhibits that are in, your Honor, so we are not --

4              THE COURT:  Yes.  You should put together a set of the

5    exhibits to go back to the jury.

6              MR. MATTHEWS:  Yes.  We can probably do that very

7    quickly.

8              THE COURT:  Yes.  Actually, I think Mr. Hampton has

9    the definitive list.  So if you want to -- I'll take a break,

10   and you can make sure that you have sort of the definitive set

11   of exhibits.  And if there is any question about it, you can

12   ask me because I have a good list, too, or we will check the

13   transcript if we need to.

14             MR. ABRAHAM:  Thank you.

15             THE COURT:  All right.  So we'll be back in five or

16   ten minutes, whenever the last juror comes in.  Thanks, folks.

17             (Recess)

18             THE COURT:  Ladies and gentlemen, are we ready for the

19   jury?

20             MR. ABRAHAM:  We are.

21             MR. MATTHEWS:  We are.

22             THE COURT:  All right.

23             MR. MATTHEWS:  I thought we had agreed we were going

24   to use one set, the set of exhibits, in any discussion with the

25   jury.  That would be the same one that goes to the jury room.

Hbtdlif1

1          THE COURT:  Right.  I think the one Mr. Hampton has,

2     the final version, that binder will go in the jury room.

3          MR. MATTHEWS:  Yes.  And for appearance sake, your

4     Honor, we would prefer to use the same one rather than a

5     different one, the same one that the jury will take with them

6     in the jury room.

7          THE COURT:  You prefer to use that --

8          MR. MATTHEWS:  In closing, yes, on the Elmo.

9          THE COURT:  Oh, OK.  Are you using any of the

10    exhibits?

11         MR. ABRAHAM:  We have copies of all the exhibits.  We

12    have electronic and also hard copies.

13         THE COURT:  Yes, they are going to use electronic

14    ones.

15         MR. MATTHEWS:  As the defendant, we don't want to be

16    using them from one book and the jury get back and be looking

17    at another book.

18         THE COURT:  Well, it is all going to be in one book.

19         MR. MATTHEWS:  Yes, I understand.  But we want to use

20    the same book that the jury uses.

21         MR. ABRAHAM:  I'm not sure why but --

22         MR. MATTHEWS:  Is there any objection to that?

23         THE COURT:  No.  Oh, you want to use the actual book?

24         MR. MATTHEWS:  Yes, your Honor, the actual book.  We

25    don't want to indicate that we are getting documents from

Hbtdlif1

1   someplace else because --

2          MR. ABRAHAM:  I could give you an extra copy of our

3   exhibits, if you need that.

4          THE COURT:  Yes.

5          MR. MATTHEWS:  All right.  We solved it.  Thank you,

6   your Honor.

7          THE COURT:  OK.  Great.

8          MR. MATTHEWS:  OK.  Thanks.

9          (Pause)

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Jury present)

2          THE COURT:  Good morning.  Welcome back, ladies and

3     gentlemen of the jury.  I hope you all had a good night.

4          As I said yesterday, we completed all the evidence in

5     the trial yesterday afternoon, and we're now at the point in

6     the trial, two important things left.  One is the closing

7     arguments of the lawyers.  Each side gets a chance to discuss

8     the evidence and argue to you about how you should think about

9     the evidence and analyze it.  Defendant goes first, plaintiff

10    goes second, because the plaintiff has the burden of proof.

11    Then my instructions to you, which are detailed instructions

12    about the law and how your deliberations are supposed to work

13    according to the law.

14         So we're going to start with the summations, or

15    closing arguments, of each of the counsel for the parties.  And

16    just make sure you all have your notepads.  You all have them?

17         A JUROR:  Yes.

18         THE COURT:  Just to remind you, as I've said several

19    times before, the evidence in the case was the testimony of the

20    witnesses and the actual exhibits, which you'll have in the

21    jury deliberation room with you.  The lawyers are free to argue

22    about what the evidence shows.  But if there is any

23    inconsistency, it's the evidence and your recollection and

24    interpretation of it that controls.

25         We will now have the closing argument on behalf of the

1    defendant.  Mr. Matthews.

2                 MR. MATTHEWS:  Thank you, your Honor.

3                 May it please the Court, counsel, ladies and

4    gentlemen:

5                 We appreciate the time that you've been here, the

6    attention that you've provided.  And you will recall, at the

7    beginning, one of the things I mentioned was the concept of

8    trying to decide what this case is not about, what the evidence

9    has not shown.  And then we can focus on what the evidence has

10   in fact demonstrated.

11                Now, because this has been a relatively short trial,

12   it's not my intention to go witness by witness and examine

13   everything that everybody said and go back and forth.  And

14   there's a reason for that.  First of all, what we don't have in

15   this case is evidence to show that the damages that are being

16   claimed here have been proved.  We've had testimony from some

17   witnesses that they have had auditors and accountants and a

18   document in which the plaintiff is basically handing you or us

19   an invoice for $25 million and saying, pay it.  We have to look

20   at, well, what is the purport behind this?  So the issue, if

21   you walk right now into the jury room and you have to look at

22   the evidence and you have to decide, what basis do we have to

23   determine that $25 million is due?  What is the actual proof?

24   What we would expect to see based upon the testimony of the

25   witnesses is that they maintain corporate records, they

1   maintain financial documents, they maintain auditing

2   statements.  When you ask them for $25 million, they should

3   come in here with documents to show that.  We don't have that

4   in this case.  We have nothing, no proof of any damages.

5          We've heard that they have this debt.  There is no

6   proof that that debt hasn't been forgiven.  What is clear is

7   that in the last 20 years there's been no effort to collect the

8   debt.  There's been no lawsuit, no arbitration.  There's been

9   nothing done.

10          The other thing is, if in fact this company in the

11  Netherlands or in China, whoever is making the decision, was

12  really after this debt and making calls, as Mr. Rooz said --

13  and he admitted that, no, he personally didn't receive any such

14  calls -- we are not to abandon our common sense.  If $7.6

15  million is owed, wouldn't we expect to see a letter from the

16  lawyer?  Yes, they would have you believe that someone in the

17  Netherlands or China called them up and said, hey, you owe me

18  $7.6 million and I'm threatening you personally to sue, or the

19  company.  There's been not one shred of evidence to show that

20  that was an actual expense of this company.  None.

21          The other thing that we don't have here is proof that

22  any of the damages that they say they have incurred were actual

23  damages according to their own testimony about how this

24  industry works, that they were entitled to.

25          Let's look at what we do have, because I think that's

 1    important.  And I think it's important to start right at the

 2    top with their expert, because I don't want you to forget the

 3    last witness we heard in this case was the expert for the

 4    defendants, Mr. Hewlett.  And basically he only testified to a

 5    couple things.  And we know from the testimony of Mr. Lucas,

 6    Mr. Hewlett is saying, look, the breach of contract, whatever

 7    you want to call it, it all happened in this time frame.

 8    Mr. Lucas, on the other hand, goes back and forth and argued,

 9    well, it's not really a default.  As far as we are concerned,

10    we could be sitting here today, and there's still no default,

11    according to his testimony.  Because they had already filed

12    suit, he says that doesn't matter.  The truth is, that's

13    different than what he testified to in his deposition.  And if

14    you remember, in his deposition, he said, look, the money is

15    the heart of this deal.  It goes, it's vital, it goes to the

16    heart of the deal between the parties.  No money, nothing

17    happens.  It's dead, in other words.  Without a heart, the

18    contract is dead.

19         Now, he wants you to believe that, even though he had

20    to admit that and he tried to tell you, the payment term was

21    not really that important, because the parties could have

22    believed -- well, he had to admit that he testified before that

23    the payment term is a material breach.  This is the most

24    significant part of the deal.  And when the deal was done,

25    everybody understood that, look, this is all going to work if

 1  we come up with the letter of credit within this certain time

 2  frame.

 3          Now, the plaintiffs have come in here and tried to get

 4  you to think that, well, in the past, you know, we worked

 5  something out.  But that's not what the contract says.

 6  According to the testimony both Mr. Rooz, who has been in this

 7  business since 1981, over 35 years, and Mr. Katz, who said he's

 8  been in this business for 45 days and has dealt with thousands

 9  of clients, Mr. Katz agreed that the heart of the relationship

10  is the contract.  This isn't where they're involved personally

11  and making a decision outside of the confines of the contract.

12  And if they did, that's the risk that they're taking.

13          Now, Mr. Katz finally came in here and we're beginning

14  to really understand why this lawsuit exists, because he said

15  something very important, which didn't seem so at the time; he

16  said, look, I've lost my reputation.  With thousands of

17  clients, one client doesn't pay up?  What did that have to do

18  with his reputation?  He thought about that, and that's why

19  we're here today.  This lawsuit is not about the damages.  It's

20  about his effort to save face with the people that he had a

21  disagreement with.  And undoubtedly he came to them and said,

22  look, I know how to handle this and I know how to set up this

23  so that there is a track, a financial guy who understands risk.

24          So what did he set up?  Let's be realistic.  And I'll

25  use the words that the man whose name -- you read his

1    biography -- when he said, in his biography, it's time for some

2    truth telling.  And it's time for some truth telling now.  The

3    truth telling discloses that they decided to take the risk.

4    And how do we know that?  Well, first of all, right from the

5    beginning, a month before there was any agreement at all, they

6    would have you -- they went out and bought product.  And, guess

7    what, when they later sold that, our client is responsible for

8    that.  That's what they would have you believe.

