UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LIFETREE TRADING PTE., LTD.,
                          Plaintiff,

-v-

WASHAKIE RENEWABLE ENERGY, LLC,
                          Defendant.

14-CV-9075 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

    Plaintiff LifeTree Trading Pte., Ltd. brought this action against Defendant Washakie Renewable Energy, LLC for breach of contract. Washakie admitted liability at the summary judgment stage, and a trial was held to determine damages. The jury awarded LifeTree over $25 million. Washakie now moves for judgment as a matter of law, or for a new trial. For the reasons that follow, Washakie's motion is denied.

**I.    Background**

    The Court presumes familiarity with the factual background and procedural history of this case, as set out in this Court's prior opinions. *See LifeTree Trading Pte., Ltd. v. Washakie Renewable Energy, LLC*, No. 14 Civ. 9075, 2017 WL 4862792 (S.D.N.Y. Oct. 27, 2017); *LifeTree Trading Pte., Ltd. v. Washakie Renewable Energy, LLC*, No. 14 Civ. 9075, 2017 WL 2414805 (S.D.N.Y. June 2, 2017); *Lifetree Trading Pte., Ltd. v. Washakie Renewable Energy, LLC*, No. 14 Civ. 9075, 2015 WL 3948097 (S.D.N.Y. June 29, 2015). Unless otherwise noted, the following facts are not in dispute.

    By contract dated May 6, 2014, LifeTree agreed to supply Washakie with 90,000 metric tons (MT) of Argentine Soy Methyl Ester ("SME"), a type of biofuel. (Trial Exhibit ("Tr. Ex.") 1 at 2.) The contract specified that LifeTree would deliver the SME in three shipments: one in

1

June 2014, the next in August or September 2014, and the final in the last quarter of 2014.  (Tr. Ex. 1 at 2.)  As a "CIFFO" contract, the agreement made LifeTree responsible for delivering the SME to a port in Texas.  (Tr. Ex. 1 at 2; Dkt. No. 94 ¶¶ 20–21.)

In return, Washakie agreed to pay $1,015 per metric ton of SME:  $1,000 payable upon presentation of shipping documents, and an additional $15 "payable upon receipt by [Washakie] of the United States tax credit incentive" for qualifying biofuels.  (Tr. Ex. 1 at 2.)  To guarantee payment, the contract obligated Washakie to procure "an irrevocable stand by letter of credit to be opened promptly and valid through February 28, 2015, covering [the] full amount of a 30,000 MT shipment plus 5% and to be replenished immediately, if it is drawn upon or if [the] contract is extended."  (Tr. Ex. 1 at 3.)

The parties' contract also incorporated by reference "FOSFA Contract NBR.51" ("FOSFA 51"), a standardized set of contract terms published by the Federation of Oils, Seeds and Fats Associations Limited.  (Tr. Ex. 1 at 4.)  LifeTree and Washakie agreed that all of FOSFA 51's "terms, conditions and rules not in contradiction" with their primary contract "shall be in force."  (Tr. Ex. 1 at 4.)

It is undisputed that Washakie failed to fulfill its obligations under the contract:  Washakie never obtained a letter of credit, and consequently it never accepted delivery of any of the three SME shipments.  (Dkt. No. 94 ¶ 35.)  At trial, LifeTree presented testimony chronicling a series of delays and requests for accommodation by Washakie.  (*See* Tr. Exs. 3, 5.)  By email dated June 19, 2014, Washakie informed LifeTree that it did not yet have a letter of credit, and it asked LifeTree to "[s]wap out the July shipment" so that Washakie could "take it at a later date." (Tr. Ex. 3 at 1.)  In an email dated July 23, LifeTree again inquired about the status of the letter of credit, asking, given the delay, whether Washakie would "want all the material . . . prior to

year's end" or would rather "start the cycle as per the contract." (Tr. Ex. 5 at 2.) Washakie responded that it would "not be able to have [a letter of credit] within two weeks," but that once it had a letter in hand, it would prefer "to start the rotation instead of getting everything before the end of the year." (Tr. Ex. 5 at 1.) Several months later, on September 24, 2014, Washakie had yet to receive a letter of credit, but it indicated by email that it was "trying to figure out a way to make this work." (Tr. Ex. 8 at 1.)