9              Now, we started looking at that and sort of

10   understanding, well, what did that mean in the context of this

11   entire case.  And finally, with the testimony of Mr. Katz, it's

12   all clear.  Has already testified, about the -- as you will

13   recall, with Mr. Rooz, I went back and forth with him over

14   where did this 30,000 -- he testified that they bought 30,000

15   metric tons before the contract so that they could be prepared.

16   I showed him a document.  He said, well, no, it's not that one,

17   it's another one.  But when we got the expert up there and we

18   started looking at the documents, there was no 30,000 that was

19   bought in April, according to the documentation.

20             Instead, what there was, this exhibit, N, when -- you

21   remember Mr. Lucas testified he created this chart, and he's an

22   expert.  We all believed that, OK, well, this makes sense.  And

23   based on this testimony and this chart, he concluded that this

24   $7.6 million at the bottom is something that is owed.

25             You'll remember that, with the issue of the mitigation

 1    of risk, I cross-examined him.  We asked questions about, well,

 2    isn't it correct that they were actually making a profit, they

 3    were doing this for profit?  And his testimony is that, no,

 4    they were rolling, they were doing other things.

 5           Well, let's look at what Mr. Hewlett has disclosed to

 6    us and look at how the expert in this case -- who, by the way,

 7    quite frankly, departed from his role as an impartial expert

 8    and became an advocate for the plaintiff -- was arguing, the

 9    plaintiffs lost this and the plaintiffs lost that.  We're here

10    for him to provide us evidence and the numbers, provide us with

11    financial documents.  Let's look at the auditing statement.

12    Let's look at the company's records that really show loss,

13    profit, whatever it is.  We don't see any of that.

14           That becomes much more important when we start

15    thinking about the testimony of the other witnesses, Mr. Rooz

16    and Mr. Katz, who stated, they don't know how much the company

17    made in 2003, the CFO, we don't know how much the company made

18    in 2014.  Now, through discovery, Mr. Rooz had to admit that,

19    yes, it was about 80 to 90 million dollars.  But what did

20    Mr. Katz say about that?  He didn't have any idea as the CFO,

21    the guy who was in charge of the money, watching the money,

22    trying to build up the credit, no concept of how much business

23    they had done.

24           And in addition to the fact that he didn't want to

25    work, I would submit, he did nothing, he did absolutely

1   nothing.  He may have made an introduction to the bank.  And we

2   heard all this conversation about the banking person.  Where is

3   that person?  Where are the documents that they talked about?

4           So when you look at the case, we only have one name to

5   rely upon.  And that is the testimony of these three men who

6   came in here and testified.  And I would submit, ladies and

7   gentlemen, that that's not $25 million worth of proof on

8   anything.

9           In the expert's report, Mr. Lucas shows that there was

10  a purchase on 7 April '14, and on May 21st, if you look at

11  this, it appears to be a sale.  My expert looked at that and he

12  said, well, this doesn't make any sense, number one, OK,

13  because you've got transactions here that don't fit.

14          So we went through the exhibits, which, by the way,

15  they are just sort of flashing in front of you.  And here's

16  what they disclosed.  On 21st May -- I'm going to start with

17  the exhibit, for the record here, 18.  Or actually, because the

18  first one shows a sale, I'll start with that exhibit, because I

19  think it will be clearer.

20          And here is evidence of the sale.  May 21st at 3:31.

21  And the sale here, number one, I'm going to ask you to notice

22  that David Ollech is a broker in this case, as in every other

23  transaction that they do.  So LifeTree performs this sale to

24  Bunge Agritrade, in Uruguay, at 3:31 p.m.

25          And by the way, this is what's important about that.

1    Date of delivery, June 2014.  Now, the important part about

2    this is because the contract required a delivery date in June

3    of 2014, not July, that first transaction.  And that is

4    undisputed.  But, here, this is a sale.  And, here, three

5    minutes later, by the same broker, is selling that same product

6    to LifeTree.  So LifeTree wires this at 3:28, May 21st.  That's

7    for June 2004 delivery.

8            They sell it three minutes later, the same broker,

9    back to the same company.  And our expert testified that the

10   effect of that is that, when you look at this, there was no --

11   they never had 30,000 metric tons for delivery in June.  They

12   never had it.

13           Now, are we saying that they must have had it?  What

14   we're saying is that every -- Mr. Rooz, Mr. Katz, came in and

15   testified to you that they had it, when the evidence shows,

16   going down here, that they never had it.  So what is the effect

17   of this?  First of all, that is not the 7 April sale at all.

18   That's the sale that took place on May 21, for both

19   transactions.

20           And how do we know that?  Because we've got June

21   delivery here, June delivery.

22           And how do we know that this 11 June sale is not the

23   sale of that?  Because that's a different delivery.  That's a

24   different contract.  Remember, these are papers.  This is not

25   the actual product.  These are contract papers.  And they have

HBTALIF2ps                     Summation - Mr. Matthews

1    to describe the delivery date.  That is not the same

2    transaction.

3           So that skews -- it's like dominoes.  When it falls

4    over, it affects everything.

5           The other thing is that our client is charged with

6    161,500 in damages that didn't occur.  This number is a total

7    falsification.  It just did not, this sale did not occur as

8    it's indicated here.

9           This is unrebutted evidence.  Their expert sat right

10   back here, heard this testimony.  They could have recalled him

11   to challenge that.  They didn't.  Because the fact is it's

12   unrebuttable.

13          Now, let's take that into consideration and see what

14   we have as a result, because, if you remember, our position is

15   that they were playing the market.  They were making money.

16   And there are two reasons why they did that.  One is to play

17   the market, make money themselves.  So if that 161,000 didn't

18   happen, then we have 322,930, which is a profit.  We have this

19   sale, what they show as a commission, that's the commission for

20   that June -- that May 21st and the May 21st buy and sell within

21   three minutes.  $17,000 commission.  So they weren't holding

22   anything.  This was a buy-and-sell operation.  And that's what

23   they were doing.  But they subtract that.  So that 17,000 goes

24   back in.

25          Then you have the 42, 5 that was made.

1          Let's move down, then, to 22,000, they show another

2     commission.  But what do we know from that?  That's not a June

3     transaction.  That's a July transaction.  So at this point,

4     it's clear that in June, they were not holding the 30,000

5     metric tons.  The fact, ladies and gentlemen, is that that's

6     not what they testified to.  So if we rely upon their oral

7     testimony, you're going to be misled, because that's not what

8     the evidence has shown in the testimony.

9          You add in 135,000 and these numbers, it's over

10    $750,000 in profit that they made.  That's why they were buying

11    and selling it.  And Mr. Katz stated, well, you want to make a

12    little money, so you buy and sell.  And that's OK.  But what's

13    not OK is that they came into this courtroom, took an oath, and

14    basically tried to deceive you as to what was really going on.

15         And I would submit, ladies and gentlemen, that when we

16    look at this, there's no fact to support these damages that we

17    would normally expect to see if we're going to pay someone $25

18    million.

19         Now, the other thing that Mr. Katz said that didn't at

20    the time seem like it made a lot of sense is, he stated that we

21    lost $17 million in book profits.  That means forward looking

22    at profit.  He got the contract.  He booked $17 million on his

23    books.  OK.  Now, why do they keep insisting?  Why did they not

24    declare a default?  Why didn't, if they're on this basis and

25    they're doing business here, why did they not just come in and

1    say, look, you're not going to perform?  The same way that

2    happened with different dates, there at the end when they were

3    unable to deliver.  Default.

4           The reason is, he booked it and they kept it on the

5    books.  If they would have recognized what the experts had

6    already testified to, is, had the breach happened early in May

7    of 2014, they would have zero.  Even their expert admitted

8    that.  Damages would have been zero in that time frame.

9           They kept it on the books so that case could convince

10   the bank that they had this agreement and they were forward

11   looking profit, which in fact, as a matter of the way this

12   whole thing is structured, in industry and in law, it should

13   never have been there.

14          So outside of the issue of risk, they had another

15   reason, unconnected with this transaction itself, to do that.

16          There are a couple other things that I feel compelled

17   to point out about the testimony.  You remember Mr. Rooz was

18   asked, well, what were your damages?  He said, well, 10 million

19   in profits and 2 million cash.  We've got totally different

20   stories.  And when it comes to the expert -- here's the problem

21   with the expert.  He never did anything independently.  If he

22   thought to come in here and convince you that, look, at this

23   stage here was the price, where is the document showing that?

24   If we're having a dispute about the price, a dispute about

25   damages, he should come in and provide you underlying documents

1    to show that.  What do we hear from him instead?  He got all of

2    the information upon which he based his report from the two

3    guys up there who, based upon their own testimony, cannot be

4    trusted.  They were the ones who are gave him all of this

5    information.

6              Now, what did he say about that?  Well, I also checked

7    some sources.  And when I asked him, well, where are they? --

8    because if he's an expert and he's getting $275 an hour to sit

9    here and come in here, to review the case and testify to you,

10   he should be prepared to say, look, I checked the prices, and

11   here they are.  Nowhere in their exhibits is there any

12   indication of that price.  This was made up.  But it's not the

13   sort of thing that you can decide to give a $25 million verdict

14   on.

15             Now, let's look at the issue of how the decision is

16   made in this case, OK.  Mr. Lucas testified that, look, treat

17   it as though it's your own money.  And in all of our lives we

18   have to make decisions, what house to buy, who to marry, what

19   school should our kids go to.  There are factors that go into

20   that.  And we need a level of confidence when we're making a

21   decision.  OK.  And this case, the only basis, when you look at

22   this evidence that is here, that you can make a decision on is

23   unsupported statements from people who the record shows were

24   inconsistent.  They never testified to anything consistently

25   and truly.  And they're asking you for a six-month period to

1   give them $25 million.  And we kind of find out about that.