But Washakie still had not opened a letter of credit by November 2014, and LifeTree filed suit for damages arising out of Washakie's "breach and anticipated breach of contract." (Dkt. No. 1 ¶¶ 41–56.) Washakie finally gave "formal notice" that the contract "is and has been canceled" by letter dated December 15, 2014. (Tr. Ex. 10 at 1.)

Several years of litigation followed. Washakie ultimately conceded liability for breach of contract, and a jury trial was held to determine damages. After a three-day trial, the jury returned a verdict finding that LifeTree sustained damages in the amount of $25,301,470.00. (Dkt. No. 155.) Washakie now moves for judgment as a matter of law or, in the alternative, for a new trial. (Dkt. No. 164.)

## II. Legal Standard

"Federal Rule of Civil Procedure 50 provides that a motion for judgment as a matter of law may be made at any time before the case is submitted to the jury, and, in the event of denial, the movant may renew the motion no later than 28 days after trial." *Koch v. Greenberg*, 14 F. Supp. 3d 247, 255 (S.D.N.Y. 2014) (citing Fed. R. Civ. P. 50(a)(2), (b)), *aff'd*, 626 F. App'x 335 (2d Cir. 2015). A renewed motion for judgment as a matter of law under Rule 50(b) "may include an alternative or joint request for a new trial under Rule 59," Fed. R. Civ. P. 50(b), which permits a court to "grant a new trial on all or some of the issues . . . after a jury trial, for any

3

reason for which a new trial has heretofore been granted in an action at law in federal court," Fed. R. Civ. P. 59(a).

A court may grant a motion for judgment as a matter of law "only when there is 'either an utter lack of evidence supporting the verdict, so that the jury's findings could only have resulted from pure guess-work, or the evidence [is] so overwhelming that reasonable and fair-minded persons could only have reached the opposite result.'" *Rosioreanu v. City of New York*, 526 F. App'x 118, 119–20 (2d Cir. 2013) (alteration in original) (quoting *Doctor's Assocs., Inc. v. Weible*, 92 F.3d 108, 112 (2d Cir. 1996)). "In ruling on a motion for judgment as a matter of law under Rule 50(b), a district court is required to 'consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.'" *Stratton v. Dep't for the Aging for N.Y.C.*, 132 F.3d 869, 878 (2d Cir. 1997) (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir. 1988)). The court may not weigh evidence or make credibility determinations, *see Cross v. N.Y.C. Trans. Auth.*, 417 F.3d 241, 247 (2d Cir. 2005), and "[t]he movant's burden . . . will be 'particularly heavy after the jury has deliberated in the case and actually returned its verdict,'" *Koch*, 14 F. Supp. 3d at 255 (quoting *Cross*, 417 F.3d at 248).

"A motion for a new trial should be granted when, in the opinion of the district court, 'the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice.'" *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992) (alteration in original) (quoting *Smith*, 861 F.2d at 370). Unlike a Rule 50 motion for judgment as a matter of law, a Rule 59 motion for a new trial may be granted "even if there is substantial evidence supporting the jury's verdict," and the court "need not view [the evidence] in the light most favorable to the verdict winner."

4

*DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998). Nevertheless, a motion for a new trial should be granted only if the jury's verdict is "egregious." *Id.* (quoting *Dunlap-McCuller v. Riese Org.*, 980 F.2d 153, 158 (2d Cir. 1992)).

## III. Discussion

Washakie proposes various grounds for disturbing the jury's verdict. The Court addresses these concerns in two categories: first, the evidentiary basis for the jury's calculation of damages, and second, legal limitations on the amount of damages that the jury may award.