2   Why?  Because Mr. Katz, who is a 25 percent owner, wants 6

3   million of that for himself.  And Mr. Rooz, who wants another 6

4   million.  And divvy that up between the parties.  We have no

5   evidence, nothing to indicate that there's a demand or even

6   notice of Nidera just to get anything.  And I would submit,

7   ladies and gentlemen, use your own common sense.  If Nidera was

8   interested in $7.6 million, when they're this national, big

9   company, they would have been in here.  They would have sent

10  notices.  Their lawyers would have been in touch.  The only

11  thing we have is the defendant saying, well, we owe this.  And

12  then Mr. Lucas comes in and at first he said, no actual

13  damages.  And then he came back and said, well, actual damages

14  and old damages.

15          And I don't know why he got defensive when I

16  challenged him about, well, they didn't really incur that cost.

17  And he snapped, well, if they owed it to somebody, they're

18  entitled to get it.

19          Nidera isn't in this courtroom.  Your job is not to

20  make a decision to give money to Nidera.  Mr. Rooz said, in his

21  own opinion -- and this is a gentleman who apparently travels

22  the world, and after some 35 years in this commodities

23  business, said, he doesn't know why any Netherlands or China

24  company would sue a company that has no assets, because there's

25  no evidence that they will.

1          Now, they want you to speculate and to buy this story.

2     And I would submit, ladies and gentlemen, that it's just not

3     there.

4          You have been asked to buy what I'll just plainly call

5     a pig in a poke.  You are being asked to buy this sack for $25

6     million, and we don't really know what's in it.  And you're

7     being asked to just trust this expert, who just came here and

8     flashed numbers and gave his great credentials and said, it's

9     $25 million.  There is nothing that shows that it is.

10          I will close by just stating, the gravity of a witness

11     coming in here and taking the stand and not telling you the

12     truth is serious.  Not only were their statements inconsistent

13     that there's really nothing to support it when you take out the

14     story that they told.  And the truth of the matter is that,

15     just like Mr. Katz stated, well -- which I think disclosed his

16     entire attitude, even after they sued, he said, well, that was

17     a -- what were his words?  "Calculated move."  And "calculated

18     move" that they made to come into court, tell this story that

19     is unsupported by any evidence, flash a few documents in front

20     of you, and said, make us all multimillionaires.  I would

21     submit, ladies and gentlemen, that that's not the case.  This

22     whole story about, we're victims because this wrong has been

23     done to us, it's just bogus.  With over 75 years of experience

24     between them and buying and selling and dealing with thousands

25     of people, they would have you believe that this one case

1    destroyed everything, at a time when you and they were under an

2    obligation to call it.  According to Mr. Rooz's own perception

3    and statement, within minutes, Mr. Katz, although he waffled

4    back and forth, agreed that it was with the execution of the

5    document and it could be within 24 hours.

6              All of this issue about buyer's call was nothing but

7    bogus, nothing but bogus.  The contract had the third date

8    specifically there and the second date specifically there.  If

9    that was going to change, the buyer would have to come in to

10   negotiate with them.  They're trying to get us to believe that

11   the buyer at any time could call them up and say, do this.

12             But even if the buyer there, we're talking about

13   shipping from South America to Texas.  I don't know how long

14   that shipment would take.  But it certainly, it's going to take

15   days or maybe even a couple weeks.  He testified that, look,

16   I'm confident, give me the money, give me an update, I'll do it

17   in 30 days, the entire thing.  So that shows us that the story

18   that they were telling us is that, oh, we were fearful that we

19   may not be able to get it, that's all bogus.  And the story

20   that they told us that they did in fact get it and all of these

21   cots, this was nothing, this was nothing but fiction.

22             Now, ladies and gentlemen, the problem is, take away,

23   as Lincoln says, let's figure out what we don't have here.  We

24   don't have a lot of proof.  If someone is going to give you a

25   bill for 25 million, then you say, let's look at it and let's

1    prove it up.  And in this case, they're trying to sell us

2    something that we can't see, because they want us to accept the

3    word of their expert, who can't even produce the underlying

4    document upon which he relied.  But more importantly, he

5    created a chart which mischaracterizes everything.  And he did

6    this deliberately.  He was paid to do that.  He was paid to

7    testify for the plaintiff.  But he didn't have to do this, but

8    he did.  And so the issue becomes, this case is really whether

9    or not these men, who took the stand and raised their hand to

10   tell you the truth, did that.  Thank you for your attention.

11              THE COURT:  Thank you, Mr. Matthews.

12              Ladies and gentlemen, we will now have the closing

13   argument on behalf of plaintiff LifeTree.  Mr. Abraham.

14              MR. ABRAHAM:  Thank you, your Honor.

15              At the beginning of this trial, I asked you to

16   consider a couple questions.  Which side had the evidence?

17   Which side had the proof?  And which side had witnesses who

18   actually testified?

19              Let's start by looking at Washakie evidence.  I think

20   one of the most surprising things that occurred over the past

21   couple days is, Washakie didn't call any fact witnesses in this

22   case.  There was not one employee or one executive from

23   Washakie who took the stand and testified in front of you.

24   Their attorneys were here all alone.

25              You heard about Rachel Kingston.  You heard about

1    Isaiah Kingston.  You heard about Jacob Kingston.  None of them

2    testified.

3         Mr. Kingston is actually here, sitting right there.

4    He's been here for the past two days.  He could have been

5    called as a witness.  But he wasn't.  There is a good reason

6    for that.  Had he taken the stand, he would have had to testify

7    truthfully.  He would have had to raise his right hand and

8    testify that Washakie defaulted on this contract on December

9    15, 2014, and had no excuse for what they did.  He would have

10   had to testify that they directly and purposefully caused $25

11   million in damages to LifeTree.

12        Now, instead of calling actual fact witnesses, people

13   with knowledge of exactly what the situation is, they put

14   someone else on the stand, someone named Jess Hewlett.  And

15   they called him an expert witness.  But it turns out he had

16   actually never testified before as an expert witness.  This is

17   his first time.  And there's a first time for everything.  But

18   maybe not on a contract worth $90 million.

19        It also came out that he primarily works for a company

20   called VALIC.  VALIC is a company that helps people plan for

21   retirement.  They sell IRS plans.  They sell 401(k) plans.  And

22   if you live in the Houston area and you're thinking of saving

23   for retirement, he may be able to guide you.  But he's not an

24   expert in a biofuels case.

25        Now, he works part time for a company called Gulf

1    Retirement Partners.  And it actually emerged that Gulf

2    Retirement Partners does business with them.  They're business

3    partners.  He's also good friends with their friend, someone

4    named Brian McAvoy, which you heard on the stand.  Not an

5    expert in this deal.

6          But he did admit one thing that I thought was helpful.

7    He confirmed, during his testimony, that a default is something

8    that has to be declared.  You have to send a letter.  You have

9    to send an e-mail in order for there to be a default.

10          So on the one hand he claimed that a default occurred

11   on May 19.  But he also admitted that no one declared the

12   default on May 19.  The testimony is not to be believed.  It's

13   a theory that he seemed to have made up.

14          Let's talk about LifeTree's witnesses in this case.

15   That's something that Mr. Matthews addressed.  You heard from

16   LifeTree's witnesses.  They took the stand and they took an

17   oath.  They testified truthfully.  You heard from Mr. Rooz that

18   LifeTree was a company that he founded after a lot of work,

19   after a lot of years in the business, and he built a business,

20   international trading company, with offices in New York, South

21   Africa, Argentina, Singapore.  He also testified that the

22   parties formed a contract in May of 2014.  And he showed you

23   the contract.

24          Now, he also testified that this was the third

25   contract that the parties had entered into.  And when they

1    signed that contract in May 2014, he had every reason to

2    believe that they had the money to pay for it.  In fact, he

3    testified that he was shown bank statements showing tens of

4    millions of dollars in assets.

5            After the contract was signed, Mr. Rooz testified that

6    LifeTree went down to Argentina and he secured 30,000 metric

7    tons.

8            And that's what they did.  It was a buyer's call

9    contract.  And that had to be held for a period of six months

10   for direct delivery to Washakie at their call.  Not one witness

11   contradicted that.  In fact, Mr. Hewlett, their supposed

12   expert, also used that word, "buyer's call."

13           Now, there's been a question raised of, well, did they

14   actually go and purchase 30,000 metric tons.  You know, when

15   lawyers and witnesses get up and speak in front of a jury,

16   there's someone transcribing everything that's said.  Well,

17   when Mr. Matthews gave his opening statement, I want to show

18   you exactly what he said, because it was written down.  He

19   said, "The proof unequivocally and indisputably will show that

20   at one point LifeTree actually acquired 30,000 metric tons of

21   products."  That's what their lawyer said, not me.  There's no

22   dispute in this case that LifeTree actually acquired a product.

23   They did. They went down to Argentina.  They acquired it.  And

24   they swapped it over a period of six months.

25           You were also shown a list of transactions.  You were

1    shown a list of transactions, and some of them occurred in

2    April, a couple of weeks before the contract was signed.

3            Mr. Matthews also has said that it takes a couple

4    weeks for product to be shipped.  He said that, a couple of

5    weeks for product to be shipped from Argentina to Texas.  So as

6    LifeTree is negotiating this contract for June delivery, they

7    have to start buying this product a couple weeks before.

8    That's why you're seeing that in the chart.  That's exactly why

9    it's there.  It takes a couple weeks for this stuff to be

10   shipped.

11           You also saw testimony that Washakie was late in

12   posting a letter of credit.  They started asking for more time.