### A. Amount of Damages

Under New York law, contract "damages must be not merely speculative, possible, and imaginary," and "they must be reasonably certain." *Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205, 209 (1886). However, "certainty" in this context "refers to the *fact* of damage, not the amount." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007). Once the fact of damages is established, "[t]he plaintiff need only show a stable foundation for a reasonable estimate of the damage incurred as a result of the breach." *Id.* (quoting *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977)) (internal quotation marks omitted).

At trial, LifeTree offered evidence of three types of damages: out-of-pocket losses, lost-profit damages, and carrying costs. The first and second categories of damages flow from Paragraph 29 of FOSFA 51, which defines the damages available in the event of "default" by either party. It states:

> In default of fulfilment of this contract by either party, the other party . . . shall . . . have the right . . . to sell or purchase, as the case may be, against the defaulter who shall on demand make good the loss, if any, on such sale or purchase. . . . The damages awarded against the defaulter shall be limited to the difference between the contract price and the actual or estimated market price on the day of default.

5

(Tr. Ex. 1 at 7–8.) The third category of damages is described in Paragraph 15 of FOSFA 51, which states that if the buyer does not take delivery within the contractual delivery period, "Buyers are to pay Sellers Carrying Charges calculated from the first day following the last day of the delivery period." (Tr. Ex. 1 at 6.)

<u>Out-of-Pocket Losses</u>. LifeTree witnesses explained that because the contract at issue was a "buyer's call" contract, LifeTree had to be able to deliver the first 30,000 MT shipment at Washakie's demand. (*See, e.g.*, Trial Transcript ("Tr.") 49:12–50:5.) Consequently, Washakie's delays in obtaining a letter of credit caused LifeTree to engage in a series of "swap" transactions—buying and selling "positions" in SME—often at a loss. (*See* Tr. 58:18–74:20; 155:13–157:9.) LifeTree's CEO William Rooz testified that these swap transactions exacted a financial toll on his company; he explained that "[w]e had to pay out for swaps, for employees, for hedges" and that "[i]n the end . . . we were left indebted to our supplier to the tune of 7 plus million dollars." (Tr. 77:18−24.) Similarly, LifeTree's CFO Shimon Katz testified that Washakie "left us hanging for about six months and eventually just ran through all of our money and reputation," leaving LifeTree "indebted about $8 million." (Tr. 127:23−25, 138:2−4.) LifeTree also presented the expert testimony of Stephen Lucas, who calculated LifeTree's out-of-pocket losses to be $7,243,570. (*See* Tr. 190:20–194:22.)

<u>Lost-Profit Damages</u>. LifeTree also presented evidence on the profits it would have made if not for Washakie's failure to perform. Lucas testified that LifeTree lost $7.6 million in profits on each of the second and third shipments. He arrived at this figure by calculating the difference between the per-metric-ton contract price and the market price of SME on December 15, 2014, and then multiplying that number by 30,000 for each shipment. (*See* Tr. 195:3–201:3.)

6

Rooz offered a somewhat lower figure, testifying that he estimated LifeTree's lost-profit damages to be "[a]round $10 million" in total. (Tr. 120:6−8.)

Carrying Costs. Finally, LifeTree offered evidence to substantiate a claim for almost $1 million in "carrying costs"—a charge for Washakie's failure to "pick up the goods up within . . . the delivery period." (Tr. 190:13−17.) Based on his experience in the commodities industry, Lucas explained that "[t]he theory of carrying charges is if the buyer is late picking the goods up, the seller may have to store it, he may have to pay insurance on it," etcetera. (Tr. 220:22−25.) As to the first shipment, Lucas testified that LifeTree's financial records reflected actual carrying costs of $412,500. (*See* Tr. 221:19−22; 222:1−5; 223:10−12.) As to the second shipment, Lucas calculated carrying charges according to the formula supplied in FOSFA 51—$0.50 per metric ton per day for the first fifteen days, and $0.75 per metric ton per day for the next fifteen days (*see* Tr. Ex. 1 at 6)—yielding a total of $564,000 (*see* Tr. 222:6−8; 223:13−15).