13   And LifeTree did its best to accommodate them.  They asked for

14   more time.  And we gave it to them.  There were a number of

15   phone calls between the parties on a weekly basis that had

16   never been contradicted, by the way.  No one from Washakie had

17   taken the stand and said, oh, yeah, they never called us on a

18   weekly basis.  On a weekly basis, phone calls were made,

19   e-mails were sent.  And we actually showed you a couple of

20   those e-mails.

21           Now, the first e-mail we showed you was Exhibit 3.

22   William Rooz, in June, writes Rachel Kingston, "Currently we

23   are holding your July order of 30,000 metric tons, and I can

24   swap it out for future delivery, but I will have to pay serious

25   penalty in regards to shipping, storing, and redirecting."  She

1   said, "OK, swap it out.  We'll take it at a later date."

2   Washakie said, "We will take it at a later date."  Contracts

3   don't work like that.  They are still trying to get it, and

4   they are telling them to swap it out.  That chart that we saw,

5   those were the swaps that we did.

6          We also showed you another e-mail.  That was Exhibit

7   5.  This is a July e-mail.  William Rooz sends, "Look, we're,

8   you know -- I want this 90,000 metric tons of material.  We've

9   got to start the cycle for the contract.  What do you want to

10  do?  We have to be logistically prepared and because you guys

11  are late we're starting to get hit with large expenses."  He

12  said, "I want to avoid additional costs."  He said, "We have a

13  cargo ready to go, can you get us the LC within the next two

14  weeks."

15         Here's the response, from Rachel Kingston.  She says,

16  "Well, we will not have the LC within two weeks.  As far as the

17  schedule after that, I think it would be logical to start the

18  rotation instead of getting everything before the end of the

19  year."  So she says, "We're going to start the rotation soon,

20  you know, let's keep doing this."  The contract is still in

21  effect.

22         Let's show you another e-mail.  This is an e-mail in

23  September.  William Rooz writes, "Rachel, this cargo is

24  bleeding the life out of me.  I have rolled it for months.

25  This has to end."  And by the way, he's rolling it because they

1    asked him to roll it.

2         He says, "I'm going way out of my box to try to

3    accommodate you and I'm trying to make any sensible concession.

4    Please do not leave me out to dry."  And Rachel Kingston writes

5    back, "I've not forgotten about you.  I've been trying to

6    figure out a way to make this work."  They are still trying to

7    figure out a way to make this work.

8         Finally, on December 15, 2014, Washakie declares

9    default.  It's a letter on their letterhead, from LifeTree's

10   offices in New York, dated December 15, 2014.  It says, "This

11   letter serves as formal notice," "formal notice," "that

12   contract between Washakie and LifeTree, dated May 6, 2014, is

13   and has been canceled."  So up to this time, up to December 15,

14   there is no question at all that this contract was in effect

15   and the parties are attempting to do their best to perform, and

16   that LifeTree is accommodating Washakie by rolling the goods

17   every month.

18        And you saw that in the chart.  Mr. Matthews tried to

19   say, well, there are mismatches in the date.  He's not reading

20   the chart right.  See, these are month-long contracts.  So you

21   roll it from one month into another.  And that's why our expert

22   matched it up and you can see it.  And that's exactly what we

23   did.

24        Now, I don't know if you remember, but on

25   cross-examination, when they cross-examined Mr. Rooz, they

1    tried to poke holes in his story.  They tried to get him to

2    admit that, oh, you sent us part of the contract at a later

3    time.  He tricked us.  First he sent us the signed contract,

4    and then he said, oh, by the way, here is the addendum that we

5    forgot to send you.

6            And Mr. Rooz testified, "So what I remember giving her

7    was what I received."  And he testified, on the screen in front

8    of you, the last line, "I would assume I gave her the whole

9    contract."

10           And what did they do?  They showed him an e-mail.  OK.

11   The subject of the e-mail was "corrected contract."  They tried

12   to get him to admit that he did in fact send them part of the

13   contract at a later date.  But if you look at the date of this

14   actual e-mail, it was dated a year before the contract was

15   signed.  They were trying to trick him on the stand.  This was

16   misrepresentation.

17           Now, by the way, if Washakie really believed that they

18   never actually got a copy of this contract, you know,

19   Mr. Kingston is welcome to take the stand and let you all know

20   that we never received a contract.  He was welcome to take the

21   stand and let you know, we had no idea what the contract

22   required of us.  He was welcome to take the stand and say, we

23   never knew we had to pay the $90 million.  But he didn't.

24           And, you know, if I recall, there was also some

25   testimony about Mr. Rooz chain-smoking during 2014.  And I'm

1    sure Mr. Rooz would like to quit.  But smoking, smoking isn't a

2    default, as far as I know.

3            You then heard from Shimon Katz, the CFO of the

4    company, who was hired right around the time of this contract.

5    And of course he was asked all these questions about finances

6    of the company years before, but he testified, he was hired in

7    the months preceding the formation of this correct.  And he

8    knew that all the details of this contract.  He was very well

9    informed.  He articulated his testimony well.  And he

10   testified, clearly, that LifeTree did its best to mitigate its

11   damages.  It secured a purchase of 30,000 metric tons.  And as

12   the months started to go by, LifeTree reduced its position by

13   8,000 metric tons.  He turned to you and he explained

14   logistics.  He said, you know, we had to have 30,000 metric

15   tons on hand, at buyer's call, because they could have demanded

16   delivery at any time.  And that's what we did.  But they were

17   starting to get late.  So when we had to mitigate our damages,

18   we had to minimize the exposure, and we sold out a third of our

19   position.

20           And he said, look, I couldn't sell everything, because

21   SME is a hard thing to buy in large quantities.  You can't just

22   go and buy 30,000 metric tons at a pop.  You can buy 2,000 at a

23   pop.  You can buy 5,000 at a pop, maybe even 8,000.  So he

24   said, OK, we can quickly purchase this other 8 as soon as they

25   post the LC, but we have to keep 22,000 metric tons on hand.

1    And in the chart that you saw, you see the number, 22,000,

2    22,000, repeatedly, for the rest of the summer.

3          Now, had LifeTree not done that, Mr. Katz testified

4    correctly, had they not reduced their position by 30 percent,

5    damages would be 30 percent higher.  Instead of seeking $25,000

6    million, we would be asking for a third more, 35, 40 million

7    dollars.  But we prudently reduced our position to an amount

8    that we thought we could handle, that we did handle.

9          Now, on cross-examination, it got a little weird.

10   They said something about him meeting someone, his cousin, on

11   the street somewhere.  And I wasn't sure why that was relevant.

12   And I'm still not sure why that's relevant.  But he testified

13   truthfully.  That was proven by the evidence.

14         After Mr. Katz, you heard from Steve Lucas.  He's

15   LifeTree's forensic damages expert.  He has 44 years of

16   experience.  They never challenged his qualifications once.

17   They never said, he's not qualified.

18         And by the way, Mr. Lucas testified that he has no

19   prior relationship with either LifeTree or Washakie.  He has

20   represented plaintiffs, he has represented defendants.  He has

21   served as an arbitrator.  He is absolutely independent.

22         And went through each of the damages provisions, the

23   out-of-pocket losses, the lost profits, and the carrying terms.

24   We went through all the numbers, we went through all the

25   calculations, for each of these three forms of damages.  And he

1    determined, based on records that he had, that LifeTree's

2    damages were $25.3 million.  And Mr. Matthews said there are no

3    records.

4          You're going to get a binder, and you're going to see

5    Exhibits 11 through 58 are detailed financial records showing

6    these rolls, showing these swaps that were made, every single

7    one of them.

8          Now, Mr. Matthews also says that there's no proof of

9    the out-of-pocket damages, $7.6 million.  He said that was a

10   number that was made up.  There's nothing in there.  He says

11   there's not one piece of evidence that you're going to see that

12   shows losses of $7.6 million.  I'm going to show you the

13   exact -- where those losses are in the binder.  And if you want

14   to write down the exhibits, it's Exhibit 33, 36, and 38.

15         And you're going to see these losses.  We compiled a

16   slide showing each of these three exhibits in one.  And we can

17   all add up that number.  And it comes out to $7.6 million.

18   Those are the out-of-pocket losses.  And it's all in there.  We

19   have nothing to hide.

20         I don't know if you remember, but there was a moment

21   during cross-examination when they challenged Mr. Lucas's math.

22   Mr. Matthews said, well, you know, I don't think the numbers

23   add up.  Well, how do you get $7.6 million out-of-pocket

24   damages on the first shipment?  It doesn't add up.  And then

25   Mr. Lucas said, well, it does add up.  If you look at the

1    out-of-pocket damages number, first line for the first

2    shipment, 7.2, plus carrying costs on the first shipment, 4, is

3    $7.6 million.  The numbers add up.  The math works.  They tried

4    to challenge the math.  The math works.

5         Mr. Lucas also testified that LifeTree's lost profits

6    were over $17 million.  When he testified, they never

7    challenged his math on that.  Not once.  They only challenged

8    his math on the actual out-of-pocket losses.  I just showed you

9    the numbers work and I just showed you the actual exhibits add

10   up.  But when he testified about the lost profits, they have

11   never challenged him at all on that.  In fact they spent most

12   of their cross-examination focusing on, I think, one line of

13   his chart.  That's it.  They never challenged the math.  And

14   the reason they never challenged the math is because it's

15   actually just an equation that's in the contract.

16        You know, you take the contract price, which we know.

17   You take the market price on the date of the default, which is

18   a publicly available number, by the way.  You know, it's a

19   number that's quoted publicly.  This is not -- you know,

20   Mr. Matthews said, well, they never showed you the number, they

21   never showed you the price of the SME on the date of default.