Taken together, this evidence was sufficient to support the jury's conclusions (1) that LifeTree did, in fact, suffer damages, and (2) that $25.3 million is a reasonable estimate of those damages. Washakie may very well have persuaded a different jury to draw different factual conclusions, but this jury's conclusions were neither egregious nor unreasonable. Nevertheless, the Court addresses each of Washakie's proffered grounds for setting aside the verdict or ordering a new trial.

### 1. Date of Default

Washakie's primary argument centers on the date from which damages should be calculated.

Paragraph 29 of FOSFA 51 directs that damages "against the defaulter shall be limited to the difference between the contract price and the actual or estimated market price *on the day of default*." (Tr. Ex. 1 at 7–8 (emphasis added).) Neither FOSFA 51 nor the parties' primary

7

contract, however, defines the term "default" or instructs the parties how to identify the day on which it occurs. Therefore, because "the contract is ambiguous and relevant extrinsic evidence as to its meaning is available, its interpretation is a question of fact for the factfinder." *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 112 (2d Cir. 2006); *see also Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000).

At trial, Washakie argued that it breached the contract in mid-May 2014, when it failed to "promptly" obtain a letter of credit after executing the contract on May 6, 2014. (Tr. 314:25–316:12.) Washakie presented an expert witness, Jess Hewitt, who testified that Washakie's failure to provide a letter of credit in May 2014 "was a breach of . . . one of the primary terms of the contract, and since [Washakie] could not cure that breach, the contract [was] in default" within ten days—no later than May 19, 2014. (Tr. 268:18−269:8.) On cross-examination, Lucas testified that the market price of SME in May 2014 was roughly $860 per metric ton—the same as the contract price, after subtracting for expenses that LifeTree saved by not shipping. (Tr. 207:7−14.) Consequently, if Washakie had defaulted in May 2014 instead of December 2014, Lucas testified that "[LifeTree's] damages would be zero." (Tr. 208:13−18.) Furthermore, Washakie argues that because it definitively breached its obligation to obtain a letter of credit to cover the first shipment, it is not liable for any damages arising out of the second or third shipments. (Dkt. No. 164-1 at 19−21.)

Despite Washakie's efforts to persuade the jury to measure damages from mid-May, LifeTree presented sufficient evidence that would allow a reasonable jury to measure from December 15, 2014. Rooz testified that prior to December 15, 2014, Washakie never communicated to LifeTree that Washakie was canceling the contract. To the contrary, Washakie repeatedly reassured LifeTree that it intended to perform. (Tr. 58:3−21.) According to Rooz, in

8

the SME industry, the term "[d]efault means when one party tells . . . the buyer . . . I'm not giving you the material, [o]r the reverse, the buyer tells me . . . I'm not buying it." (Tr. 55:15−19.) Based on this understanding of the term "default," Rooz testified that LifeTree considered Washakie to have "defaulted" on December 15, 2014—the date that Washakie sent a letter giving "formal notice that [the contract] . . . is and has been canceled." (Tr. 55:4−12, 76:19−77:2, 111:24−112:18; Tr. Ex. 10.)

Rooz's definition of "default" was confirmed by Lucas, who testified based on his forty-five years of experience in the commodities trading industry. (Tr. 128:4−21.) Lucas distinguished between a "breach" and a "default," defining the former as "a technical violation of some provision of the contract," and the latter as a more serious transgression in which "one party either says or acts like he is not going to perform any part of the contract." (Tr. 195:22−23, 196:6−7.) Lucas explained that following standard industry practice, he assumed a default date of December 15, 2014, for purposes of calculating damages. (Tr. 196:25−197:16.)