22   That's a publicly available number.  And if they had a

23   different number, they were welcome to take the stand and let

24   you know, the numbers are wrong.

25        Mr. Hewlett, their expert, never said our numbers are

1    wrong.  In fact, he said the opposite.  In this case, he put

2    this together.  It's an expert report, a sworn piece of paper.

3              MR. MATTHEWS:  Objection.

4              MR. ABRAHAM:  It's a document.

5              MR. MATTHEWS:  That's a document not in --

6              THE COURT:  Is it in evidence?

7              MR. ABRAHAM:  It's not in evidence.

8              THE COURT:  OK.  Sustained.

9              MR. ABRAHAM:  OK.

10             And in that report, he said, I have no reason to argue

11   with the cost of the profit.  He accepted all the numbers for

12   purposes of his calculation.  And if he had reason to believe

13   that the number was --

14             MR. MATTHEWS:  I was objecting that the document is

15   not in evidence.

16             THE COURT:  Sustained as to, if he didn't bring it out

17   in examining him, I don't think it's admissible.

18             MR. ABRAHAM:  OK.  At the end of his testimony, I

19   asked him a question, do you think Mr. Lucas is qualified to

20   testify as an expert?  Mr. Hewlett said, yeah, he is.  He said,

21   Mr. Hewlett is qualified as an expert.

22             Now, if he took issue with any of the data points that

23   Mr. Lucas provided, he was welcome to let you know.  But he

24   didn't.  Instead, the only data point, the only data point,

25   that was challenged in this case was the default date of

HBTALIF2ps                    Summation – Mr. Abraham

1   December 15, 2014.  That is the only number they actually

2   disputed when they examined the witnesses, the expert

3   witnesses.

4           If you accept December 15 as the default date, you

5   have to accept Mr. Lucas's math.  Now, how do we know December

6   15th was the default date?  Well, that's the day that they

7   themselves canceled the contract.  That's Exhibit 10 in the

8   binder.

9           If you accept this December 15th date of default, you

10  have to accept Mr. Lucas's calculation.  Now, if December 15

11  isn't the date of default, Mr. Kingston was welcome to take the

12  stand and let you know that this letter is real.  He was

13  welcome to take the stand and say, no, we defaulted on a

14  different date.  That would have been impossible, because this

15  is a letter from their company dated December 15, 2014, saying,

16  "This letter serves as a formal notice that the contract is

17  canceled."

18          (Continued on next page)

19

20

21

22

23

24

25

1              MR. ABRAHAM:  Now, a contract is -- it is just a legal

2       word for a promise.  You know, it's no different than the

3       promises that you make, people that make promises to you on a

4       daily basis.  And in this case, Washakie promised to pay

5       $90 million.  And they broke that promise.  And not once during

6       this trial have they attempted to justify what they did.

7              Instead, they let LifeTree lose a significant amount

8       of money when LifeTree tried to keep its side of the deal.

9       LifeTree was obligated to go down to Argentina and secure this

10      material, and Mr. Matthews admitted in his opening statement

11      that they did.  And LifeTree lost money trying to accommodate

12      what they thought was a good company.

13             In bringing this lawsuit, LifeTree is only asking one

14      thing -- make them keep their promise.  LifeTree is simply

15      asking it be made whole again.  We are not asking for more

16      damages than we deserve and we're not asking for less.  We're

17      asking for the damages that are provided, clearly in the

18      contract that the parties signed.

19             Now, when I'm done with my remarks, the Judge is going

20      to instruct you on the law.  And the Judge is going to explain

21      that LifeTree has an obligation to prove its case by a

22      preponderance of the evidence.  What does that mean?  You're

23      going to hear from the Judge that a preponderance of the

24      evidence means that what LifeTree said is more likely true than

25      not.  Is LifeTree's case more likely true than not?

1          LifeTree has done its job in this case.  LifeTree has

2     the evidence.  LifeTree has the proof.  And LifeTree has the

3     testimony.  LifeTree has the documents.  LifeTree has the

4     evidence.  And LifeTree has done the math.  LifeTree's case is

5     more likely true than not.  And by a preponderance of the

6     evidence, LifeTree's damages are $25.3 million.

7          Thank you.

8          THE COURT:  Thank you, Mr. Abraham.

9          Ladies and gentlemen, you are now in a position where

10    I'm going to do one final thing before you deliberate and that

11    is give you instructions about your deliberations and the

12    substantive law to be applied.

13          Before I do that, does anyone need a bathroom break?

14    Are you good to go?  All right.

15          (Pause)

16          Members of the jury, we've now reached the point where

17    you will soon begin your final function as jurors, which, as

18    you all appreciate, is one of the most important duties of

19    citizenship in this country.

20          My instructions will be in four parts:  First, I will

21    provide you with general introductory instructions on the role

22    of the Court and the jury; second, I will instruct you on the

23    substantive law; third, I will give you instructions concerning

24    the evaluation of evidence; fourth, and finally, I will

25    instruct you on deliberations.  And I will provide each of you

with a copy of these instructions before you deliberate, so you

don't have to write everything down.  You will have a copy of

what I'm reading.

         The role of the Court and the jury.

         I will now describe the role of the Court and the role

of the jury.

         It is my duty to instruct you as to the law, and it is

your duty to accept these instructions of law and apply them to

the facts as you determine them.  If an attorney states a legal

principle different from a principle that I state to you in my

instructions, it is my instructions you must follow.  You

should not consider any single instruction, standing alone, to

state the law; you should consider my instructions as a whole

when you retire to deliberate.  You Should not be concerned

about the wisdom of any legal rule -- of any rule that I state.

You must set aside any opinion you have about what the law may

be or ought to be.  It would be a violation of your oath to

base your verdict on any view of the law other than the view

set forth in these instructions.

         Now, the substantive law.

         As you heard during the course of this proceeding,

this is a case involving a breach of a contract.  The defendant

has admitted that it breached the contract.  You will be asked

to determine whether plaintiff has sustained damages as a

result of the breach, and, if so, the amount of plaintiff's

1   damages.  I will now instruct you on the law regarding damages.

2          My charge to you on damages, however, must not be

3   taken as a suggestion that you should conclude that plaintiff

4   suffered damages or award a particular amount.  It is for you

5   to decide on the evidence presented and the rules of law I give

6   whether a party is entitled to recover from an opposing party.

7          If you do find that damages should be awarded, you

8   should not take into consideration attorneys' fees or court

9   costs, which will be decided by the Court.  If you make any

10  award of damages, such award is not subject to federal income

11  taxes and you should not consider such taxes in determining the

12  award of damages, if any.

13         Burden of proof.

14         LifeTree has the burden of proving by a preponderance

15  of the evidence that it sustained damages as a result of the

16  WRE's breach.  So what does a "preponderance of the evidence"

17  mean?  To establish a fact by a preponderance of the evidence

18  means to prove that the fact is more likely than not.  A

19  preponderance means the greater weight of the evidence.  It

20  refers to the quality and persuasiveness of the evidence, not

21  the number of witnesses or number of exhibits.  To determine

22  whether a claim has been proven by a preponderance of the

23  evidence, you may consider the relevant testimony of all

24  witnesses -- regardless of who may have called them -- and all

25  the relevant exhibits received in evidence, regardless of who

Hbtdlif3                    Charge

1    may have introduced them.

2           For the plaintiff to prevail on an issue on which it

3    bears the burden of proof, the evidence supporting the

4    plaintiff's claim must appear to you as more nearly

5    representing what took place than the opposing evidence.  If it

6    does not, or if the evidence weighs so evenly that you are

7    unable to say, you must resolve the question against the

8    plaintiff and in favor of the defendant.  We often say that

9    evidence should be weighed on scales.  If you find that the

10   evidence on any issue is balanced equally in favor of a

11   plaintiff and a defendant, then the plaintiff will not have

12   sustained its burden of proof on that issue and the case must

13   be decided in favor of the defendant on that issue.  But a tip

14   of the scales, however slight, in favor of the plaintiff

15   constitutes a preponderance of the evidence, and the legal

16   burden of proof for that issue would be satisfied.

17          You may have heard of "proof beyond a reasonable

18   doubt," which is the proper standard for proof only in a

19   criminal trial.  That requirement does not apply to a civil

20   case, like this one, and you should put it out of your mind.

21   The proper standard in this case is a preponderance of the

22   evidence.

23          If the plaintiff shows that it more likely than not

24   suffered damages, the amount of damages need only be proved

25   with reasonable certainty.  Put differently, plaintiff need

1    not -- sorry.  Put differently, plaintiff need only show a

2    stable foundation for a reasonable estimate of damages.  Where

3    the existence of damage is certain, and the only uncertainty is

4    the amount of damages, the burden of uncertainty as to the

5    amount of damages is upon the breaching party.  It is the

6    breaching party that must shoulder the burden of any

7    uncertainty regarding the amount of damages.

8         The basic principle of damages in a contract case --

9    in a breach of contract case is to leave the party in as good a

10   position as it would have been had the contract been fully

11   performed.  It is equally fundamental that plaintiff should not

12   recover more from the breach than it would have gained had the

13   contract been fully performed.

14        A party seeking to recover damages must establish

15   causation -- that it suffered damages because of the other

16   party's breach.  A party can recover damages that are the

17   natural, probable, and foreseeable result of a contract breach.

18   Damages cannot be speculative and they cannot be abstract.  To

19   determine whether damages are natural, probable and

20   foreseeable, you must consider what damages the parties

21   contemplated at the time they entered into the contract.  In

22   other words, when LifeTree and WRE executed the contract, what

23   did they reasonably believe would happen if a breach occurred?