In response, Washakie argues that New York law requires that damages be measured from the date of "material breach." So, according the Washakie, to the extent the contract requires damages to be calculated on the date of "default" instead of the date of "material breach," the contract contravenes New York law. (*See* Dkt. No. 164-1 at 11−12, 14−17, 18−21.) This argument is unavailing. As an agreement for the sale of goods, the contract is governed by Article 2 of New York's Uniform Commercial Code.[1] *See* N.Y. U.C.C. Law § 2-102. While the UCC provides default remedies to a seller in the case of a buyer's non-acceptance of goods or repudiation of a contract, *see id.* §§ 2-703, 2-706, 2-708, contracting parties may agree to deviate

---

[1] By virtue of a choice-of-law clause in the parties' contract (*see* Tr. Ex. 1 at 4), New York law applies to this dispute, *see Lifetree*, 2015 WL 3948097, at \*6 n.9.

9

from the UCC's default damages provisions. Section 2-719 states that a contract "may provide for remedies in addition to or in substitution for those provided in [Article 2] and may limit or alter the measure of damages recoverable under [Article 2]." *Id.* § 2-719(1)(a). This is precisely what the parties did by incorporating the terms of FOSFA 51, which provides a formula for calculating damages in the case of a "default." The jury was appropriately instructed to apply the contract's terms when determining damages,[2] and the jury reasonably selected, based on the evidence at trial, a default date of December 15, 2014.

### 2. Lucas's Calculations

Next, Washakie challenges various line-items in Lucas's $25.3 million total. Mindful that "the party who has caused the loss may not insist on theoretical perfection," *Entis v. Atlantic Wire & Cable Corp.*, 335 F.2d 759, 763 (2d Cir. 1964), the Court briefly discusses each of Washakie's arguments.

First, Washakie argues that in calculating out-of-pocket damages, Lucas erroneously included losses on 8,500 MT of SME that LifeTree purchased on April 7, 2014 (before finalizing its contract with Washakie) and sold on May 21, 2014 (after the contract was in effect). (*See* Dkt. No. 164-1 at 17.) Washakie offered the testimony of its expert witness, Jess Hewitt, to support this argument. Hewitt testified that, under his interpretation of LifeTree's financial records, "[o]n the same day [LifeTree was] purchasing 8,500 for delivery in June, [it] sold that same volume for delivery in June, so . . . there was no product purchased for the month of June

---

[2] The jury was instructed as follows: "Under New York law, parties may agree by contract on how damages will be calculated in the event of a breach. Parties are free to shape their remedies to their particular requirements. In this case, the various forms of damages available to the plaintiff are set forth in the contract that is the subject of this lawsuit. Therefore, the burden of proof is on the plaintiff to establish the amount of damages it is entitled to under the contract's damages provisions." (Tr. 348:8−15.)

10

whatsoever." (Tr. 270:24−271:2.) In contrast, LifeTree's expert Lucas explained that he believed losses from the April 7 transaction were fairly attributable to Washakie's default because LifeTree "bought goods in anticipation of the sale" to Washakie, and when Washakie "did not open the letter of credit promptly, . . . Lifetree continued to try to find a way . . . to make the thing go forward" by swapping and reducing its quantities of SME. (Tr. 230:3−11.)

After hearing from both experts, the jury apparently credited Lucas over Hewitt. The Court will not disturb that decision.[3]

Second, Washakie argues that Lucas erred in calculating damages based on an initial contract price of $1,015 per metric ton, because $15 of that sum was "payable upon receipt by [Washakie] of the United States tax credit incentive." (*See* Dkt. No. 164-1 at 18; Tr. Ex. 1 at 2.) Washakie correctly points out that "LifeTree presented no evidence" that Washakie did, in fact, receive such a tax credit, or that Washakie would have received such a credit had the SME been delivered. (Dkt. No. 164-1 at 18.) However, Washakie presented no *contrary* evidence, and it failed to cross-examine Lucas on his decision to value the contract at $1,015 per metric ton. Left with no tax-credit-specific evidence on either side of the ledger, the jury apparently relied on