24        If you find that the plaintiff has proven that the

25   defendant caused it to suffer damages, then you must determine

1    the amount that would compensate it.  This amount must be

2    reasonably certain and directly traceable to the defendant's

3    breach.  Reasonable certainty does not require absolute

4    certainty or mathematical precision.  It may be an

5    approximation.  But damages may not be merely speculative, or

6    imaginary.  Damages must be capable of measurement based upon

7    the reliable evidence before you.

8           Under New York law, parties may agree by contract on

9    how damages will be calculated in the event of a breach.

10   Parties are free to shape their remedies to their particular

11   requirements.  In this case, the various forms of damages

12   available to the plaintiff are set forth in the contract that

13   is the subject of this lawsuit.  Therefore, the burden of proof

14   is on the plaintiff to establish the amount of damages it is

15   entitled to under the contract's damages provisions.

16          You may notice that the parties' contract in this case

17   refers to arbitration or an arbitrator.  You are instructed

18   that the parties have waived arbitration; instead, they have

19   litigated their case in this court.  It is your job to apply

20   the law to the facts as you find them.

21          In determining damages, you should know a little bit

22   about the options available to a nonbreaching party under New

23   York law.  In general, a breach of contract occurs when a party

24   does not perform its contractual obligations.  A material

25   breach is a breach that is so substantial that it defeats the

1    purpose of the contract.  When a party materially breaches a

2    contract, the nonbreaching party must choose between two

3    remedies:  (a) it can elect to terminate the contract and

4    recover damages as specified under the contract or, (b) it can

5    continue the contract and recover damages solely for the

6    unperformed obligation.  Put another way, if one party to a

7    contract materially breaches during the course of a continuing

8    performance, the nonbreaching party has a choice presented to

9    him of continuing the contract or of refusing to go on.

10           Under the law, a party has a duty to use reasonable

11   efforts to mitigate damages.  To mitigate damages means to

12   avoid or minimize damages.  The defendant claims that the

13   plaintiff did not make reasonable efforts to mitigate its

14   damages.

15           It is the defendant's burden to prove by a

16   preponderance of the evidence both that plaintiff failed to

17   mitigate or minimize its damages, and the extent to which such

18   efforts would have diminished its damages.  The plaintiff does

19   not have the burden to prove that it did mitigate its damages

20   or that there were not reasonable opportunities to do so.

21           In considering whether the defendant has proven by a

22   preponderance of the evidence that the plaintiff failed to

23   mitigate its damages, you may consider that the plaintiff's

24   duty to mitigate does not require it to take unreasonable steps

25   or incur unreasonable expenses.

1          If you find that the defendant is liable and that the

2     plaintiff has suffered damages, the plaintiff may not recover

3     for any item of damages that it could have avoided through

4     reasonable effort.  If, however, you find that the plaintiff

5     acted reasonably following a breach of the contract, you should

6     not reduce the award of damages that you -- you should not

7     reduce the amount of damages that you award.

8          Now I am going to talk about the evaluation of

9     evidence.

10         You are to consider only the evidence introduced in

11    this case.  The evidence in this case consists of the sworn

12    testimony of the witnesses, the exhibits received in evidence,

13    and any stipulations to which the parties have agreed.

14         A stipulation is an agreement among the parties that a

15    certain fact is true.  You must regard such agreed fact as

16    true.

17         It is for you alone to decide the weight, if any, to

18    be given to the testimony you have heard and the exhibits you

19    have seen.  Testimony that I have excluded or stricken or told

20    you to disregard is not evidence and you may not consider it in

21    rendering your verdict.

22         You are not to consider questions asked by the

23    parties' lawyers as evidence.  It is the witnesses' answers

24    that are evidence, not the questions.  Arguments by the

25    attorneys are not evidence, because the attorneys are not

1  witnesses.  I must stress again that what they said to you in

2  their opening statements and in their summations is intended to

3  help you understand the evidence that actually was admitted, to

4  help you reach your verdict.  If, however, your recollection of

5  the evidence differs from the statements made by the lawyers in

6  their opening statements or summations, it is your recollection

7  that controls.

8         Finally, any statements or rulings that I have made do

9  not constitute evidence.  Because you are the sole and

10  exclusive judges of the facts, I do not mean to indicate any

11  opinion as to what the facts are or what the verdict should be.

12  The rulings I have made during the trial are not any indication

13  of my views.  You should not draw any inference from the fact

14  that, on occasion, I may have asked questions of witnesses.

15  Those questions were intended only to clarify or expedite

16  things, and are not an indication of my view of the evidence.

17  In short, if anything I have said or done seemed to you to

18  indicate an opinion relating to any matter that you need to

19  consider, you must disregard it.

20         Now, there are two types of evidence that you may

21  properly use in reaching your verdict.  One type of evidence is

22  direct evidence.  Direct evidence is a witness' testimony about

23  something he or she knows by virtue of his or her own senses --

24  something the witness has seen, felt, touched or heard.  Direct

25  evidence may also be in the form of an exhibit, which may be a

piece of paper.

The other type of evidence is circumstantial evidence. Circumstantial evidence is evidence that tends to prove one fact by proof of other facts.  Here is a simple example of circumstantial evidence that we often use in this courthouse.

Assume that when you came into the courtroom this morning the sun was shining and it was a nice day.  Assume that the courtroom blinds were closed and you couldn't see anything outside.  As you're sitting here, someone walks in a with an umbrella that's dripping wet.  Somebody else comes in with a raincoat that's dripping wet.

You can't look outside and cannot see, hear, smell or feel whether it is raining.  Therefore, you have no direct evidence of the fact.  But on the combination of facts I asked you to assume, it would be reasonable and logical to conclude that between the time you arrived and the time that people walked in, it had started to rain.

That's all there is to circumstantial evidence.  You infer on the basis of reason, experience, common sense from an established fact the existence or nonexistence of some other fact.  Many facts, such as a person's state of mind, can only rarely be proven by direct evidence.  Circumstantial evidence is of no less value than direct evidence; the law makes no distinction between the two, but simply requires that you, the jury, decide the facts in accordance with all of the evidence,

1    both direct and circumstantial.

2            I have used the term "infer," and the lawyers in their

3    arguments have asked you to draw inferences.  When you draw an

4    inference, you conclude, from one or more established facts,

5    that another fact exists, and you do so on the basis of your

6    reason, experience, and common sense.  The process of drawing

7    inferences from facts in evidence is not a matter of guesswork,

8    suspicion, or speculation.  An inference is a reasoned, logical

9    conclusion that you, the jury, may draw -- but are not required

10   to draw -- from the facts which have been established by either

11   direct or circumstantial evidence.  In considering inferences,

12   you should use your common sense and draw, from the facts that

13   you find to be proven, whatever reasonable inferences you find

14   to be justified in light of your experience.

15           Now for the important subject of witness credibility,

16   or of evaluating the testimony.

17           How do you evaluate the credibility or believability

18   of the witnesses?  The answer is that you use your plain common

19   sense.  There is no magic formula by which you evaluate

20   testimony.

21           You should use the same tests for truthfulness that

22   you use in determining matters of importance in your everyday

23   lives.  You should ask yourselves:  Did the witness impress you

24   as honest, open, and candid, or was the witness evasive and

25   edgy as if hiding something?  How did he appear -- that is, his

behavior, bearing, manner and appearance while testifying?  How

responsive was the witness to the questions asked on direct

examination and cross-examination?  You should consider the

opportunity the witness had to see, hear, or know about the

things about which he was testifying; the accuracy of his

memory; his lack of candor; his intelligence; the

reasonableness and probably of his testimony; its consistency

or lack of consistency; and its corroboration or lack of

corroboration by other credible evidence.

In short, in deciding credibility, you should size up

the witness in light of his demeanor, the explanations given,

and all of the other evidence in the case.  Always remember to

use your common sense, good judgment, and life experience.

Few people recall every detail of every event in

precisely the same way.  A witness may be inaccurate,

contradictory or even untruthful in some respects yet entirely

believable and truthful in other respects.  It is for you, the

jury, to determine whether such inconsistencies are significant

or inconsequential.

If you find that a witness intentionally testified

falsely, that is always a matter of importance that you should

weigh carefully.  If you find that any witness has willfully

testified falsely as to any material fact -- that is, as to an

important matter -- the law permits you to disregard completely

the entire testimony of that witness based upon the principle

that one who testifies falsely about one material fact is
likely to testify falsely about everything.  You are not
required, however, to consider such a witness wholly
unreliable.  You may accept so much of his testimony as you
deem true and disregard what you feel is false.

By the processes I have just described to you, you, as
the sole judges of the facts, decide which of the witnesses to
believe, and what portion of their testimony to accept, and
what weight to give it.

Now, expert testimony.

You have heard testimony from two witnesses concerning
their qualifications as experts in a particular field
concerning issues in the case.  When a case involves a matter
of science or art or requires specialized knowledge or skill
not ordinarily possessed by the average person, an expert is
permitted to state his or her opinion for the information of
the Court and the jury.

The opinion stated by an expert who testifies before
you is based on particular facts, as the expert obtains
knowledge of them and testifies to them before you, or as the
attorney who questions the expert asks the expert to assume.
You may reject an expert's opinion if you find the facts to be
different from those which formed the basis for the opinion.
You may also reject the opinion if, after careful consideration
of all the evidence in the case, expert and other, including

1  the cross-examination of an expert, if you decide that the

2  opinion is not convincing.  In other words, you are not

3  required to accept an expert's opinion to the exclusion of the

4  facts and circumstances disclosed by other evidence.  Expert

5  opinion is subject to the same rules concerning reliability as

6  the testimony of any other witness.  It is given to assist you

7  in reaching a proper conclusion; it is entitled to such weight

8  as you find the expert's qualification in the field warrant and

9  must be considered by you, but is not controlling upon your

10 judgment.