---

[3] On the issue of causation, the jury was instructed as follows: "A party seeking to recover damages must establish causation—that it suffered damages because of the other party's breach. A party can recover damages that are the natural, probable, and foreseeable result of a contract breach. Damages cannot be speculative and they cannot be abstract. To determine whether damages are natural, probable and foreseeable, you must consider what damages the parties contemplated at the time they entered into the contract. . . . If you find that the plaintiff has proven that the defendant caused it to suffer damages, then you must determine the amount that would compensate it. This amount must be reasonably certain and directly traceable to the defendant's breach. Reasonable certainty does not require absolute certainty or mathematical precision. It may be an approximation. But damages may not be merely speculative, or imaginary. Damages must be capable of measurement based upon the reliable evidence before you." (Tr. 347:16−348:7.)

Lucas's expertise and the contract language itself, which stated: "Price: USD 1015.00 per metric ton, duty paid." (Tr. Ex. 1 at 2.) The jury's finding was not unreasonable.

Third, Washakie argues that Lucas "admitted to having calculated damages for the first shipment alone." (Dkt. No. 164-1 at 14.) This claim simply misstates Lucas's testimony: Lucas testified that he calculated out-of-pocket losses for the first shipment based on LifeTree's financial documents and that he calculated lost-profit damages for the second and third shipments based on the FOSFA formula. (*See* 190:20–194:22; 195:3–201:3.)

### 3. Lucas's Demonstrative

Finally, Washakie argues that the Court "improperly allowed into evidence a chart depicting the damages calculated by LifeTree's expert witness . . . for demonstrative purposes." (Dkt. No. 164-1 at 13.) The demonstrative at issue was displayed during Lucas's testimony, and it presented the following information:

**Washakie Default Date: December 15, 2014**

May 2014 Contract - Three SME Shipments - $90 Million

- Three Categories of Damages:

  1. Out of Pocket Damages (FOSFA § 29):
     First Shipment: $7,243,570

  2. Lost Profit Damages (FOSFA § 29):
     First SME shipment: $1,783,200
     Second SME shipment: $7,649,100
     Third SME shipment: $7,649,100

  3. Carrying Cost Damages (FOSFA § 15):
     First SME shipment: $ 412,500
     Second SME shipment: $ 564,000

**LifeTree's Total Damages:** $25,301,470

Washakie argues that the chart misled the jury and "ultimately affected the outcome" because Lucas's testimony did "not corroborate the damages calculations provided in the chart." (Dkt. No. 164-1 at 14.)

But contrary to Washakie's claim, the demonstrative was not admitted into evidence. (*See* Tr. 179:1−14.) During Lucas's testimony the Court instructed the jury:

> You see this document on the screen, this is called a demonstrative exhibit, which is different from ordinary exhibits that come into evidence. A demonstrative exhibit is simply used during a witness' testimony to assist in explaining something to the jury. And that's what this is. So you will not have this in the jury room for your deliberations because it is solely a demonstrative exhibit. . . . [T]he testimony is what is the actual evidence in the case.

(Tr. 193:21−194:11.) In response to Washakie's objection to displaying the demonstrative, the Court directed defense counsel that "insofar as there are differences or problems [with the chart], that is properly the subject of cross-examination." (Tr. 179:11−12.)