11         Now, you may have heard of evidence that at some

12 earlier time a witness has said or done something which counsel

13 suggests was inconsistent with the witness' testimony during

14 the trial.

15         If that prior inconsistent statement is sworn

16 testimony, such as in a deposition, it can be considered as

17 evidence.  Likewise, if the prior inconsistent statement is

18 that of a party, it can be considered as evidence against that

19 party.  Otherwise, evidence of a prior inconsistent statement

20 is not to be considered by you as affirmative evidence in

21 determining liability, or damages.  Evidence of a prior

22 inconsistent statement was placed before you for the more

23 limited purpose of helping you decide whether to believe the

24 trial testimony of the witness who may have contradicted

25 himself.  If you find that the witness made an earlier

Hbtdlif3                          Charge

1   statement that conflicts with his trial testimony, you may

2   consider that fact in deciding how much of his trial testimony,

3   if any, to believe.

4         In making this determination, you may consider whether

5   the witness purposely made a false statement or whether it was

6   an innocent mistake; whether the inconsistency concerns an

7   important fact, or whether it had to do with a small detail;

8   whether the witness had an explanation for the inconsistency,

9   and whether that explanation appealed to your common sense.

10         It is exclusively your duty, based on all the evidence

11   and your own good judgment, to determine whether the prior

12   statement was inconsistent and, if so, how much, if any, weight

13   to give to the inconsistent statement in determining whether to

14   believe all or part of the witness' testimony.

15         In deciding whether to believe a witness, you should

16   specifically note any evidence of bias, hostility, or affection

17   that the witness may have toward one of the parties.  Likewise,

18   you should consider evidence of any interest or motive that the

19   witness may have in cooperating or not cooperating with a

20   particular party.  If you find any such bias, hostility,

21   affection, interest, or motive, you must then consider whether

22   or not it affected or colored the witness' testimony.

23         You should also take into account any evidence that a

24   witness may benefit or suffer in some way from the outcome of

25   the case.  Such interest in the outcome may create a motive to

Hbtdlif3                         Charge

testify falsely and may sway a witness to testify in a way that

advances his or her own interests.  Therefore, if you find that

any witness whose testimony you are considering may have an

interest in the outcome of the trial, then you should bear that

factor in mind when evaluating the credibility of his testimony

and accept it with great care.

Keep in mind, though, that it does not automatically

follow that testimony given by an interested witness is to be

disbelieved.  There are many people, who, no matter what their

interest in the outcome of the case may be, would not testify

falsely.  It is for you to decide, based on your own

perceptions and common sense, to what extent, if at all, the

witness' bias or interest has affected his or her testimony.

You are not required to disbelieve an interested witness.  You

may accept as much of his testimony as you deem reliable and

reject as much as you deem unworthy of acceptance.

It is the duty of the attorney for each side of the

case to object when the other side offers testimony or other

evidence which the attorney believes is not admissible.

Counsel also have the right and duty to ask the Court to make

rulings of law.  All those questions of law must be decided by

me.  You should not show any prejudice against an attorney, or

his client, because the attorney objected to the admissibility

of evidence, or asked for a conference outside the hearing of

the jury, or asked the Court for a ruling on the law.

1          As I already indicated, my rulings on the

2    admissibility of evidence do not indicate any opinion about the

3    weight or effect of such evidence.  You, the jury, are the sole

4    judges of the credibility of all witnesses and the weight and

5    effect of all the evidence.  If, however, I sustained an

6    objection to any evidence, or if I ordered evidence stricken or

7    disregarded, that evidence must be entirely ignored.

8          Now, the most important part of this case, members of

9    the jury, is the part that you as jurors are about to play as

10   you deliberate on the issues of fact.  It is for you, and you

11   alone, to decide whether the plaintiff has proven its claim by

12   a preponderance of the evidence.  I know you will try the

13   issues that have been presented to you according to your oath

14   that you have taken as jurors.  In that oath, you promised that

15   you would well and truly try the issues in this case and render

16   a true verdict.  Your function is to weigh the evidence in the

17   case and reach your decision based solely on the evidence.

18   Your duty is to decide the issues before you fairly and

19   impartially, and to see that justice is done.

20         It is your duty as jurors to consult with one another

21   and to deliberate with a view toward reaching an agreement.

22   Each of you must decide the case for yourself, but you should

23   do so only after consideration of the case with your fellow

24   jurors.  Discuss and weigh your respective opinions

25   dispassionately, without regard to sympathy, without prejudice

or favor toward either party, and adopt the conclusion, that

conclusion which in your good conscience appears to be in

accordance with the truth.

As you deliberate, please listen to the opinions of

your fellow jurors, and ask for an opportunity to express your

own views.  Each juror should be heard.  No one juror should

hold center stage in the jury room or control or monopolize

deliberations.  You should all listen to one another with

courtesy and respect.  If, after stating your own view, and

after listening to your fellow jurors, you become convinced

that your own view is wrong, do not hesitate because of

stubbornness or pride to change your view.  On the other hand,

do not surrender your honest convictions and beliefs concerning

the weight or effect of the evidence solely because of the

opinions of your fellow jurors or because you are outnumbered

or for the mere purpose of reaching a verdict.  Your final vote

must reflect your conscientious belief as to how the issues

should be decided.

Your verdict must be unanimous.

You are not to discuss the case unless and until all

eight jurors are present.  Five or six or seven of you is only

a gathering of individuals.  Only when all eight jurors are

present do you constitute the jury, and only then may you

deliberate.

Now, I am going to ask you to select a foreperson.

1    The foreperson does not have any more power or authority than

2    any other juror, and his or her vote or opinion does not count

3    for any more than any other juror's vote or opinion.  The

4    foreperson is merely your spokesperson to the Court.  He or she

5    will send out any notes to the Court, and when the jury has

6    reached a verdict, the foreperson will notify the court officer

7    that a verdict has been reached and then will ultimately fill

8    out and sign the verdict form, which is this, which I'll send

9    back with you, and also will give the verdict in open court.

10           The exhibits will be sent to you in the jury room, all

11   the exhibits that have been entered into evidence.  If you want

12   any testimony read back to you, that can be arranged.  Any

13   communications with the Court -- I said "read back" to you but

14   I should clarify.  If you ask for any testimony, we can

15   actually provide you a paper copy of the transcript of the

16   testimony.

17           Any communication with the Court should be made in

18   writing, signed by your foreperson, and given to the court

19   officer, who will be here in the courtroom while you

20   deliberate.  I will respond to any question or requests you

21   have as promptly as possible, either in writing or by having

22   you come back to the courtroom so I can speak with you in

23   person.

24           If at any time you are not in agreement, do not reveal

25   the standing of the jurors -- that is, the split of the current

Hbtdlif3                      Charge

1   vote -- to anyone, including me, at any time during your

2   deliberations.  So do not ever indicate, in a note or

3   otherwise, what the vote is or which way the majority is

4   leaning or anything like that.  Nobody outside the jury room

5   should know how the jury stands on any issue until a verdict

6   has been reached.

7          If you took notes during the course of the trial, you

8   should not show your notes to or discuss your notes with any

9   other jurors during your deliberations.  Any notes that you

10  have taken are to be used solely to assist yourself.  The fact

11  that a particular juror has taken notes entitles that juror's

12  views to no greater weight than those of any other juror.

13         Under your oath as jurors, you are not to be swayed by

14  sympathy.  You are to be completely fair and impartial.  You

15  are to be guided solely by the evidence, or lack of evidence,

16  in this case, without regard to the consequences of your

17  decision.  The crucial question you must ask yourselves as you

18  sift through the evidence is whether the plaintiff has proven

19  its claim by a preponderance of the evidence.

20         It would be improper for you to consider, in deciding

21  the facts of the case, any personal feelings that you have

22  about the race, religion, national origin, sex, sexual

23  orientation, disability, or age of any party or witness, or any

24  other such irrelevant factor.  It would also be improper for

25  you to consider any sympathy you might feel for any individual

1   involved in a lawsuit.

2          You should consider and decide this case as a dispute

3   between parties of equal standing in the community, of equal

4   worth, and holding the same or similar stations in life.

5          Finally, all litigants stand equal in this courtroom.

6   All litigants stand equal before the bar of justice.  And all

7   litigants stand equal before you, the jury.  Your duty is to

8   decide between these parties fairly and impartially, to see

9   that justice is done, all in accordance with your oath as

10  jurors.

11         I want to thank you for your time and attentiveness,

12  and it is now time when you may begin your deliberations.

13  Before we do that, there is going to be a court officer, a

14  United States Marshal's officer, who will be serving outside

15  the jury room and will take any note and indicate to me and the

16  parties when you have reached a verdict or when you have any

17  note that you have.  And I am going to have that officer sworn

18  at this time.

19         (The court officer was sworn)

20         THE COURT:  Thank you.  We are going to have lunch

21  brought to you.

22         The first note that you send out should indicate whom

23  you've selected as foreperson, and then any other notes should

24  be any questions you have, anything you need in terms of

25  testimony, copies of testimony, or anything like that, and then

Hbtdlif3

1    you can indicate -- well, any other questions you have.

2              We'll have lunch for you.  As I said, if you want, you

3    could take a break for lunch.  If you want to deliberate during

4    lunch, it's totally up to you, the jurors.