The Court reiterates that conclusion here: Because the demonstrative was not admitted into evidence and the jury was clearly instructed as such, Washakie's objections to the chart should have been put to the jury at trial—not to this Court in a post-trial motion. The Court will not disturb the jury's verdict because Washakie failed to persuade the proper audience.[4]

---

[4] The Court notes two mathematical discrepancies between Lucas's testimony and the demonstrative chart, neither of which was raised by Washakie at trial or in its post-trial motion. First, Lucas testified that lost-profit damages were $7.6 million for each of the second and third shipments ($15.2 million total), calculated by subtracting $664.47 (the market price per metric ton on December 15, 2014) from $860 (the adjusted contract price per metric ton) and multiplying the difference by 30,000 MT. That equation returns a result of $5,865,900—short of $7.6 million by about $2 million. Second, Lucas testified that total damages were $25.3 million, composed of three damage subtotals: approximately $7.2 million for actual damages on the first shipment, approximately $15.2 million for lost profits on the second and third shipments, and $976,000 for carrying costs on the first and second shipments. These figures add up to $23,376,500—again, short of $25.3 million by about $2 million.

A review of Lucas's expert report—which, the Court emphasizes, is not admissible evidence and was not presented to the jury—clarifies both discrepancies. Both $2 million

13

B.  **Legal Limits on Damages**

Even if the jury's factual findings were reasonable, New York law imposes legal limits on some types of damage claims. Washakie raises two such legal grounds in support of its motion for judgment as a matter of law.

1.  **Unenforceable Penalty**

First, Washakie argues that because the parties' contract assigned financial responsibility for delivery to LifeTree, carrying costs "do not bear reasonable relationship to the damages expected to result from [a] breach" and are therefore an unenforceable penalty. (Dkt. No. 164-1 at 19.) UCC § 2-718 states:

> Damages for breach . . . may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

N.Y. U.C.C. Law § 2-718(1).

---

deficits are attributable to the same figure: "gross trading margins." Lucas testified at trial that he subtracted a variety of figures from the nominal contract price of $1,015 to arrive at an effective contract price of $860. (*See* Tr. 198:9–200:6.) Most of his subtractions cover categories of expenses that LifeTree saved by not delivering the SME—e.g., shipping costs, import duties, and so on. Lucas testified, however, that he also excluded "gross margins," which he described as "what's left over after you take off all those costs from the original price and . . . the cost [of] your goods"—in short, profit. (Tr. 199:24–200:3.) In other words, the $195.53 per-metric-ton difference between $860 and $664.47 *excludes* LifeTree's per-metric-ton anticipated profit. Lucas's expert report and trial demonstrative—again, neither admitted into evidence—assign gross trading margins a value of approximately $60 per metric ton—just under $2 million per 30,000 MT shipment. (*See* Dkt. No. 72-8 ¶ 42.)

Thus, although Lucas *excluded* "gross trading margins" from his calculation of market-price-minus-contract-price (a difference of $195.53), he *added* gross trading margins back into his calculation of damages for each of the three shipments. In substance, this means that Lucas failed to explain the source of $5,349,600 in his overall damages calculation of $25,301,470. The Court concludes, however, that—especially in the absence of cross-examination on these subjects—the jury's acceptance of Lucas's $25.3 bottom-line figure was neither unreasonable nor egregious.

14

Washakie's argument misses the boat. It is true that Washakie would not have paid for shipping costs had the contract been performed. But carrying costs are not an estimate of shipping costs; rather, they are the costs of continuing to hold material after the buyer should have taken possession. As Lucas explained, "in the commodities business, it is commonly understood that carrying charges are a type of liquidated damages because when a buyer does not pick up the goods, there are so many scenarios of how the seller might be damaged, of things he would have to pay for, [for example] storage [and] railcar demurrage." (Tr. 222:19−24.) Lucas further testified that calculating actual carrying costs "is messy and just terrible, so people agree [to] pick a number . . . that's about right to cover most of the damages." (Tr. 222:24−223:3.)