5              And I think that's it.  You are ready to deliberate.

6              At this time, you can bring your -- you should bring

7    your notepads back with you, and you may begin your

8    deliberations.  Thank you very much.

9              And we'll be sending in a copy of the verdict form,

10   eight copies of the instructions I've just read, and all the

11   exhibits.

12             (Time noted at 11:48 a.m., the jury began

13   deliberations)

14             THE COURT:  You may be seated.

15             OK.  So Mr. Hampton will be bringing back one copy of

16   the verdict form.  We're going to print eight copies of the

17   jury instructions as I read them, and he'll bring back a copy

18   of the exhibits that you all have agreed are the admitted

19   exhibits.

20             And if you would check in with Mr. Hampton about your

21   whereabouts just so you are nearby for if and when we get any

22   notes.  All right?

23             MR. ABRAHAM:  OK.

24             MR. MATTHEWS:  Thank you, your Honor.

25             THE COURT:  OK.

Hbtdlif3                    Verdict

1              (Recess awaiting jury verdict)

2              (Time noted at 1:54 p.m., jury not present)

3              THE COURT:  Good afternoon, folks.

4              MR. ABRAHAM:  Good afternoon.

5              MR. MATTHEWS:  Good afternoon, your Honor.

6              THE COURT:  So, just for the record, I'm marking as

7      Court Exhibit 1 the copy of the jury charge that went into the

8      jury room -- eight copies of which went into the jury room,

9      which is the final version as I read it.

10             Then I received a note earlier just indicating who the

11     foreperson is, and I'll mark that as Court Exhibit 2, 11:56

12     a.m., and it just says, "Cynthia Chalker, Juror No. 1,

13     Foreperson."

14             And then we received a note at 1:30, which I'll mark

15     as Court Exhibit 3, that says:  "We, the jury, have reached a

16     verdict.  Thank you.  Cynthia Chalker."

17             So, shall we bring them out?

18             MR. ABRAHAM:  Sure.

19             MR. MATTHEWS:  Sure.

20             THE COURT:  OK.

21             (Time noted at 1:56 p.m., jury present)

22             THE COURT:  You may be seated.

23             Good afternoon, ladies and gentlemen

24             JURORS:  Good afternoon.

25             THE COURT:  Just so the record is clear, I have your

Hbtdlif3                    Verdict

1    note from 11:56 this morning indicating that Juror No. 1,

2    Ms. Chalker, is the foreperson.

3         And then I've received your note from a few minutes

4    ago, 1:30 p.m.  It says:  "to Judge Oetken, we, the jury, have

5    reached a verdict.  Thank you."  Signed, "The Foreperson."

6         Let me just confirm, Ms. Chalker, Juror No. 1, has the

7    jury reached a verdict?

8              THE FOREPERSON:  Yes.

9              THE COURT:  And is it unanimous?

10             THE FOREPERSON:  Yes.

11             THE COURT:  Do you have a copy of the verdict with

12   you?

13             THE FOREPERSON:  Yes.

14             THE COURT:  OK.  Please hand the verdict form to

15   Mr. Hampton.

16             (Pause)

17             Could you please hand it back and take the verdict.

18             THE CLERK:  Did plaintiff prove behind -- I'm sorry.

19   Did plaintiff prove by a preponderance of the evidence that it

20   sustained damages as a result of defendants' breach of

21   contract?

22             Your answer is?

23             THE FOREPERSON:  Yes.

24             THE CLERK:  And what is the amount?

25             THE FOREPERSON:  25-million-301 dollars 470.  I'm not

Hbtdlif3                    Verdict

1    saying it right.  25.301.470.

2         THE COURT:  That's 25,301,000, and what was the last

3    amount?

4         THE FOREPERSON:  470.

5         THE COURT:  470?

6         THE FOREPERSON:  Mm-hmm.

7         THE COURT:  Just to confirm, $25,301,470?

8         THE FOREPERSON:  Yes.

9         THE COURT:  OK.  Mr. Hampton, please poll the jury.

10        THE CLERK:  OK.

11        Ladies and gentlemen of the jury, please listen to

12   your verdict as it stands recorded.

13        Did plaintiff prove by a preponderance of the evidence

14   that it sustained damages as a result of defendants' breach of

15   contract?  Your answer is yes.

16        If "yes," in what amount?  Your amount is 25,301,470.

17        Juror No. 1, is that your verdict?

18        JUROR:  Yes.

19        THE CLERK:  Juror No. 2, is that your verdict?

20        JUROR:  Yes.

21        THE CLERK:  Juror No. 3, is that your verdict?

22        THE FOREPERSON:  Yes.

23        THE CLERK:  Juror No. 4, is that your verdict?

24        THE FOREPERSON:  Yes.

25        THE CLERK:  Juror No. 5, is that your verdict?

1          THE FOREPERSON:  Yes.

2          THE CLERK:  Juror No. 6, is that your verdict?

3          JUROR:  Yes.

4          THE CLERK:  Juror No. 7, is that your verdict?

5          THE FOREPERSON:  Yes.

6          THE CLERK:  Juror No. 8, is that your verdict?

7          THE FOREPERSON:  Yes.

8          THE CLERK:  Verdict unanimous.

9          THE COURT:  Thank you very much.  The verdict will be

10   recorded and filed on the docket.

11          Let me just ask counsel before I release the jurors,

12   is there any reason I can't release the jurors at this time?

13          MR. ABRAHAM:  No reason at all.

14          MR. MATTHEWS:  None, your Honor.

15          THE COURT:  OK.  Ladies and gentlemen, your work is

16   done.  I want to thank you.  We were able to finish in three

17   days, as predicted.  And I just want to take a minute to thank

18   you for your service as jurors.

19          Jury service is not convenient.  It takes time out of

20   your day.  You would probably rather be doing other things.  It

21   is actually an unusual process that we have in this country.

22   Most countries, these kinds of cases are decided by government

23   bureaucrats, someone appointed by a dictator or a king or all

24   sorts of different things, or little commissions of people who

25   are government workers or who are appointees, sometimes

1    political appointees.  In our system, it's basically a group of

2    random people from the community who decide these cases, and

3    parties have a right to have that group of people who are

4    qualified to serve as jurors come into court and decide the

5    case, as you've done.

6         I want to thank you for patiently listening to all the

7    evidence during this trial and deciding the case based on your

8    evaluation of the evidence.  You clearly took it seriously, you

9    paid attention, and you reached your verdict, and I want to

10   thank you for that.

11        So with this, you are free to go.

12        My admonition earlier about not talking about the case

13   is now -- no longer holds, so you are free to talk about the

14   case.  You can -- sometimes lawyers or others want to hear your

15   views about the case, and you are now free to talk to them

16   about the case.  You can talk to these lawyers or anyone else

17   you can talk to about the case, if you want.  You also don't

18   have to.  You are welcome to say I'd rather not talk about it,

19   whatever.

20        The one thing I'd ask -- and this is just out of

21   respect for your fellow jurors -- is that you not talk about

22   what others said during deliberations.  I mean, it is your

23   right to have that be a black box and that to be private, and

24   it's each of your right.  And, therefore, if you want to talk

25   about your views, what you thought about the evidence, what you

thought about witness, you are welcome to, but others might not

want to, and, therefore, I would ask you not to talk about the

deliberations of other people, but you are welcome to talk

about your own views of the evidence, if you want.

          I have no knowledge of whether anyone is going to try

to talk to you or not.  You are also free to just leave.  But

there is no restriction now on your talking about the case or

you doing any research on the case.  Your jury service is now

over.

          Your notepads, I am going ask you to go back to the

jury room now and take your notepads there and leave them.

They will be destroyed.  We are going to shred them.  You

should not take them with you.  They are not going to become

anything that is filed or evidence.  They were just for your

use during the trial, and, therefore, we will be destroying the

notepads, anything in there.

          And so you can all go back in the jury room now.  If

you'd like, in about five minutes or so, I'll come back just to

answer any questions you have and to thank you for your service

personally, but you don't have to wait for that if you don't

want to.  If you want to get on with your day, you are welcome

to go back, leave your notepads, take whatever you have, and

leave.

          So one final time I want to thank you all for your

service.  You are free to go

1          JURORS:  Thank you.

2          (The jury was dismissed)

3          THE COURT:  You may be seated.

4          The original of the jury verdict is marked Court

5     Exhibit 4.  That will go up on the docket and will be in the

6     permanent file.

7          In terms of final judgment in the case, are there

8     any -- are there other issues to be resolved, or is this going

9     to be the final judgment -- final amount of the judgment?

10         MR. ABRAHAM:  I think there is statutory interest, I

11    believe, that is available on this judgment, so we would want

12    to compute that as well.

13         THE COURT:  Could you submit a proposed judgment

14    within, say, a week?

15         MR. ABRAHAM:  Will do.

16         THE COURT:  OK.  And any other -- if you'd confer with

17    defense counsel about it and raise any issues in a cover

18    letter --

19         MR. ABRAHAM:  OK.

20         THE COURT:  -- as to whether there are any issues.

21         MR. ABRAHAM:  OK.

22         THE COURT:  And any other issues we need to address?

23         MR. ABRAHAM:  Not from plaintiff, I don't think so.

24         MR. MATTHEWS:  Not at this time, your Honor.  We

25    obviously understand that there are post-trial procedures that

Hbtdlif3                        Verdict

1    are in the federal rules.  We will proceed in accordance with

2    that.

3              THE COURT:  Right.  OK.

4              All right.  Thank you all very much.

5              MR. ABRAHAM:  Thank you, your Honor.

6              MR. MATTHEWS:  Thank you, your Honor.

7              THE COURT:  We are adjourned.

8

9                              -   -   -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25