As the Court previously held in denying Washakie's pre-verdict motion on this issue, "the carrying costs, which are very clearly set forth in the agreement, were a reasonable rather than punitive estimate" of damages. (Tr. 307:12−15.) FOSFA 51's carrying costs represent "an amount which is reasonable in the light of" both the anticipated harm caused by delayed delivery and the difficulties in calculating such a loss. *See* N.Y. U.C.C. Law § 2-718(1). Furthermore, because carrying charges in this case comprised less than $1 million of a $25.3 award, the Court concludes that the charges are also "reasonable in the light of . . . actual harm caused" by Washakie's failure to perform. *Id.*

### 2. Duty To Mitigate

Second, Washakie argues that LifeTree failed to mitigate its damages.

"Under New York law, the party that is injured by a breach of contract has 'the duty of making reasonable exertions to minimize the injury.'" *Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 402 (S.D.N.Y. 2014) (quoting *Holy Properties Ltd., L.P. v. Kenneth Cole Prods., Inc.*, 87 N.Y.2d 130 (1995)), *aff'd sub nom. APEX Employee Wellness Servs., Inc. v. APS Healthcare Bethesda, Inc.*, No. 14-3191, 2018 WL 672419 (2d Cir. Feb. 1,

15

2018). "Nonetheless, . . . it is not required that the injured party *actually* mitigate its damages. Rather, 'if plaintiff takes such [mitigating] action within the range of reason,' the breaching party remains liable if such reasonable attempts at mitigation fail." *APL Co. PTE v. Blue Water Shipping U.S. Inc.*, 592 F.3d 108, 111 (2d Cir. 2010) (second alteration in original) (quoting *Ellerman Lines, Ltd. v. The Steamship President Harding*, 288 F.2d 288, 290 (2d Cir. 1961)). Failure to mitigate is an affirmative defense, and therefore Washakie "bore the burden of introducing evidence to prove that [LifeTree] could have lessened [its] damages." *Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985).

At trial, Rooz testified that in June 2014, LifeTree reduced its SME position from 30,000 MT to 22,000 MT in an effort "to mitigate [its] costs." (Tr. 75:14−23.) Katz explained that the decision to sell 8,000 MT—about a third of the first shipment—"was a calculated decision" that balanced the need to minimize damages against the risk that Washakie would open a letter of credit and demand delivery of all 30,000 MT. (Tr. 135:2−137:4.) Lucas testified that LifeTree's 8,000 MT sale did, in fact, reduce LifeTree's out-of-pocket costs, and he concluded that LifeTree "acted more than appropriately" in mitigating its damages. (Tr. 202:19−203:9.) From this evidence, the jury could have reasonably concluded that LifeTree's efforts to minimize its losses fell within the "range of reason."

In response, Washakie argues that because "LifeTree has admitted to mitigating at least some of its damages, LifeTree was also obligated to mitigate all damages"—to wit, lost profits on the second and third shipments. (Dkt. No. 164-1 at 22−23.) But this argument fails to appreciate the nature of FOSFA's lost-profits provision. Paragraph 29 limits lost-profit damages to "the difference between the contract price and the actual or estimated market price on the day of default." (Tr. Ex. 1 at 8.) In substance, Paragraph 29 presumes that the non-defaulting party

16

will mitigate by selling the contracted-for quantity at the market price on the day of default. Therefore, contrary to Washakie's claim, there was nothing more for LifeTree to mitigate with respect to its lost-profit damages.[5]

## IV. Conclusion

For the foregoing reasons, Washakie's motion for judgment as a matter of law or for a new trial is DENIED.

The Clerk of Court is directed to close the motion at Docket Number 164.

SO ORDERED.

Dated: May 14, 2018
       New York, New York

_____
J. PAUL OETKEN
United States District Judge

---

[5] Furthermore, "[m]itigation of damages is not relevant when there is a valid liquidated damages clause." *Delvecchio v. Bayside Chrysler Plymouth Jeep Eagle, Inc.*, 706 N.Y.S.2d 724, 727 (App. Div. 2d Dept. 2000). LifeTree is entitled to calculate lost-profit damages based on the parties' contractual formula.